# **EXHIBIT 1**



# ARBITRATION INSTITUTE
### OF THE STOCKHOLM CHAMBER OF COMMERCE

Box 16050, 103 21 Stockholm, Sweden
Phone: +46 8 555 100 00, E-mail: arbitration@chamber.se
https://sccinstitute.com/

### FINAL AWARD

Made on 24 October 2022
The seat of arbitration is Stockholm, Sweden
Arbitration No.: 2017/194

| | |
|---|---|
| **Claimant**: | TRIODOS SICAV II |
| | 11-13 Boulevard de la Foire |
| | 1528 Luxembourg |
| | Registration number B115771 |
| **Claimant's counsel**: | King & Spalding LLP |
| | Gómez-Acebo & Pombo |
| **Respondent**: | KINGDOM OF SPAIN |
| **Respondent's counsel**: | Abogacía General del Estado |
| | Dirección del Servicio Jurídico del Estado |
| **Arbitral Tribunal:** | Alejandro A. Escobar |
| | Baker Botts (UK) LLP |
| | Level 30, 20 Fenchurch Street, London, UK |
| | |
| | Oscar M. Garibaldi |
| | 809 Wincrest Place, Great Falls, VA, USA |
| | |
| | Christophe Bondy |
| | Steptoe & Johnson LLP |
| | 5 Aldermanbury Square, London UK |

# TABLE OF CONTENTS

I.    THE DISPUTE, THE PARTIES AND THEIR COUNSEL ........................................... 1

    A.    The Dispute ..................................................................................................... 1

    B.    The Claimant ................................................................................................... 1

    C.    The Respondent ............................................................................................... 1

    D.    Intervention of the European Commission as a *non-disputing party* ................... 2

II.   PROCEDURAL HISTORY ............................................................................................. 2

    A.    Commencement of the Arbitration and Constitution of the Tribunal .................... 2

    B.    First Procedural Conference and Procedural Order No. 1 ...................................... 4

    C.    Pleadings and Production of Documents ........................................................... 5

    D.    The Hearing and Post-Hearing Submissions ...................................................... 11

III.  FACTUAL BACKGROUND ......................................................................................... 19

    A.    Overview ........................................................................................................ 19

    B.    The Regulatory Framework Prior to the Claimant's Investments ...................... 22

        1.    The Hierarchy of Regulatory Measures Under Spanish Law ..................... 22

        2.    The Evolution of Spain's Regulatory Framework Prior to the Disputed
            Measures ................................................................................................. 23

            (i)    Law 54/1997 ................................................................................. 23

            (ii)   The Plan for the Promotion of Renewable Energies in Spain 2000-
                2010 ("1999 PER") ........................................................................ 24

            (iii)  Royal Decree 436/2004 ("RD 436/2004") ..................................... 24

            (iv)   The Plan for the Promotion of Renewable Energies in Spain 2005-
                2010 ("2005 PER") ....................................................................... 26

            (v)    Royal Decree 661/2007 ................................................................ 26

            (vi)   Royal Decree 1578/2008 ............................................................... 29

            (vii)  Spain's Photovoltaic Capacity Following RD 661/2007 ................. 29

    C.    The Claimant's Investments ............................................................................. 29

    D.    Strains on the Regulatory Framework Leading Up to the Dispute ...................... 30

    E.    The Disputed Measures ................................................................................... 32

        1.    Royal Decree 1565/2010 ............................................................................. 32

        2.    Royal Decree-Law 14/2010 ......................................................................... 33

        3.    Law 15/2012 ............................................................................................... 33

        4.    Royal-Decree Law 2/2013 ........................................................................... 33

        5.    Royal Decree-Law 9/2013 ........................................................................... 33

         6.    Law 24/2103, Royal Decree 413/2014 and MO IET/1045/2017 ................. 35

    F.    The European Commission's Decision of 10 November 2017 ............................ 37

IV.   JURISDICTION ............................................................................................................ 37

A.  Introduction ................................................................................................ 37

B.  The Respondent's Objections to Jurisdiction........................................... 37

C.  The Intra-EU Objections ........................................................................ 38

    1.  The Respondent's Position ................................................................ 38

        (i)  EU law is applicable to the present dispute ...................... 38

        (ii)  The decision in *Achmea* embraces the present case.......... 39

        (iii)  An effective interpretation of the ECT upholds the lack of consent for intra-EU arbitration .................................................................. 44

        (iv)  The "*disconnection"* of EU law from international treaties ............. 47

    2.  The Claimant's Position ................................................................. 49

        (i)  EU law is not applicable to the present dispute ................. 49

        (ii)  The decision in *Achmea* does not embrace the present case............. 50

        (iii)  The interpretation of the ECT does not uphold a lack of consent for intra-EU arbitration ................................................................. 54

        (iv)  A disconnection clause is not *'unnecessary'* ................... 55

    3.  The submission by the European Commission ........................... 56

        (i)  Whether Article 26 of the ECT applies to a dispute between a Contracting Party and an Investor of a Contracting Party where both Contracting Parties are EU Members................................ 57

        (ii)  Whether and to what extent the rules of EU law on State aid are relevant to the interpretation of the substantive provisions of Part III of the ECT, including Article 16 of the ECT .................... 59

    4.  The Tribunal's Analysis ................................................................ 60

D.  The Taxation Measure Objection ........................................................... 69

    1.  The Respondent's Position ............................................................ 69

    2.  The Claimant's Position ................................................................. 72

    3.  The Tribunal's Analysis ................................................................ 74

V.  LIABILITY ...................................................................................................... 76

A.  Introduction ................................................................................................ 76

B.  The Claimant's Position on Liability ...................................................... 76

    1.  Applicable Law .............................................................................. 76

    2.  Violation of standards of protection under the ECT..................... 79

    3.  The Respondent breached its obligation to provide FET ............ 79

        (i)  Violation of the Claimant's Legitimate Expectations of Fixed Feed-in Tariffs for its Photovoltaic Facilities.................... 80

        (ii)  Fundamental Changes to the Incentives Regime ............... 88

        (iii)  The Respondent failed to treat the Claimant's investments transparently and consistently ............................................ 90

4.    The Respondent Impaired the Claimant's investments through Unreasonable or Discriminatory Measures ................................. 94

5.    The Respondent violated the Umbrella Clause of the ECT ........................ 98

6.    The Respondent cannot invoke the Defence of Necessity under International Law ....................................................................... 101

    (i)    The Respondent enacted its Electricity Sector Reforms to address the tariff deficit it had ignored since 2000 ............................. 101

    (ii)    No authority has independently concluded that a State of Necessity excused the Respondent's changes to RD 661/2007 and RD 1578/2008 ....................................................................... 103

    (iii)    The Respondent has not, and cannot, establish a defence of necessity under international law .............................................. 103

C.    The Respondent's Position on Liability .............................................. 104

1.    Applicable Law ................................................................... 104

2.    No Violation of the Standards of Protection under the ECT ..................... 108

    (i)    Objective and purpose of the ECT: To grant a foreign investor national or non-discriminatory treatment ........................................ 108

    (ii)    The ECT does not prevent justified Macroeconomic Control Measures from being adopted .......................................... 111

3.    The Respondent respected the Standard of FET under Article 10(1) of the ECT .......................................................................... 114

    (i)    The Respondent has not breached the Legitimate Expectations of the Claimant ...................................................................... 116

    (ii)    The conduct of the Respondent was transparent ............................. 131

    (iii)    The measures taken by the Respondent were reasonable and proportionate and they do not constitute any impairment for the Claimant's investments .................................................. 132

4.    The Respondent did not Impair the Claimant's investment through Unreasonable or Discriminatory Measures ................................. 136

5.    The Respondent has not breached any obligations undertaken regarding the Claimant's investment (Umbrella Clause) ................................. 136

    (i)    The interpretation made by the Claimant contradicts the literal sense of Article 10(1) of the ECT and the interpretation thereof by doctrine and arbitral precedents .................................................. 136

6.    The Respondent has not invoked the Defence of Necessity under International Law ....................................................................... 139

D.    The Tribunal's Analysis ................................................................ 140

1.    The Applicable Law ................................................................ 140

2.    Fair and Equitable Treatment ...................................................... 142

3.    Impairment through Unreasonable or Discriminatory Measures ............. 161

4.    The Umbrella Clause ............................................................... 162

|  |  | 5. | Necessity as a Circumstance Excluding Wrongfulness | 163 |

VI. THE BASES AND THE QUANTUM OF DAMAGES ............................................. 163

A. The Claimant's Position ............................................................................. 164

    1. The Principles and Appropriate Method of Valuation ............... 164

    2. DCF Method ............................................................................... 164

    3. The Appropriate Date of Valuation ............................................ 164

    4. Alternative Methods ................................................................... 165

    5. The Calculation of Quantum ...................................................... 166

    6. Interest ........................................................................................ 168

B. The Respondent's Position ........................................................................ 168

    1. The Principles and Appropriate Method of Valuation ............... 168

    2. DCF Method ............................................................................... 169

    3. Alternative Methods ................................................................... 170

    4. The Appropriate Date of Valuation ............................................ 171

    5. The Calculation of Quantum ...................................................... 171

    6. Interest ........................................................................................ 172

C. The Tribunal's Analysis ............................................................................ 173

    1. The Principles and Appropriate Method of Valuation ............... 173

    2. DCF Method ............................................................................... 173

    3. Alternative Methods and Calculations ....................................... 175

    4. The Appropriate Date of Valuation ............................................ 175

    5. The Calculation of Quantum ...................................................... 177

    6. Interest ........................................................................................ 178

VII. APPORTIONMENT OF THE COSTS OF THE PROCEEDING .............................. 179

A. The Claimant's Request for Costs ............................................................. 180

B. The Respondent's Request for Costs ......................................................... 180

C. The Tribunal's Analysis and Decision on Costs ....................................... 180

VIII. THE ARBITRAL TRIBUNAL'S DECISION ........................................................... 181

## I.    THE DISPUTE, THE PARTIES AND THEIR COUNSEL

### A.    The Dispute

1.    This case concerns a dispute submitted to arbitration under the 2017 Arbitration Rules of the Arbitration Institute of the Stockholm Chamber of Commerce (the "**SCC Rules**") on the basis of the Energy Charter Treaty (the "**ECT**"), which entered into force on 16 April 1998 for the Grand Duchy of Luxembourg and the Kingdom of Spain.

2.    The dispute concerns certain measures adopted by the Kingdom of Spain which allegedly affected the legal framework of renewable energies and allegedly impacted the investments of the Claimant in the photovoltaic sector.

### B.    The Claimant

3.    The Claimant in this arbitration is TRIODOS SICAV II ("**Triodos**" or the "**Claimant**"), an open-ended investment fund, duly formed under the laws of the Grand Duchy of Luxembourg and listed in the Luxembourg Commercial Register under registration number B115771. The Claimant filed this arbitration on behalf of one of three sub-funds, Triodos Renewables Europe Fund ("**TREF**"), whose identification number in the Luxembourg Financial Sector Supervisory Commission is 4213-01. The corporate address of the Claimant is at 11-13 Boulevard de la Foire, 1528 Luxembourg.

4.    The Claimant was represented by Mr. Kenneth R. Fleuriet, Ms. Amy Roebuck Frey, Ms. Héloïse Hervé, Ms. Isabel San Martín (until 17 September 2021), Mr. Reginald R. Smith, Mr. Kevin D. Mohr, and Ms. Violeta Valicenti of King & Spalding LLP, and by Ms. Verónica Romaní Sancho, Mr. Gonzalo Ardila Bermejo (until 29 March 2021), Mr. Luis Gil Bueno, Ms. Inés Vázquez García, Ms. Inés Puig-Samper, Ms. Cristina Matia, Ms. Teresa Gutiérrez, and Ms. Celia Altable of Gómez-Acebo & Pombo.

### C.    The Respondent

5.    The Respondent in this arbitration is the Kingdom of Spain ("**Spain**" or the "**Respondent**"). The contact details of the Respondent, for the purposes of this arbitration, are as follows: Abogacía General del Estado, Dirección del Servicio Jurídico del Estado, Calle Ayala nº 5, 28001 Madrid, Spain.

6.    The Respondent was represented by Mr. Diego Santacruz, Mr. Antolín Fernández, Mr. Roberto Fernández, Ms. Patricia Froehlingsdorf, Ms. Mónica Moraleda, Ms. Amaia Rivas, Mr. Pablo Elena Abad (all the foregoing until 12 June 2019), Ms. Elena Oñoro,

Ms. María José Ruiz Sánchez, Ms. Gloria de la Guarda Limeres, Ms. Ana María Rodríguez, Mr. Alberto Torró Molés, Mr. Rafael Gil Nievas, Mr. José Manuel Gutiérrez Delgado, Ms. Alicia Segovia Marco, Ms. Gabriela Cerdeiras Megias, Ms. Lourdes Martínez de Victoria Gómez, Ms. Lorena Fatás Pérez and Ms. Ana Fernández-Daza Álvarez.

### D.    Intervention of the European Commission as a *non-disputing party*

7.    On 25 January 2019, the Tribunal issued Procedural Order No. 2, by which it granted the European Commission's application to intervene in the present arbitration as a *non-disputing party*, in the terms and conditions set out at Section 3.8 of Procedural Order No. 2. The contact details of the European Commission, for the purposes of this arbitration, are as follows: Legal Service of the European Commission, Greffe Contentieux, BERL 1/169, 1049 Brussels.

8.    The European Commission was represented by Mr. Nicolaj Kuplewatzky, Ms. Petra Nemeckova, Mr. Luigi Malferrari and Mr. Tim Maxian Rusche, Members of its Legal Service, as Agents.

## II.    PROCEDURAL HISTORY

### A.    Commencement of the Arbitration and Constitution of the Tribunal

9.    On 21 December 2017, the Claimant submitted its Request for Arbitration pursuant to Article 26(4)(c) of the ECT and Article 6 of the SCC Rules. On the basis of Articles 16 and 17 of the SCC Rules, and in view of the size and complexity of the case, the Claimant proposed that the Tribunal was constituted with three arbitrators. It appointed Mr. Oscar M. Garibaldi as an arbitrator. It then proposed that the President of the Tribunal were selected by the two party-appointed arbitrators, with the agreement of the Parties. It additionally proposed English as the procedural language and Stockholm, Sweden, as the seat of the arbitration.

10.    On 29 January 2018, the Respondent submitted its Answer to the Request for Arbitration. It agreed with the Claimant's proposal that the Tribunal be constituted with three arbitrators. It disagreed, however, with the methodology proposed by the Claimant for the appointment of the President of the Tribunal. It rather submitted a counterproposal, which consisted of the appointment of the President through an exchange of lists of candidates between the Parties (the "list procedure"). It also considered that the President had to be able to use Spanish as a working language. It

further rejected the Claimant's proposals regarding the procedural language and the seat of the arbitration. It proposed, instead, Spanish to be the procedural language and Paris, France, to be the seat of the arbitration.

11.    On 31 January 2018, Mr. Oscar M. Garibaldi accepted its appointment, by the Claimant, to serve as an arbitrator.

12.    On 1 February 2018, the Arbitration Institute of the Stockholm Chamber of Commerce (the "**SCC**") requested the Respondent to inform the name of its appointed arbitrator by 7 February 2018. It also requested the Parties to agree on the procedure for the appointment of the President of the Tribunal, and to notify the SCC thereupon, by 10 February 2018.

13.    On 6 February 2018, the Claimant submitted its comments to the Respondent's Answer to the Request for Arbitration. It accepted the list procedure proposed by the Respondent for the appointment of the President of the Tribunal. It disagreed, however, with the Respondent's position that the President had to be able to use Spanish as a working language. It further rejected the Respondent's proposal regarding the seat of the arbitration.

14.    On 7 February 2018, the Respondent informed the SCC that it appointed Mr. Christophe Bondy as an arbitrator.

15.    On 8 February 2018, the Respondent submitted a letter to the SCC, by which it reiterated its position that the President of the Tribunal had to be able to use Spanish as a working language. On the other hand, it accepted the Claimant's proposal to designate Stockholm as the seat of the arbitration.

16.    On 8 February 2018, Mr. Christophe Bondy accepted its appointment, by the Respondent, to serve as an arbitrator.

17.    On 24 April 2018, the SCC confirmed that Mr. Alejandro Escobar was appointed as President of the Tribunal, via the list procedure previously agreed by the Parties. Mr. Escobar accepted its appointment on 18 April 2018.

18.    On 19 August 2020, the SCC Board dismissed a request for the disqualification of the President of the Tribunal which was submitted by the Respondent. The reasons for the decision of the SCC Board were notified to the Parties and the arbitrators the following day.

## B.    First Procedural Conference and Procedural Order No. 1

19.    On 27 April 2018, the Tribunal confirmed to the Parties that it had received the referral of the case from the SCC.

20.    On 8 May 2018, following consultation, the Tribunal invited the Parties to hold the First Procedural Conference by telephone conference on 12 June 2018. To that end, the Tribunal proposed and sent to the Parties a draft Procedural Order No. 1.

21.    On 6 June 2018, the Parties submitted to the Tribunal their agreed draft Procedural Order No. 1. They noted their points of disagreement on the draft.

22.    On 12 June 2018, the First Procedural Conference was held by telephone.

23.    On 15 June 2018, the Tribunal issued Procedural Order No. 1. It provided that the seat of the arbitration was fixed at Stockholm, Sweden; that the Tribunal shall decide the issues in dispute in accordance with the ECT and applicable rules and principles of international law; that the arbitration shall be governed by the SCC Rules, except as modified by the provisions of Article 26 of the ECT; that the Tribunal's communications, procedural orders, and other decisions could be issued in either English or Spanish, and that its award or awards shall be issued in both English and Spanish; that the Parties could submit written communications, pleadings or other submissions, fact witness statements, and expert reports in either English or Spanish; and that oral proceedings shall be conducted in English or Spanish. Procedural Order No. 1 also set out the Procedural Calendar and noted the Parties agreement that this was to amend and replace the time limit for making the final award provided by Article 43 of the SCC Rules.

24.    On 28 September 2018, the Tribunal approved an agreement by the Parties to extend the time limit for the submission of the Claimant's Statement of Claim by one week, until 12 October 2018. The Tribunal invited the Parties to seek further agreement on the adjusted dates for the subsequent submissions.

25.    On 2 October 2018, the Tribunal wrote to the SCC and requested an extension of the time limit for rendering the Final Award, which was set for 25 October 2018. The reasons for the request, as set out in the Tribunal's letter, referred to the Procedural Calendar agreed with the Parties. The Procedural Calendar provided for the Hearing on the Merits to take place within 24 months from the date of the First Procedural Conference, and for the Tribunal to render its Final Award within approximately six

months from the likely date of the last submission of the Parties.

26.    On 8 October 2018, the SCC granted the Tribunal's request, after it had given the Parties an opportunity to submit their comments. The time limit for rendering the Final Award was extended until 1 February 2021.

27.    On 6 January 2021, the Tribunal wrote to the SCC and requested a second extension of the time limit for rendering the Final Award. The reasons for the request, as set out in the Tribunal's letter, referred to the rescheduling of the Hearing on the Merits, following the Respondent's request for disqualification of the President of the Tribunal.

28.    On 8 October 2018, the SCC granted the Tribunal's request, after it had given the Parties an opportunity to submit their comments. The time limit for rendering the Final Award was extended until 30 November 2021.

29.    On 22 November 2021, the Tribunal wrote to the SCC and requested a third extension of the time limit for rendering the Final Award.

30.    On 30 November 2021, the SCC granted the Tribunal's request, after it had given the Parties an opportunity to submit their comments. The SCC extended the time limit for rendering the Final Award until 31 March 2022.

31.    On 29 March 2022, the SCC extended the time limit for rendering the Final Award until 30 September 2022.

32.    On 28 September 2022, the SCC extended the time limit for rendering the Final Award until 14 October 2022; and then until 21 October 2022.

### C.    Pleadings and Production of Documents

33.    On 12 October 2018, the Claimant submitted its Statement of Claim,[1] along with supporting lists of exhibits and legal authorities, witness statements, and regulatory and quantum expert reports.

34.    On 15 November 2018, the European Commission submitted an Application for Leave to Intervene as a Non-Disputing Party.[2] It sought authorization from the Tribunal to intervene in the arbitration in order to comment on two points:

---

[1]    Claimant's Statement of Claim, dated 12 October 2018 and submitted on the same day.
[2]    European Commission's Application for Leave to Intervene as a Non-Disputing Party, dated 9 November 2018 and submitted on 15 November 2018.

(a)    Article 26 of the Energy Charter Treaty does not apply intra-EU, so that the Arbitral Tribunal lacks jurisdiction; and

(b)    European Union law on State aid is relevant as a matter of law for the interpretation of the substantive investment protection provisions of the Energy Charter Treaty and precludes in the present case the awards of damages against Spain.[3]

35.    The application of the European Commission relied on the general power of the Tribunal to allow intervention by a third party, rather than on any specific rule. It also requested that the Tribunal:

> *... allow the Commission access to the documents filed in the case, to the extent necessary for its intervention in the proceedings'[4] and 'allow the Commission to attend hearings in order to present oral argument and reply to the questions of [the Tribunal] at those hearings, should the Tribunal and the parties deem that useful.[5]*

36.    On 22 November 2018, the Tribunal transmitted to the Parties the application submitted by the European Commission and invited them to comment on the procedural implications of such application.

37.    On 7 December 2018, the Parties submitted their comments.

38.    The Claimant opposed to the application submitted by the European Commission and asked the Tribunal to deny it on three grounds, with reference to Article 3(3), Annex III, of the SCC Rules. *First*, that the European Commission's intervention would not assist the Tribunal by offering a perspective, particular knowledge or insight that was distinct from or broader than that of the Respondent and which the Respondent could not advance for itself. *Secondly*, that the European Commission did not have a valid, significant interest in the proceeding but only a political and self-serving interest. *Thirdly*, that the intervention of the European Commission was premature since the Respondent had not yet raised objections to jurisdiction or contested liability.[6]

39.    In the event that the Tribunal accepted the application submitted by the European Commission, the Claimant asked the Tribunal to implement certain restrictions that, in

---

3  European Commission's Application for Leave to Intervene as a Non-Disputing Party, ¶ 26.
4  European Commission's Application for Leave to Intervene as a Non-Disputing Party, ¶ 61(iii).
5  European Commission's Application for Leave to Intervene as a Non-Disputing Party, ¶ 61(iv).
6  Claimant's Response to the European Commission's Application for Leave to Intervene as a Non-Disputing Party, dated 7 December 2018 and submitted on the same day, pp. 3-7.

the Claimant's view, were necessary to protect its rights. Those restrictions included the following:

(i)    Limiting the Commission's involvement to a single submission that is narrow in scope and length and that would be filed immediately, so as to avoid delaying the procedural calendar;

(ii)   providing Claimant ample opportunity to respond in accordance with SCC Rules Appendix III Article 3(8);

(iii)  rejecting the Commission's request to attend any hearing that is a part of this proceeding;

(iv)   rejecting the Commission's request to have access to the case file; and

(v)    requiring the Commission to post security for the additional costs imposed upon the Claimant as a result of the Commission's intervention in accordance with SCC Rules Appendix III Article 3(10).[7]

40.    The Respondent supported the application submitted by the European Commission. It relied on Article 19 of the 2010 SCC Rules and, as guidance, on Article 37(2) of the ICSID Arbitration Rules.[8] It stated that "*the Commission should be allowed to endow the Tribunal with all its special knowledge on the issue without limitation*,"[9] but conceded that the Tribunal could direct the European Commission to file a single submission followed by comments by the Parties.[10] The Respondent also supported the granting of access to the European Commission to all documents in the proceeding and its intervention at the hearing.[11]

41.    On 25 January 2019, the Tribunal issued Procedural Order No. 2. It granted the application of the European Commission under Article 4(1), Appendix III, of the SCC Rules in the terms and conditions set out at Section 3.8 of Procedural Order No. 2.[12]

---

7   Claimant's Response to the European Commission's Application for Leave to Intervene as a Non-Disputing Party, p. 9.
8   Respondent's Observations Regarding the European Commission's Request to Intervene as a Non-Disputing Party, dated 7 December 2018 and submitted on the same day, ¶¶ 10, 14.
9   Respondent's Observations Regarding the European Commission's Request to Intervene as a Non-Disputing Party, ¶ 38.
10  Respondent's Observations Regarding the European Commission's Request to Intervene as a Non-Disputing Party, ¶¶ 39, 42.
11  Respondent's Observations Regarding the European Commission's Request to Intervene as a Non-Disputing Party, ¶¶ 40, 41.
12  Procedural Order No. 2, issued by the Tribunal on 25 January 2019, Section 4.

42. Procedural Order No. 2 established, *inter alia*, that the submission by the European Commission shall contain a precise statement of its positions on the following issues of treaty interpretation, to the extent they were material to the outcome of the case:

    (i) Whether Article 26 of the ECT applies to a dispute between a Contracting Party and an Investor of a Contracting Party where both Contracting Parties are EU Member States; and

    (ii) Whether and to what extent the rules of EU law on State aid are relevant to the interpretation of the substantive provisions of Part III of the ECT, including Article 16 of the ECT.[13]

43. Procedural Order No. 2 also provided that the statement of the European Commission shall deal only with the scope and meaning of the provisions of the ECT, and that the European Commission shall refrain from making arguments with respect to the existence or extent of liability of any of the Parties.[14]

44. The Tribunal denied, however, the application of the European Commission under Article 4(2), Appendix III, of the SCC Rules in the terms and conditions set out at Sections 3.9 to 3.13 of Procedural Order No. 2. It also denied to the European Commission access to any of the supporting evidence or documentation in the proceeding, other than the redacted Memorial and Counter-Memorial. The Tribunal further reserved its decision on whether to permit the European Commission to attend the hearing or any part of it.[15]

45. On 5 February 2019, the Tribunal approved an amendment to the Procedural Calendar which had been jointly communicated by the Parties. The time limit for the submission of the Respondent's Counter-Memorial was extended until 2 April 2019. The Document Production Phase was adjusted to commence on 17 April 2019, and to conclude on 5 August 2019.

46. On 12 February 2019, the Respondent submitted a letter to the Tribunal. It informed that the Claimant had sold two of the photovoltaic plants which were subject of its claim in the present arbitration. The Respondent considered that the conditions of the sale and the profits allegedly obtained were decisive, at least, for the clarification of the

---

13 Procedural Order No. 2, Section 3.8.3.
14 Procedural Order No. 2, Section 3.8.4.
15 Procedural Order No. 2, Section 4.

legitimate expectations of the Claimant in the present arbitration, and for the correct fixing of the quantum, if any. The Respondent requested that the Tribunal order the Claimant to clarify the sale and its scope, and, if applicable, to submit all related documentation. The Respondent also requested the suspension of the time limit for the submission of its Counter-Memorial.

47.    On the same day, the Tribunal invited the Claimant to submit its comments on the Respondent's letter.

48.    On 20 February 2019, the Claimant submitted its formal response to the Respondent's letter of 12 February 2019. The Claimant concurred with the Respondent that the disclosure of *some* documents related to the sale of the photovoltaic plants could be appropriate. It, however, disagreed with the contention that the Procedural Calendar should be modified. The Claimant suggested, instead, a procedure for the disposition of the Respondent's request for disclosure.

49.    On 25 February 2019, the Tribunal issued directions to the Parties regarding the Respondent's request for disclosure. The Claimant would immediately disclose to the Respondent the documents identified by the Tribunal, upon an appropriate undertaking of confidentiality by the Respondent. The Tribunal invited the Parties to agree on the terms of, and to execute, such undertaking by 4 March 2019. Requests for production or for disclosure of other documents were to be made in accordance with Procedural Order No. 1 and the steps foreseen in the Procedural Calendar.

50.    On 7 March 2019, the Respondent informed the Tribunal that it agreed to the confidentiality undertaking proposed by the Claimant and that, consequently, the Claimant proceeded with the disclosure. In addition, the Parties informed the Tribunal of their agreement to extend the time limits for the submission of the Respondent's Counter-Memorial on the Merits, until 12 April 2019, and of the Parties' Requests for production, until 26 April 2019.

51.    On 8 March 2019, the Tribunal confirmed the Parties' agreed changes to the Procedural Calendar.

52.    On 12 April 2019, the Respondent submitted its Counter-Memorial on the Merits and Memorial on Jurisdictional Objections,[16] along with supporting lists of factual exhibits

---

[16]  Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, dated 12 April 2019 and submitted on the same day.

and legal authorities, and an expert report.

53.    On 12 June 2019, in accordance with the Procedural Calendar, the Parties submitted their respective Requests to Produce Documents, in the format of the Model Redfern Schedule for Document Requests adopted as Annex 2 of Procedural Order No. 1.

54.    On 19 June 2019, in accordance with Section 3.8.6 (iii) of Procedural Order No. 2, the Parties transmitted to the Tribunal the redacted versions of their Pleadings, as agreed between them, to be transmitted to the European Commission.

55.    On 10 July 2019, the Tribunal issued Procedural Order No. 3. It decided on the Parties' respective Requests to Produce Documents. The decisions on the Claimant's requests were set out in the Redfern Schedule at Annex I of Procedural Order No. 3. The decisions on the Respondent's requests were set out in the Redfern Schedule at Annex II of Procedural Order No. 3.

56.    On 9 August 2019, the European Commission submitted its Observations as a Non-Disputing Party.[17]

57.    On 25 October 2019, the Claimant submitted its Reply on the Merits and Counter-Memorial on Jurisdiction,[18] along with supporting factual exhibits and legal authorities, a rebuttal regulatory expert report and a rebuttal quantum expert report.

58.    On 10 February 2020, the Respondent submitted its Rejoinder on the Merits and Reply on Jurisdictional Objections,[19] along with supporting lists of factual exhibits and legal authorities, and a quantum expert report.

59.    On 24 February 2020, the Respondent submitted the English version of an expert legal opinion by Professor Marcos Vaquer Caballería (the "**Vaquer Report**").[20]

60.    On 25 February 2020, the Claimant wrote to the Tribunal and asked it to direct the Respondent to clarify the status of the Vaquer Report in the proceeding.

---

[17]    European Commission's Observations as a Non-Disputing Party, dated 9 August 2019 and submitted on the same day.

[18]    Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, dated 25 October 2019 and submitted on the same day.

[19]    Respondent's Rejoinder on the Merits and Reply on Jurisdictional Objections, dated 10 February 2020 and submitted on the same day.

[20]    Marcos Vaquer Caballería, "Legal Opinion on the Legality and Foreseeability of Regulatory Changes in Remuneration for Renewable Energy Under Spanish Law", dated January 2020, submitted by the Respondent on 24 February 2020.

61.    On the same day, the Respondent wrote to the Tribunal and explained that if the Spanish version of the Vaquer Report was not attached to its Rejoinder on the Merits and Reply on Jurisdiction was due to a "clerical error". It stated that such error did not affect the admission of the document, as said document was quoted several times in its Rejoinder on the Merits and Reply on Jurisdiction.

62.    On 4 March 2020, the Claimant submitted its comments on the Vaquer Report at the Tribunal's direction. It objected to the timeliness and the scope of the Vaquer Report and requested that the Tribunal rejected it and instructed that it not was not to be relied upon in the proceeding.

63.    On the same day, the Respondent submitted its response to the Claimant's comments of 4 March 2020. It pointed out, *inter alia*, that paragraph 53 of its Rejoinder on the Merits and Reply on Jurisdictional Objections expressly referred to the Vaquer Report as part of the submission, and that several other paragraphs quoted passages from the Vaquer Report.

64.    On 25 March 2020, the Claimant submitted its Rejoinder on Jurisdiction,[21] along with supporting lists of exhibits and legal authorities.

65.    On 8 June 2020, the Tribunal issued Procedural Order No. 5. It confirmed that the Vaquer Report was admitted into the record in full. Procedural Order No. 5 also granted the Claimant an opportunity to submit its observations on the Vaquer Report.[22]

66.    On 19 June 2020, the Claimant submitted its comments on the Vaquer Report.[23]

    **D.    The Hearing and Post-Hearing Submissions**

67.    The Procedural Calendar contemplated a Hearing on the Merits to commence on 25 May 2020 and to conclude on 29 May 2020. On 25 March 2020, the Tribunal proposed to the Parties that, in light of the COVID-19 pandemic, the Hearing were held remotely on the dates scheduled.

68.    On 3 April 2020, the Parties submitted their respective responses to the Tribunal's proposal. While the Claimant agreed with the proposal, the Respondent held the view that the dates of the Hearing should be reconsidered.

---

[21]  Claimant's Rejoinder on Jurisdiction, dated 25 March 2020 and submitted on the same day.

[22]  Procedural Order No. 5, issued by the Tribunal on 8 June 2020, Section 3.

[23]  Claimant's Comments on Professor Vaquer's Report, dated 19 June 2020 and submitted on the same day.

69. On 6 April 2020, the SCC addressed a letter to parties and tribunals in SCC cases in face of the COVID-19 pandemic. The letter stated that, when travel and in-person meetings were discouraged or impossible, arbitral tribunals were encouraged to use alternative digital meeting facilities. It further noted that arbitral tribunals were expected to observe timetables previously established, and that parties were asked to make efforts in the same regard.

70. On 23 April 2020, following further comments from the Parties, the Tribunal communicated its intention to hold the Hearing on the original dates and by means of a digital platform. It asked the Parties to confer on the appropriate arrangements.

71. On 27 April 2020, the Respondent submitted a request for reconsideration of the Tribunal's directions of 23 April 2020. It requested that the Hearing were postponed until the lifting or easing of restrictions to movement resulting from the COVID-19 pandemic.

72. On 30 April 2020 and 11 May 2020, the Tribunal held telephone conferences with the Parties to discuss the request for reconsideration submitted by the Respondent, as well as alternative dates for the Hearing and the resort to a digital platform.

73. On 30 May 2020, the Tribunal issued Procedural Order No. 4. It ruled on the request for reconsideration submitted by the Respondent on 27 April 2020. Procedural Order No. 4 provided that the Hearing was to be held during the week of 6 July 2020 and by means of a digital platform. It also instructed the Parties to seek agreement on a protocol for the purposes of the Hearing.

74. On 1 June 2020, the Respondent submitted a request to set aside Procedural Order No. 4. It requested that the Tribunal either conducted an in-person hearing on the dates set out in Procedural Order No. 4 or on new dates to be determined. In the event that those requests were denied, the Respondent requested that the Tribunal identified which of its members supported the Tribunal's decision.

75. On 8 June 2020, the Tribunal issued Procedural Order No. 5. It observed that the Respondent's submission of 1 June 2020 presented neither new legal arguments nor new legal factual circumstances that would justify amending Procedural Order No. 4. It confirmed Procedural Order No. 4. On the same day, the Tribunal invited the Parties to hold a Pre-Hearing Conference on 15 June 2020.

76. On 8 June 2020, in accordance with Procedural Order No. 4, the Parties submitted to

the Tribunal their agreed draft Virtual Hearing Protocol. The Parties noted that they were still discussing two specific points, which were marked on the draft, and that they would attempt to reach an agreement during the course of the week.

77.    On 10 June 2020, the Respondent wrote to the Tribunal and raised objections to Procedural Order No. 5.

78.    On 11 June 2020, the Tribunal considered and rejected the Respondent's position on holding a virtual hearing.

79.    On 20 October 2020, the Tribunal communicated to the Parties its directions to reschedule the Hearing. The Hearing was set to take place from 3 to 7 May 2021. Also, 2, 8 and 9 May 2021 were left in reserve for eventual sessions with the Tribunal.

80.    On 10 March 2021, the Tribunal wrote to the Parties and confirmed that the Hearing was to be held remotely via a digital platform. It directed the Parties to make the appropriate arrangements, to confer with each other as necessary, and to inform the Tribunal of those arrangements by 29 March 2021.

81.    On 29 March 2021, the Parties informed the Tribunal about the arrangements agreed between them for the Hearing. They further clarified that they would inform the Tribunal about any agreed proposals on additional matters by 9 April 2021. The Tribunal approved the Parties' agreement on arrangements for the Hearing.

82.    On 6 April 2021, the Parties informed the Tribunal about their agreement to exchange on that same date the names of the witnesses and experts they wished to call for cross-examination, in order to reach an agreement on the schedule for the Hearing. The Parties sent their respective lists to the Tribunal only, which then forwarded the submissions to the respective opposite Party.

83.    On 9 April 2021, the Claimant submitted to the Tribunal the Parties' agreed Hearing Protocol and Hearing Schedule. The Claimant noted that the Parties were unable to agree on two specific points, which were marked in track changes on both documents. One point of disagreement related to the time afforded for the presentations of the following experts: Brattle Regulatory, Brattle Quantum, and BDO. The Claimant disagreed with the Respondent's contention that BDO (whose reports were submitted by the Respondent) should be allowed the same amount of time as both Brattle Regulatory and Brattle Quantum (whose reports were submitted by the Claimant) combined. The Claimant considered that each set of experts should be afforded 45

minutes to present its respective reports.

84.    On 10 April 2021, the Respondent wrote to the Tribunal and explained its position concerning the disagreement on the time afforded for the presentations of the experts. It considered that the time should be equal for each Party's team of experts.

85.    On 14 April 2021, in accordance with the schedule agreed by the Parties at Section 5 of the draft Hearing Protocol, the Parties submitted to the Tribunal a list containing the documents that they had agreed to admit to the record. In addition, the Respondent submitted a letter by which it requested leave to introduce into the record new factual and legal exhibits. The Respondent enclosed the list of documents that the Claimant had not accepted to admit to the record.

86.    On the same day, the Claimant also submitted a letter to the Tribunal. It noted that the Respondent had not called the Claimant's witness Mr. Jaume Margarit for cross-examination. The Claimant manifested its willingness to make Mr. Margarit appear at the Hearing, should the Tribunal decided to call him on its own initiative.

87.    On 15 April 2021, the Tribunal noted that, in accordance with the Parties' agreement communicated on 9 April 2021, the Claimant should submit by 16 April 2021 its comments to the Respondent's request of 14 April 2021, and the Tribunal should decide on such request by 19 April 2021. As to the letter submitted by the Claimant on 14 April 2021, the Tribunal reserved its discussion for the Pre-Hearing Conference to take place on 19 April 2021.

88.    On 16 April 2021, the Claimant submitted its comments to the Respondent's request for leave to introduce into the record new factual and legal exhibits. For the reasons described in its submission, the Claimant requested that the Tribunal reject the Respondent's request.

89.    On 19 April 2021, the Pre-Hearing Conference was held. Following the conference, the Parties submitted their agreement regarding the revised Hearing Schedule. They further informed the Tribunal and sought to coordinate with it on the technical and operative matters of the Hearing.

90.    On 20 April 2021, the Tribunal replied to the Parties with regard to the technical and operative matters of the Hearing. It also proposed to be assisted at the Hearing by Ms. Fiorella Badin.

91.    On 21 April 2021, the Parties confirmed that they had no objection to Ms. Fiorella Badin assisting the Tribunal during the Hearing.

92.    On 28 April 2021, the Parties submitted the updated Hearing Schedule, where they agreed on a modification in the order of the examination of witnesses.

93.    On 3 May 2021, the Tribunal issued Procedural Order No. 6, which addressed the organization of the Hearing. The Hearing was to be held from 3 through 7 May 2021, via Zoom hearing platform.

94.    From 3 through 7 May 2021, the Hearing on Jurisdictional Objections and the Merits was held via a remote digital platform.

95.    The following persons attended the Hearing:

Tribunal
Mr. Alejandro A. Escobar                President
Mr. Oscar M. Garibaldi                  Co-Arbitrator
Mr. Christophe Bondy                    Co-Arbitrator

Administrative Secretary to the Tribunal
Ms. Fiorella Badin

For the Claimant
Counsel:
Mr. Kenneth R. Fleuriet               King & Spalding LLP
Mr. Kevin D. Mohr                     King & Spalding LLP
Ms. Amy Roebuck Frey                  King & Spalding LLP
Ms. Isabel San Martín                 King & Spalding LLP
Ms. Violeta Valicenti                 King & Spalding LLP
Ms. Inés Vázquez García               Gómez-Acebo & Pombo
Ms. Inés Puig-Samper                  Gómez-Acebo & Pombo
Ms. Cristina Matia                    Gómez-Acebo & Pombo
Ms. Celia Altable                     Gómez-Acebo & Pombo


Witnesses:
Mr. Daniël Povel                      Former Chair of TREF's
                                      Investment Committee
Mr. Hans Schut                        One of TREF's founders
Mr. Carlos Bendito                    Former Deputy Managing Director
                                      of Triodos Investment
                                      Management in Spain
Experts:
Mr. José Antonio García              The Brattle Group
Mr. Carlos Lapuerta                  The Brattle Group
Mr. Richard Caldwell                 The Brattle Group
Mr. Andrés Child                     The Brattle Group

Mr. Jaume Margarit                        Former Director of Renewable
                                          Energy at IDAE and former
                                          Director General at APPA

For the Respondent
Counsel:
Mr. José Manuel Gutiérrez Delgado         Abogacía General del Estado
Mr. Rafael Gil Nievas                     Abogacía General del Estado
Ms. Ana Fernández Daza Álvarez            Abogacía General del Estado
Ms. Gabriela Cerdeiras Megias             Abogacía General del Estado
Ms. Lorena Fatás Pérez                    Abogacía General del Estado
Mr. Alberto Torró Molés                   Abogacía General del Estado
Ms. Gloria de la Guardia Limeres          Abogacía General del Estado
Mr. Javier Comeron Herrero                Abogacía General del Estado

Experts:
Mr. Gervase MacGregor                     BDO
Mr. Eduardo Pérez Ruiz                    BDO
Mr. Francisco Javier Espel Sesé           BDO
Mr. David Mitchell                        BDO
Mr. Manuel Vargas                         BDO
Ms. Susana Campos                         BDO
Ms. Leticia Pérez                         BDO
Mr. Adam Cuthbertson                      BDO
Ms. Susan Blower                          BDO
Mr. Marcos Vaquer Caballería              Professor of Administrative Law at
                                          University Carlos III of Madrid

Interpreters
Mr. Jesus Gaetan Bornn
Ms. Amalia Thaler-De Klemm
Ms. Anna Sophia Chapman
Court Reporters
Mr. Trevor McGowan
Dante Rinaldi, D-R Esteno

96.    The Parties examined the following witnesses and experts at the hearing:

Mr. Hans Schut                            One of TREF's founders
Mr. Daniël Povel                          Former Chair of TREF's
                                          Investment Committee
Mr. Carlos Bendito                        Former Deputy Managing
                                          Director of Triodos Investment
                                          Management in Spain
Mr. Jaume Margarit                        Former Director of Renewable
                                          Energy at IDAE and former
                                          Director General at APPA
Mr. Richard Caldwell                      The Brattle Group
Mr. Carlos Lapuerta                       The Brattle Group

| Mr. Marcos Vaquer Caballería | Professor of Administrative Law at University Carlos III of Madrid |
| Mr. Francisco Javier Espel Sesé | BDO |
| Mr. Eduardo Pérez Ruiz | BDO |

97.    On 31 May 2021, the Tribunal issued Procedural Order No. 7,[24] with directions to the Parties with respect to their post-hearing submissions.

98.    On 9 June 2021, the Parties informed the Tribunal of their agreed Post-Hearing Schedule:

   (a)    To submit to the Tribunal by 15 July 2021 the final version of the transcripts underlining the potential disagreements (if any, adding that the Parties did not envision any major disagreements as to the transcripts); and

   (b)    To have a single round of post-hearing briefs to be filed on 17 September 2021, confirming the directions to Procedural Order No. 7 with respect to the scope, format, and extension of the post-hearing submissions.

99.    On 9 June 2021, the Tribunal confirmed the Parties' agreed Post-Hearing Schedule.

100.   On 15 July 2021, the Parties submitted an agreed corrected version of the Hearing transcript.

101.   On 4 August 2021, the Tribunal issued Procedural Order No. 8,[25] with additional questions to the Parties in accordance with Section 2.5 of Procedural Order No. 7.

102.   On 10 September 2021, the Respondent submitted a request to introduce the CJEU's judgment in *Komstroy v. Moldova*.

103.   On 17 September 2021, the Claimant submitted its observations opposing the Respondent's request.

104.   On 21 September 2021, the Parties submitted their respective post-hearing briefs.

105.   On 1 November 2021, the Parties filed their respective submission on costs.

106.   On 21 February 2022, the Respondent submitted a copy of the award and dissenting opinion in *Sevilla et al. v. the Kingdom of Spain*,[26] together with a three-page comment,

---

[24]  Procedural Order No. 7, issued by the Tribunal on 31 May 2021.

[25]  Procedural Order No. 8, issued by the Tribunal on 4 August 2021.

[26]  *Sevilla Beheer B.V. and others v. The Kingdom of Spain*, ICSID Case No. ARB/16/27, Decision on Jurisdiction, Liability and the Principles of Quantum, 11 February 2022 **(RL-0180)**, and Partial Dissenting Opinion by Professor Peter D. Cameron, 11 February 2022 **(RL-0181)**.

in accordance with section 15.5 of Procedural Order No. 1.

107.    On 1 March 2022, at the invitation of the Tribunal, the Claimant submitted its comments on the *Sevilla* award.

108.    On 10 May 2022, the Respondent submitted a request to introduce into the record, in connection with its first jurisdictional objection: (i) the judgment of the CJEU of October 26, 2021, issued in the Case C-109/20: PL Holding v. Poland; (ii) the Order of November 12, 2021, issued by the Svea Court of Appeal regarding the preliminary ruling requested from the CJEU on the compatibility of ECT arbitration clause with EU Treaties; (iii) ruling of the CJEU in Case C638-19 P, European Food y others vs. European Commission, dated January 25, 2022; (iv) the referral by the Commission of the United Kingdom to the Court of Justice of the European Union in relation to a Judgment of its Supreme Court of 19 February 2020; (v) the judgement of the Paris Court of Appeal nº 48/2022, dated April 19, 2022 and (vi) the judgement of the Paris Court of Appeal nº 49/2022, dated April 19, 2022.

109.    On 16 May 2022, the Claimant submitted its comments on the Respondent's request, opposing the same.

110.    On 23 June 2022, the Respondent submitted a copy of the award in *Green Power v. Kingdom of Spain*,[27] together with a three-page comment, in accordance with section 15.5 of Procedural Order No. 1.

111.    Also on 23 June 2022, the Respondent submitted a request to introduce into the record CJEU Opinion 1/20 dated 16 June 2022.

112.    On 2 July 2022, the Claimant submitted its comments on the *Green Power* award.

113.    Also on 2 July 2022, the Claimant submitted its comments on the Respondent's request to introduce CJEU Opinion 1/20, opposing the same.

114.    On 7 July 2022, the Claimant submitted 10 additional arbitral awards,[28] in accordance

---

[27]  Green Power Partners K/S and SCE Solar Don Benito APS v. The Kingdom of Spain, SCC Case No. V 2016/135, Final Award, 16 June 2022 **(RL-0182)**.

[28]  Mathias Kruck et al. v. Kingdom of Spain, ICSID Case No. ARB/15/23, Decision on Respondent's Request for Reconsideration of the Tribunal's Decision dated 19 April 2021, 6 December 2021 **(CL-200)**; Landesbank Baden-Württemberg et al. v. Kingdom of Spain, ICSID Case No. ARB/15/45, Decision on Reconsideration, 11 November 2021, decision not public – see Damien Charlotin, ICSID Tribunal Hearing Claims by State-Owned German Banks Against Spain Declines to Reconsider Intra-EU Decision in Light of the CJEU's Komstroy Decision, IA REPORTER, 13 December 2021 **(CL-201)**; Rockhopper Exploration Plc et al. v. Italian Republic, ICSID Case No. ARB/17/14, Decision on Italy's Request for Reconsideration,

with section 15.5 of Procedural Order No. 1.

115. On 11 July 2022, the Tribunal granted leave for the Respondent to introduce into the record the CJEU's judgment in *Komstroy v. Moldova* and the CJEU's Opinion 1/20.

116. On 18 July 2022, the Respondent submitted its comments on the additional arbitral awards submitted by the Claimant and introduced the above CJEU documents into the record.

## III.    FACTUAL BACKGROUND

117. The following factual background illustrates the most relevant aspects of the factual record, which is mostly uncontested. The Arbitral Tribunal has in addition taken into account all the evidence submitted by the Parties.

### A.    Overview

118. The Claimant's claims concern certain legislative and regulatory measures introduced by Spain to support investment in renewable electricity generation. Spain's measures were intended to enable Spain to meet national and EU targets for electricity generation from renewable energy. The broader context of the EU's and Spain's renewable energy generation targets was the international effort to reduce greenhouse gas emissions. These efforts included notably the Kyoto Protocol 1997, pursuant to which signatories, including the EU and Spain, accepted ambitious targets for emissions reductions.

119. Directive 2001/77/EC of the European Parliament and Council of 27 September 2001 (Directive 2001/77/EC) set Spain an indicative target for electricity energy generation from renewables at 29.4% of total electricity consumption by 2010.[29] The purpose of Directive 2001/77/EC was "to promote an increase in the contribution of renewable energy sources to electricity production in the internal market for electricity and to

---

20 December 2021 **(CL-202)**; Cavalum SGPS, S.A. v. Kingdom of Spain, ICSID Case No. ARB/15/34, Decision on Spain's Request for Reconsideration, 10 January 2022 **(CL-203)**; Mainstream Renewable Power et al. v. Federal Republic of Germany, ICSID Case No. ARB/21/26, Decision on Respondent's Application Under ICSID Arbitration Rule 41(5), 18 January 2022 **(CL-204)**; Infracapital F1 S.à.r.l. and Infracapital Solar B.V. v. Kingdom of Spain, ICSID Case No. ARB/16/18, Decision on Respondent's Request for Reconsideration, 1 February 2022 **(CL-205)**; Sevilla Beheer B.V. et al. v. Kingdom of Spain, ICSID Case No. ARB/16/27, Decision on Jurisdiction, Liability and the Principles of Quantum, 11 February 2022 **(CL-206)**; SolEs Badajoz GmbH v. Kingdom of Spain, ICSID Case No. ARB/15/38, Decision on Annulment, 16 March 2022 **(CL-207)**; NextEra Global Holdings B.V. and NextEra Energy Spain Holdings B.V. v. Kingdom of Spain, ICSID Case No. ARB/14/11, Decision on Annulment, 18 March 2022 **(CL-208)**; Cube Infrastructure Fund SICAV et al. v. Kingdom of Spain, ICSID Case No. ARB/15/20, Decision on Annulment, 28 March 2022 **(CL-209)**; and RENERGY S.à.r.l. v. Kingdom of Spain, ICSID Case No. ARB/14/18, Award, 6 May 2022 **(CL-210)**.

[29] **C-57**, Annex.

create a basis for a future Community framework thereof."[30]  The indicative targets include a statement that, in taking these targets into account, "Member States make the necessary assumption that the State aid guidelines for environmental protection allow for the existence of national support schemes for the promotion of electricity produced from renewable energy sources."[31]

120.    The preamble of Directive 2001/77/EC referred to national support mechanisms for renewable energy as follows:

> *Member States operate different mechanisms of support for renewable energy sources at the national level, including green certificates, investment aid, tax exemptions or reductions, tax refunds and direct price support schemes. One important means to achieve the aim of this Directive is to guarantee the proper functioning of these mechanisms, until a Community framework is put into operation, in order to maintain investor confidence.[32]*

121.    Directive 2009/28/EC of the European Parliament and Council of 23 April 2009 (Directive 2009/20/EC), replaced Spain's indicative target by a mandatory target for renewable energy consumption, set at 20% of Spain's total energy consumption by 2020.[33]  The preamble of Directive 2009/20/EC states in part as follows:

> *Member States have different renewable energy potentials and operate different schemes of support for energy from renewable sources at the national level. The majority of Member States apply support schemes that grant benefits solely to energy from renewable sources that is produced on their territory. For the proper functioning of national support schemes it is vital that Member States can control the effect and costs of their national support schemes according to their different potentials. One important means to achieve the aim of this Directive is to guarantee the proper functioning of national support schemes, as under Directive 2001/77/EC, in order to maintain investor confidence and allow Member States to design effective national measures for target compliance. This Directive aims at facilitating cross-border support of energy from renewable sources without affecting national support schemes.[34]*

122.    Directive 2009/20/EC, like its predecessor, acknowledges the relevance of EU rules on State aid for renewable energy support mechanisms.  Article 3(3) provides in relevant

---

[30]  **C-57**, Article 1.

[31]  **C-57**, Annex.

[32]  **C-57**, Preamble, para. 14.

[33]  **C-97**.

[34]  **C-97**, Preamble, para. 25.

part: "Without prejudice to Articles 87 and 88 of the Treaty, Member States shall have the right to decide, in accordance with Articles 5 to 11 of this Directive, to which extent they support energy from renewable sources which is produced in a different Member State."  Under Article 22(1)(b) of Directive 2009/20/EC, Member States are required to report to the EU on, among other things, "the introduction and functioning of support schemes and other measures to promote energy from renewable sources".  Article 24 of Directive 2009/20/EC call for a transparency platform for such support schemes.

123.   These EU directives were transposed by Spain into its domestic law.  Three instruments of Spain's regulatory framework for renewable energy are the most relevant to this case.  The first is Royal Decree 661/2007 ("**RD 661/2007**"),[35] adopted under Law 54/1997.  The second is Royal Decree 1578/2008 ("**RD 1578/2008**"),[36] also adopted under Law 54/1997.  The third is Royal Decree-Law 9/2013 ("**RDL 9/2013**"),[37] in combination with Law 24/2013, which replaced Law 54/1997.

124.   Law 54/1997 liberalized and updated the general regulatory framework for the Spanish electricity system ("**SES**"), both for conventional energy generation (termed the "Ordinary Regime") and for renewable energy production and supply (the "Special Regime").  Under the Ordinary Regime, remuneration derived solely from the wholesale market price of electricity.  Under the Special Regime, generators benefitted from a premium set by the Spanish Government over and above the wholesale market price.  Of particular relevance to the Parties' dispute, Law 54/1997 also provided that investors under the Special Regime would receive a remuneration set by the Government by reference to certain stated criteria, with the overall objective of providing the investors with a "*reasonable rate[] of return with regard to the cost of money in the capital markets*".  However, Law 54/1997 did not specify what this reasonable rate of return should be.  That was left to regulations such as RD 661/2007.

125.   RD 661/2007 was a renewables support scheme enacted to achieve its renewable electricity target under Directive 2001/77/EC.  Two salient features of RD 661/2007 were that it established fixed Feed in Tariffs ("**FiTs**") for qualifying photovoltaic ("**PV**") facilities – ostensibly to be paid in full over an initial period of 25 years, followed by a reduced amount for the remaining lifetime of the facility – and priority

---

[35]  **C-92**.

[36]  **R-47**.

[37]  **C-91 / R-40**.

of access and dispatch to the electricity grid.

126.    RD 661/2007 succeeded in attracting substantial investment in renewables. Within just four months of its enactment, installed PV capacity reached 85% of the target set by RD 661/2007. But RD 661/2007 also coincided with – and indeed exacerbated – a widening gap between regulated electricity access charges (*i.e.*, the amount retail customers paid for their electricity) and the regulated costs of the SES (which includes the costs of renewables support schemes). This shortfall is known as the "tariff deficit".

127.    RD 1578/2008 introduced new support parameters once access to RD 661/2007 was no longer available under its terms. RD 1578/2008 offered an indexed FiT over a 25-year period.

128.    Between 2010 and 2013, Spain modified the incentives available to PV facilities registered under RD 661/2007 and under RD 1578/2008, purportedly to eliminate the tariff deficit. The Claimant takes issue with these measures and contends that they materially reduced the returns on their investments.

129.    Among other measures, Spain repealed and replaced both RD 661/2007 and RD 1578/2008 with what the Claimant terms the "New Regulatory Regime", which replaced the fixed FiTs for PV facilities with remuneration designed to achieve a "reasonable rate of return" for a "standard plant" of the relevant type, as defined by Spain. The "reasonable rate of return" was initially set by Spain at the ten-year average of Spanish Government bond yields plus 3%, which was 7.398% (pre-tax). However, the Respondent contends that the New Regulatory Regime in fact maintained the essential characteristics of RD 661/2007, including the payment of a "subsidy" and priority of access to the grid.

130.    Sections B and D below describe the background to these measures, as well as their broader regulatory framework. Section E below describes the measures themselves in detail.

**B.    The Regulatory Framework Prior to the Claimant's Investments**

**1.    The Hierarchy of Regulatory Measures Under Spanish Law**

131.    The SES is regulated under Spanish law by the following instruments, in order of hierarchy: (i) the Spanish Constitution of 1978; (ii) Laws of the Spanish Parliament; (iii) Royal Decree-Laws, which have the force of a Law and may be enacted by the

Government in situations of extraordinary need or urgency; (iv) Royal Decrees, which are regulations issued by the Government to give effect to statutory provisions pursuant to its constitutional and statutory powers; (v) Ministerial Orders, which are issued by ministerial departments (such as the Ministry of Industry, Energy and Tourism) to implement Royal Decrees; and (vi) Resolutions, which are issued by Government to also implement Royal Decrees. Finally, in the context of the SES, there are renewable energy plans, which are regulatory standard-setting instruments drawn up by the regulator.

## 2. The Evolution of Spain's Regulatory Framework Prior to the Disputed Measures

132. Spain has a longstanding commitment to the promotion of renewable energy. In 1994, Spain enacted RD 2366/1994 creating the Special Regime.

133. The Tribunal summarizes below the relevant key legislative and regulatory developments that occurred prior to the disputed measures, including the RD 661/2007 and RD 1578/2008 support schemes under which the Claimant's PV facilities were registered.

### (i) Law 54/1997

134. In November 1997, Spain enacted Law 54/1997 to transpose into Spanish law EU Directive 96/92/EC on the internal market in electricity. Law 54/1997 liberalized Spain's electricity sector – particularly energy generation and distribution – and committed Spain to produce 12% of its total energy demand from renewables by 2010.

135. Law 54/1997 established the essential characteristics of Spain's regulatory framework governing the electricity sector, as well as the limits of the regulatory power of the Spanish Government. Notwithstanding the creation of a free market system, Law 54/1997 provided that incentives would be offered to promote investment in renewable energy facilities.[38] Under Law 54/1997, remuneration of electricity producers under the Special Regime would be supplemented by a "premium" to be established in subsequent regulations in accordance with stated criteria with the overall objective of

---

[38] Article 15 of Law 54/1997 (**C-66A, R-24**) provides, in relevant part: "1. The activities involved in the supply of electric power shall be remunerated economically in the manner provided by this Act, as charged [sic] to the rates and prices paid. / 2. To determine the rates and prices that consumers must pay, the remuneration of activities shall be stipulated in regulations with objective, transparent and non-discriminatory criteria that act as an incentive to improve the effectiveness of management, the economic and technical efficiency of said activities and the quality of the electricity supply"

achieving "reasonable rates of return with regard to the cost of money in the capital market."[39]  In December 1998, implementing this provision, Royal Decree 2818/1998 ("**RD 2818/1998**") introduced an option for renewable electricity producers to elect to receive a FiT for each kWh produced instead of a premium over the market price.

136.   In order to achieve its 12% renewables target by 2010, Law 54/1997 called for the drawing up of a renewable energies promotion plan that would be one of the factors for the setting of the premiums for renewable energy producers.

(ii)    **The Plan for the Promotion of Renewable Energies in Spain 2000-2010 ("1999 PER")**

137.   Pursuant to Law 54/1997, in December 1999 the Institute for Energy Diversification and Savings ("**IDAE**"), an agency of the Spanish government, prepared the 1999 PER, a renewable energies promotion plan for the 2000-2010 period. The 1999 PER proposed that a remuneration scheme be developed through regulations in order to meet the EU's indicative target that Spain produce 12% of its total energy demand from renewables by 2010. On 30 December 1999, Spain's Council of Ministers approved the 1999 PER.

(iii)   **Royal Decree 436/2004 ("RD 436/2004")**

138.   On 27 September 2001, the European Parliament and Council adopted Directive 2001/77/EC, which set Spain an indicative target for renewable energy generation at 29.4% of total electricity consumption by 2010.

139.   The RD 2818/1998 support scheme had failed to attract a sufficient level of investment in renewable energy for Spain to meet its targets.  By 2004, Spain had achieved only 56.2% of its 2006 objective for renewable electricity production, and only 28.4% of its target for 2010.

140.   In February 2003, the Renewable Energies' Producers Association ("**APPA**"), which represents over 500 Spanish renewable energy companies, published a report that recommended improvements to the RD 2818/1998 support scheme. APPA recommended that: (i) incentives for certain technologies, including solar PV, be

---

[39]   Article 30(4) of Law 54/1997 (**C-66A, R-24**) provides, in relevant part: "The remuneration arrangements for electric power generation installations operating under the special regime shall be supplemented by the payment of a premium under statutory terms set out in regulations and in the following cases: […] To work out the premiums, the voltage level on delivery of the power to the network, the effective contribution to environmental improvement, to primary energy saving and energy efficiency, the generation of economically justifiable useful heat and the investment costs incurred shall all be taken into account so as to achieve reasonable profitability rates with reference to the cost of money on capital markets."

24

increased in order to guarantee an adequate return on investment; and (ii) incentives be explicitly guaranteed for the life of the investment.

141. In April 2003, Spain's energy regulator, the National Energy Commission ("**CNE**"), concluded that it was necessary to increase remuneration and to guarantee incentives throughout the facilities' useful life, in order to encourage sufficient investment and reach Spain's renewables targets.

142. In March 2004, Spain enacted RD 436/2004, a new renewables support scheme that addressed several perceived shortcomings of RD 2818/1998. The purpose of RD 436/2004, as articulated in its preamble, was to provide "*security and stability*" and to establish a "*long-lasting, objective, transparent regulatory framework*" in order to promote investment in renewable electricity generation.

143. As its predecessor RD 2818/1998, RD 436/2004 gave eligible electricity producers the option to elect to receive either: (i) a FiT; or (ii) the market price plus an incentive for participating in the market and premium. RD 436/2004 continued to guarantee that producers would receive a "*reasonable remuneration*".[40]

144. In order to incentivize investors, RD 436/2004 revised the rate scale for FiTs, premiums and incentives. For example, PV facilities of 100kW or smaller received an almost 95% increase in FiT rates. However, the FiT rates were not fixed but were set as percentages of the "Average Electricity Tariff" (AET), which was an index determined annually by Spain based on a complex set of variables affecting the cost of the electricity system. These variables included the cost of the renewables support scheme itself. Spain subsequently realised that the linking of the FiTs to this index created a "feedback loop" whereby growth in renewable energy generation led to an increase in the AET, which in turn led to an increase in the FiTs even if the cost per kWh produced did not increase.

145. RD 436/2004 provided that any future revisions to the FiTs, premiums and incentives would not apply to facilities already registered and in operation under the support scheme.[41]

---

[40] On 24 May 2005, IDAE published promotional documentation which stated that "[t]he return on the investment [for a solar photovoltaic facility] is reasonable and can sometimes reach up to 15%", and that there can be "significant financing of the investment". IDAE, The Sun Can Be All Yours, Reply to all the Key Questions, 24 May 2005 (**C-122**), p. 43.

[41] RD 436/2004, (**C-75, R-45**) "Article 40. Revision of tariffs, premiums, incentives and supplements for new facilities. [...] 3. The tariffs, premiums, incentives and supplements resulting from any of the revisions provided for in this section shall apply solely to the plants that commence operating subsequent to the date

(iv)    **The Plan for the Promotion of Renewable Energies in Spain 2005-2010 ("2005 PER")**

146.    In August 2005, the Council of Ministers approved the 2005 PER prepared by IDAE. The 2005 PER revised the 1999 PER and acknowledged the insufficient growth of Spain's renewable electricity capability.[42] In order to meet Spain's target of 29.4% share of renewables in total electricity consumption by 2010 in light of a projected growth in energy demand, the 2005 PER increased Spain's installed PV capacity target for 2010 from 144 MW to 400 MW. The 2005 PER projected that PV electricity generation would require €1.875 billion in total capital investment, of which amount nearly 80% would be debt financed.

(v)    **Royal Decree 661/2007**

147.    Just as its predecessor RD 2818/1998, RD 436/2004 failed to attract the level of investment in renewable energy necessary for Spain to meet its 2010 targets.

148.    The shortfall in PV investment was pronounced: whereas the 2005 PER targeted a PV capacity of 400 MW by 2010, Spain's installed PV capacity as of 2006 was 84 MW.

149.    In the light of this shortfall, Spain decided to reform the RD 436/2004 support scheme. In February 2007, the CNE published a report on the draft regulations that would later become RD 661/2007. The CNE observed *inter alia* that economic incentives were necessary to promote the development of renewables and that "*[i]n certain cases, differentiated incentives are justified that lead to higher returns, so that the objectives set in the planning can be achieved.*" The CNE also called for the draft regulations to be amended to include "*sufficient guarantees to ensure that the economic incentives are stable and predictable throughout the entire life of the facilities….*"

150.    On 27 May 2007, Spain enacted RD 661/2007, which repealed and replaced RD 436/2004.

---

of the entry into force referred to the paragraph above and shall not have a backdated effect on any previous tariffs and premiums."

[42]    "[T]he incentives that have been established have not been sufficient to ensure the anticipated rate of growth. Although Royal Decree 436/2004 has, in some cases, brought about an improvement in returns on investment, it is necessary to provide further incentives if possible in particular technology areas in order to make them more attractive to future investors."  Ministry of Industry, Tourism and Commerce & IDAE, *Summary of the Spanish Renewable Energy Plan 2005-2010* (August 2005) ("**PER 2005-2010 Summary**"), Section 6.2, (**BRR-56, C-84**) para. 4.

151. RD 661/2007 introduced several changes to the incentives available to qualifying renewable electricity producers under the Law 54/1997 general regulatory framework. In contrast with the RD 2818/1998 and RD 436/2004 support schemes, PV facilities registered under RD 661/2007 were entitled only to a FiT and were not given the option to receive a premium. In addition, whereas incentives under RD 436/2004 were based on the AET index – which was determined annually by Spain – RD 661/2007 fixed the FiT in absolute numbers (€/kWh), based on the total electricity generation capacity of the facility, for its entire operating life.

152. Annex V of RD 661/2007 contains the following table setting out the FITs offered to qualifying PV facilities ("Category b 1.1"), sub-grouped by power output of the facility.

| Grupo | Subgrupo | Potencia | Plazo | Tarifa regulada c€/kWh | Prima de referencia c€/kWh | Límite Superior c€/kWh | Límite Inferior c€/kWh |
|-------|----------|----------|-------|------------------------|----------------------------|------------------------|------------------------|
| b.1 | b.1.1 | P≤100 kW | primeros 25 años | 44,0381 | | | |
| | | | a partir de entonces | 35,2305 | | | |
| | | 100 kW<P≤10 MW | primeros 25 años | 41,7500 | | | |
| | | | a partir de entonces | 33,4000 | | | |
| | | 10<P≤50 MW | primeros 25 años | 22,9764 | | | |
| | | | a partir de entonces | 18,3811 | | | |
| | b.1.2 | | primeros 25 años | 26,9375 | 25,4000 | 34,3976 | 25,4038 |
| | | | a partir de entonces | 21,5498 | 20,3200 | | |

153. For each sub-group, there is a fixed FiT that applies for the first 25 years of a PV facility's operations, which is then reduced to 80% of the original tariff for the remaining life of the facility. The fixed FiT was to be adjusted annually for inflation based on the Consumer Price Index ("**CPI**"). RD 661/2007 does not explain the methodology used to determine the fixed FiTs.

154. For PV facilities with a power output of between 100 kW and 10 MW, the fixed FiT rate in RD 661/2007 represented an almost 82% increase as compared to the corresponding FiT under RD 436/2004. By contrast, the value of FiTs for PV facilities producing either less than 100 kW or more than 10 MW of power remained virtually unchanged under RD 661/2007.

155. RD 661/2007 granted renewable producers, including PV facilities, priority of dispatch and grid access, meaning that they could sell and transmit electricity whenever it was produced.

156. RD 661/2007 provided that Spain would review the fixed FiT rates in 2010 and every four years thereafter. As its predecessor RD 436/2004, RD 661/2007 required that any revisions to the FiT rates would guarantee a reasonable rate of return by reference to the cost of money in the capital markets and would not apply to facilities already enrolled in the support scheme. In full, the relevant provision of RD 661/2007, Article 44.3, read as follows:

> *During the year 2010, [in view] of the results of the monitoring reports on the degree of fulfillment of the Renewable Energies Plan (PER) 2005-2010, and of the Energy Efficiency and Savings Strategy in Spain (E4), together with such new targets as may be included in the subsequent Renewable Energies Plan 2011-2020, there shall be a review of the tariffs, premiums, supplements and lower and upper limits defined in this Royal Decree with regard to the costs associated with each of these technologies, the degree of participation of the [S]pecial [R]egime in covering the demand, and its impact on the technical and economic management of the system, and a reasonable rate of profitability shall always be guaranteed with reference to the cost of money in the capital markets. Subsequently a further review shall be performed every four years, maintaining the same criteria as previously.*
>
> *The revisions to the regulated tariff and the upper and lower limits indicated in this paragraph shall not affect facilities for which the deed of commissioning shall have been granted prior to 1 January of the second year following the year in which the revision shall have been performed.*

157. In a press announcement on RD 661/2007, Spain stated that:

> *The tariff revisions carried out in the future will not affect those installations already operating. This guarantee affords legal safety to the producer, providing stability to the sector and promoting its development. The new regulations will not be of a retroactive nature.*

158. To be eligible to receive the fixed FiT under the RD 661/2007 support scheme, PV facilities were required to obtain a "Final Commissioning Certificate" and be registered in the regional Administrative Registry for Special Regime Generation Facilities ("**RAIPRE**").

159. In June 2007, IDAE released a new version of its promotional material titled "The Sun Can Be All Yours" highlighting the remuneration regime under RD 661/2007.[43]

160. Private investors responded enthusiastically to RD 661/2007. In September 2007, four months after enactment, Spain reached 85% of the target set in RD 661/2007, which

---

[43]  IDAE, The Sun Can Be All Yours, Reply to all the Key Questions, June 2007, (**C-111**), p. 18.

was to have 371 MW of installed PV capacity by 2010. Reaching this threshold triggered the twelve-month sunset clause under RD 661/2007, pursuant to which RD 661/2007 became closed to entrants not registered by 29 September 2008. Spain did not amend this twelve-month sunset provision.

### (vi)    Royal Decree 1578/2008

161.  On 26 September 2008, Spain enacted RD 1578/2008, which created a new support scheme for PV facilities that were not registered by the deadline for enrolment under RD 661/2007. RD 1578/2008 retained the essential features of RD 661/2007 but reduced the FiTs available to PV facilities. RD 1578/2008 applied only prospectively and did not affect the incentives offered to those PV facilities already registered under RD 661/2007.[44]

### (vii)    Spain's Photovoltaic Capacity Following RD 661/2007

162.  Spain far surpassed the target specified in RD 661/2007, which had been to achieve an installed PV capacity of 371 MW by 2010. Between 2006 and 2007, Spain's installed PV capacity in fact increased from approximately 167 MW to 690 MW. By 2008, it had grown to over 3,000 MW. In 2008, Spain accounted for half of all the solar power installed globally.

163.  By 2010, Spain had achieved an aggregate installed PV capacity of over 3,960 MW. This meant that renewable energy supplied 13.2% of Spain's total energy consumption and 29.2% of its electricity, close to Spain's 2010 target of 29.4%.

### C.    The Claimant's Investments

164.  The Claimant's fund, TREF, made four investments in Spain's photovoltaic generation industry, as relevant for these proceedings. Each is described below.

165.  The GSI Investment On 7 April 2008, TREF acquired 51% of the shares in the Spanish holding company Generación Solar Investment, S.L. ("**GSI**"). All of the GSI plants secured RAIPRE registrations between April and August 2008 and therefore qualified for the RD 661/2007 feed-in tariff.[45]

166.  The Lucentum Investment On 30 October 2009, TREF acquired a 50% stake in the

---

[44]  **R-47**, Article 2.
[45]  Statement of Claim, ¶ 251.

holding company Piraenergy Solar I, S.L.[46]  Its plants were entitled to RD 661/2007 tariffs given that they had secured final RAIPRE registrations on 24 September 2008.[47]

Aznalcollar and Los Cabezos

167.  On 30 December 2009, TREF acquired 50% of the shares in the local companies of the Aznalcollar project, Mysolar Proyectos 1-20, S.L., and on 15 April 2010, it acquired 50% of Los Cabezos through the 20 local companies, Plantas Fotovoltaicas Los Cabezos I-XX.[48]  The plants had secured RAIPRE registrations, and therefore were entitled to received RD 661/2007 tariffs.[49]

The El Carpio Investment

168.  In 2009 the Claimant's fund looked into investing in a project named El Carpio, involving plants that had not yet been built.

169.  In April and May 2010, Triodos Bank Spain informed TREF of rumours circulating in Spain regarding a potential reduction to the feed-in tariffs Spain had granted to existing plants, due to high electricity prices for consumers and the fact that there had been many instances of fraud in the PV sector. As a result, when TREF negotiated the EPC contract for El Carpio, which was signed on 2 June 2010, TREF included provisions that would require the contractor to adjust the final purchase price of the plant if the tariff rate pre-allocated to it declined before the plant was built (which was anticipated to occur by the end of the year). TREF acquired the project on 4 June 2010.[50]

170.  The plants were completed and received final registration in the RAIPRE on 9 March 2011, thereby securing their right to the tariff of 0.290857 €/kWh.[51]

**D.    Strains on the Regulatory Framework Leading Up to the Dispute**

171.  After enacting RD 661/2007, Spain became increasingly concerned by its growing tariff deficit.  In short, the SES did not generate enough revenue to cover the costs of FiTs and other remuneration.

172.  Spain's tariff deficit was attributable to several factors. These include the fact that

---

[46]  Statement of Claim, ¶ 257.
[47]  Statement of Claim, ¶ 255.
[48]  Statement of Claim, ¶ 264.
[49]  Statement of Claim, ¶ 261.
[50]  Statement of Claim, ¶ 269.
[51]  Statement of Claim, ¶ 271.

actual electricity consumption in Spain fell below forecasts in the 2005 PER as a result of the global financial crisis and subsequent recession in Spain. However, the tariff deficit had emerged several years earlier and is not therefore exclusively the product of the financial crisis.

173.    As illustrated in the first report of Dr Grunwald of FTI, Spain's annual tariff deficit first materialized in 2000 and subsequently grew to over €6 billion for the year 2008, before returning to surplus in 2014.

174.    On an accumulated basis, Spain's tariff deficit exceeded €40 billion by 2013 (approximately 4% of GDP), an increase of 271% from 2007, when the accumulated deficit stood at approximately €10.8 billion.

175.    In April 2009, Spain enacted Royal Decree-Law 6/2009 (RDL 6/2009), which adopted certain measures to address the tariff deficit. The preamble to RDL 6/2009 explains that:

> *The increasing tariff deficit [...] is causing serious problems which in the current context of international financial crisis, is profoundly affecting the system and endangering, not only the financial situation of the companies in the electricity sector, but the system's sustainability itself. This imbalance is unsustainable and has serious consequences by deteriorating the security and investment financing capacity necessary to supply electricity in the quality and safety levels demanded by Spanish society. [...] by its increasing incidence on the tariff deficit, mechanisms are established with regard to the remuneration system of the facilities under the special regime. The trends followed by these technologies could put at risk in the short term, the sustainability of the system, both from the economic point of view due to their impact on the electricity tariff, and from a technical point of view, further compromising the economic viability of the already completed facilities, whose operation depends on the proper balance between manageable and non-manageable generation.*

176.    In addition to RDL 6/2009, Spain adopted several other measures to address the tariff deficit, including the Disputed Measures defined and discussed below in the following section.

177.    The tariff deficit became a political issue in Spain. In his inaugural speech on 19 December 2011, the newly elected prime minister of Spain, Mariano Rajoy, stated:

> *Another essential structural reform concerns our energy system. Energy policy must aim to pursue an adequate balance between its objectives: competitiveness, security of supply and environmental impacts [...].*

> *Energy is a key factor in the competitiveness of Spanish companies. It is important for us to realise Spain has a major energy problem, especially in the electricity sector, with an annual deficit in excess of 3,000 million Euros, and an accrued tariff deficit of more than 22,000 million.*
>
> *Electricity tariffs for domestic consumers are the third most expensive in Europe, and the fifth highest for industrial consumers.*
>
> *[...] If reforms are not made, the imbalances will be unsustainable, and increases in prices and tariffs will place Spain at the greatest disadvantage in terms of energy costs in the entire developed world. We must therefore introduce policies based on putting a break on and reducing the average costs of the system, take decisions without demagoguery, employ all the technologies available, without exception, and regulate with the competitiveness of our economy as our prime objective.*

178.    On 27 January 2012, Spain enacted Royal Decree Law 1 ("**RDL 1/2012**"), which eliminated the economic incentives for new production installations.  In March 2012, in response to a request from the Secretary of State for Energy, the CNE published a report proposing regulatory adjustment measures to address the tariff deficit. The CNE report stated that:

> *[T]he current situation is unsustainable. The introduction of regulatory measures, as requested by the document of the [Secretary of State for Energy], is called for with immediate effect in the short term, in order to eliminate the deficit of the system, mitigate the cost of funding the yet unsecuritised debt and clearly define the access costs that will be assumed by electricity customers, in order to determine their access tariffs in a satisfactory and stable manner.*

179.    Among the short-term measures proposed by the CNE was the removal of annual CPI indexing for FiTs, and the elimination of FiTs at the end of the economic (or useful) life of a facility (as opposed to its operating life).

### E.    The Disputed Measures

180.    The Claimant argues that the Respondent's six measures described below (the "**Disputed Measures**"), individually and together breached the Respondent's ECT obligations.

#### 1.    Royal Decree 1565/2010

181.    In November 2010, Spain enacted Royal Decree 1565/2010 ("**RD 1565/2010**"), which cancelled the right of PV facilities to receive the FiTs specified in RD 661/2007 after the first 25 years of their operation.

182.  In response to criticism, however, Spain promptly extended the initial FiT period to 28 years by RDL 14/2010, and then to 30 years by Law 2/2011.

### 2.    Royal Decree-Law 14/2010

183.  In December 2010, Spain enacted Royal Decree-Law 14/2010 ("**RDL 14/2010**"), which concerned urgent measures to address the tariff deficit.

184.  RDL 14/2010 capped the annual operating hours (*i.e.*, the total quantity of electricity produced) for which PV facilities could receive FiTs under RD 661/2007 and RD 1578/2008.  The applicable operating hour limit depended on the type of PV technology and geographic location.  PV facilities in locations with higher solar radiation had a higher cap.  Once a PV facility reached the applicable cap, additional electricity could only be sold at market prices.

185.  RDL 14/2010 also established a new 0.5 EU/MWh "access toll" on all electricity a producer delivered to the grid.

### 3.    Law 15/2012

186.  In December 2012, Spain enacted Law 15/2012, which introduced a 7% "energy production value tax" on all revenues (including FiT revenues) derived from the production of electricity ("**TVPEE**").  Article 4.1 of Law 15/2012 defined the "taxable event" as "*the production of electricity and its incorporation into the electricity system measured at power station bus bars*".  The tax base consists of the total amount received by the taxpayer for the production and incorporation of power into the electric energy system, "*in all economic regimes*" under Law 54/1997.

### 4.    Royal-Decree Law 2/2013

187.  In February 2013, Spain enacted Royal Decree-Law 2/2013 ("**RDL 2/2013**"), which introduced an "*amended CPI*" that excluded price changes in food, energy products and certain tax effects for the purposes of calculating annual FiT inflation revisions under RD 661/2007 and RD 1578/2008.  Initially, the amended CPI was lower than the general CPI.  From late 2014, however, the amended CPI was higher than the general CPI.

### 5.    Royal Decree-Law 9/2013

188.  In July 2013, Spain enacted Royal Decree-Law 9/2013 ("**RDL 9/2013**"), concerning the tariff deficit and "*urgent measures to guarantee the financial stability of the*

*electricity system*". RDL 9/2013 abolished the RD 661/2007 and RD 1578/2008 support schemes – including the FiT regime – and authorized the government to approve a new legal framework for renewable energy production.

189. Pursuant to Article 1(2) of RDL 9/2013, Article 30.4 of Law 54/1997 was modified as follows:

> *4. Additionally, and in the terms set forth in the regulations by royal decree of the Board of Ministers, for the compensation of the sale of generated energy valued at market price, the facility can receive a specific compensation composed of one period by unit of installed power that covers, when applicable, the investment costs of a typical facility that cannot be recovered by the sale of energy and one period of operation that covers, in any case, the difference between the exploitation costs and the income for the market share of said typical facility.*
>
> *For the calculation of said specific remuneration, the following aspects shall be considered, taking into account a standard facility throughout its legal service life, according to the activity performed by an efficient, well-managed business:*
>
> *(a) The standard income for the sale of generated energy valued at the price of the production market.*
>
> *(b)        The standard exploitation cost.*
>
> *(c)        The standard value of the initial investment.*
>
> *To these effects, in no case will the costs and investments that come determined by norms or administrative actions that are not applicable in all the Spanish territory be considered. In the same manner, only those costs and investments are taken into account that respond exclusively to the electrical energy production activity.*
>
> *As a consequence of the peculiar characteristics of the electrical systems internal and external to the Iberian Peninsula, specific type installations can be exceptionally defined for each one of them.*
>
> *This compensation regime will not surpass the minimum level necessary to cover the costs that will allow the installations to compete on an equal level with the rest of the technologies in the marketplace and that permit the possibility of obtaining a reasonable profit in reference to the installation type in each applicable case. Notwithstanding the foregoing, the compensating regime can also exceptionally incorporate an investment and execution incentive within a determined period of time when its installation supposes a significant cost reduction in the insular and extra-peninsular systems.*

*This reasonable profitability will be based, before taxes, on the average yield in the secondary market of the Obligations of the State to ten years applying the adequate differential.*

190. The essence of the new framework envisaged by RDL 9/2013 – the precise details of which were left to subsequent legislation and regulations – was that all renewable energy facilities would be required to sell electricity on the wholesale market. Instead of FiTs, producers would receive the market price plus remuneration designed to achieve a "*reasonable rate of return*" for a "*standard*" facility over a defined regulatory life period. RDL 9/2013 set the target rate of return at 300 points above the ten-year average yield of Spanish government ten-year bonds (approximately 7.4%).

191. RDL 9/2013 provided that PV facilities would temporarily continue to receive remuneration under the RD 661/2007 and RD 1578/2008 support schemes until the new legal framework was enacted. However, any such payments (*i.e.*, from July 2013 onwards) would be subject to a "true-up" adjustment (or claw back) once the new framework was in force (which occurred in 2014 as discussed below).

### 6.    Law 24/2103, Royal Decree 413/2014 and MO IET/1045/2017

192. In December 2013, Spain enacted Law 24/2013 to implement the new renewable energies framework envisaged by RDL 9/2013. Law 24/2013 eliminated the distinction between the Ordinary and Special Regimes under Law 54/1997. Law 24/2013 provided that remuneration under the new renewables support scheme would be "*compatible with the economic stability of the electric system*" and would:

> *"not exceed the minimum level required to cover the costs which allow the production installations from sources of renewable energies ... to compete on an equal footing with the other technologies on the market and which allows a fair return to be obtained pertaining to the standard installation applicable in each case".*

193. Following the enactment of the new general framework for renewables under Law 24/2013, a new support scheme was established by RD 413/2014 and supplemented by Ministerial Order IET/1045/2014 (MO 1045), which detailed precisely how remuneration for PV facilities would be calculated.

194. In sum, remuneration of renewable energy facilities under the new support scheme was comprised of the following elements:

(a)    Market remuneration from the sale of electricity in the wholesale market

(€/MWh); and

(b)     "specific remuneration", which was based on "standard" (not actual) costs of a PV facility and consisted of:

(i)     an "operating incentive" (or "Return on operation"), calculated per unit of electricity produced (€/MWh), to compensate facilities for operating expenses not covered by the wholesale price of electricity; and

(ii)    an "investment incentive" (or "Return on investment"), calculated per unit of installed capacity (€/MWh), to enable investors to cover their investment (capital) costs and receive a "reasonable rate of return" over a defined regulatory life period, which was set at 30 years for PV facilities. The "reasonable rate of return" prescribed by Spain was initially the 10-year average of Spanish 10-year treasury bonds, plus 300 basis points, which was 7.398% pre-tax for 2013-2018.

195.    MO 1045, a 1,761-page document, sets the "remuneration parameters" for 1,517 different "standard facilities", including 578 different "standard" PV facilities, resulting in the formula for calculating the "specific remuneration" that a given PV facility receives.

196.    Pursuant to MO 1045, each PV facility is assigned one of 578 "standard" facility codes (known as "IT codes") on the basis of several factors, including technology type, capacity, date of installation and location. Within each IT code, MO 1045 sets out the parameters of compensation applicable to that standard facility, including: an imputed investment cost; estimated current operating costs; estimated future operating costs; estimated hours of operation; estimated daily and intraday market prices of electricity; and net asset value of the facility.

197.    MO 1045 also set a minimum operating hours threshold for a PV facility to receive the operating incentive and investment incentive, as well as a maximum operating hours threshold to receive the operating incentive.

198.    The parameters used to set the operating incentive were subject to revision every three years. The parameters for the investment incentive and the level of the "reasonable rate of return" were subject to revision every six years. Although the initial target "reasonable rate of return" (7.398% pre-tax) was based on the ten-year average yield of ten-year Spanish treasury bonds, the periodic review would be based on a two-year average of the ten-year bond, taking into account "*the cyclical state of the economy, the*

*electricity demand and an appropriate remuneration.*"

### F.    The European Commission's Decision of 10 November 2017

199.    On 10 November 2017, the Commission issued Decision SA.40348, concerning State Aid measures in Spain, titled "Support for electricity generation from renewable energy sources, cogeneration and waste" (the "**EC Decision**").  The EC Decision rules on the lawfulness of the specific remuneration scheme for the photovoltaic solar industry governed by RDL 9/2013, Law 24/2013, RD 413/2014, MO 1045/2014 and Order IET/1459/2014 of 1 August 2014 ("**MO 1459.2014**") (together, the "**Remuneration Scheme**").  The EC Decision holds that the Remuneration Scheme is compatible with the common market.   The EC Decision considers that the introduction of the Remuneration Scheme does not contravene principles of legitimate expectations or legal certainty as a matter of EU law.  The EC Decision also contains statements concerning allegations by affected investors that the Remuneration Scheme breaches investment provisions of the ECT.

## IV.    JURISDICTION

### A.    Introduction

200.    The Claimant commenced this proceeding under the ECT, including ECT Article 26 on investor-State dispute settlement.  The Respondent has raised objections to jurisdiction. The Parties agreed to hear the Respondent's objections concurrently with the merits.

### B.    The Respondent's Objections to Jurisdiction

201.    The Respondent raises the following objections to the jurisdiction of the Tribunal:

(i)    Lack of jurisdiction *ratione personae* and *ratione materiae* to hear the dispute, on the grounds that, in accordance with the provisions of Article 26(6) of the ECT, EU law and principles are applicable international law for the resolution of the dispute, and EU regulations prevent that the dispute be submitted to arbitration (the "**Intra-EU Objections**"); and

(ii)    Lack of jurisdiction of the Tribunal to hear the dispute on an alleged breach of Article 10(1) of the ECT through the introduction of the TVPEE by Law 15/2012, of 27 December, on fiscal measures for energetic sustainability, on the ground that the Kingdom of Spain has not given its consent to submit this issue to arbitration (the **"Taxation Measure Objection"**).

37

202.    The following sections set out a summary of the Parties' respective positions on each of the objections, followed by the Tribunal's analysis and conclusion thereon.

### C.    The Intra-EU Objections

#### 1.    The Respondent's Position

203.    The objections raised by the Respondent against the Tribunal's jurisdiction *ratione personae* and *ratione materiae*, based on the alleged application of EU law to the dispute, follow a single sequence of arguments.

204.    The Respondent objects to the Tribunal's jurisdiction *ratione personae* by arguing that the arbitration clause under Article 26(4) of the ECT is not applicable to cases between an investor of an EU Member State and another EU Member State regarding an investment in the latter Member State. In the Respondent's position, the requirement under Article 26(1) of the ECT, that the dispute takes place between a *'Contracting Party'* and an *'investor of another Contracting Party'*, is not met.[52]

205.    The Respondent objects to the Tribunal's jurisdiction *ratione materiae* on the same basis. The Tribunal summarizes the Respondent's arguments below.

#### (i)    EU law is applicable to the present dispute

206.    Article 26(6) of the ECT provides as follows: 'A tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law.'

207.    The Respondent states that, when dealing with an intra-EU dispute, a tribunal established under Article 26(4) must apply EU law as the *'applicable rules and principles of international law'*. The Respondent offers two reasons for its statement.

208.    The *first* reason is that, in the Respondent's view, fundamental freedoms are affected in any intra-EU investment. The Respondent specifically refers to *'free movement of goods, capital, workers, services, [and] freedom of establishment'*.[53]

209.    The *second* reason is that, in the Respondent's position, the present dispute affects an essential EU institution, which is State aid.[54] The Respondent asserts that the Claimant requires the payment of compensation derived from a subsidy scheme that the European

---

[52]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶¶ 50-51.

[53]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 58.

[54]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 58.

Commission has already qualified as State aid.[55]

210.    The Respondent observes that the EU State aid system is reserved for the exclusive competence of the European Commission.[56] It further asserts that EU regulations on State aid, insofar as they are aimed at one of the basic objectives of the EU, which is the creation of the Internal Market, constitute imperative and public-order standards. In that vein, the Respondent cautions that an award that did not respect EU regulations on State aid could be annulled.[57]

### (ii)    The decision in *Achmea* embraces the present case

211.    As the Respondent argues that EU law is international law applicable to the present dispute, it submits that the decision of the Court of Justice of the European Union ("**CJEU**") in *Achmea*[58] is applicable to the present case. The Respondent then argues that *Achmea* confirms that Article 26 of the ECT is not applicable to intra-EU disputes.[59]

212.    The Respondent recalls the CJEU's interpretation in *Achmea* that an arbitration clause in a Bilateral Investment Treaty (a "**BIT**") concluded between EU Member States was incompatible with EU law and the autonomy of the EU legal system.[60]

213.    The Respondent cites the following passage from the decision:

> *Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement concluded between Member States [...], under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State,*

---

[55]    The Respondent submits that the European Commission has firmly stated that the incentives provided by RD 61/2007 and 1578/2008 are State aid in *two moments*. *First*, in its response of 29 February 2016 regarding the request from several photovoltaic investor associations to initiate a violation procedure against Spain, as a consequence of the same measures which, in the Respondent's view, are at dispute in the present arbitration (Commission reply, received on 29 February 2016 on Petition No 2520/2014 by Miguel Ángel Martínez Aroca (Spanish) on behalf of the Asociación Nacional de Productores e Inversores de Energías Renovables (ANPIER) (**R-0188**)). *Secondly*, in its Decision of 13 November 2017 in the Case Ayudas de Estado S.A., Case No. 40348 (2015/NN) (**RL-0003**), in which the European Commission examined the aid granted by RD 661/2007 and RD 1578/2008. Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 66.

[56]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 65.

[57]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶¶ 82-84, 86, 87.

[58]    *Republic of Slovakia v. Achmea BV*, CJEU Case C-284/16, Judgment of Court of Justice of the European Union, 6 March 2018 (**RL-0005**).

[59]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 131.

[60]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 90.

> *bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept.[61]*

214. The Respondent considers that the principles and underlying reasoning of *Achmea* apply to the present case.[62] More specifically, it holds that the conclusion in *Achmea* can be extended to Article 26 of the ECT both from a *literal* and a *substantive* point of view.

215. From a *literal* point of view, the Respondent points to the fact that *Achmea* did not refer to *'Bilateral Investment Treaties'* but rather to an *'international agreement concluded between Member States'*. In the Respondent's understanding, the ETC would fall under the second category.[63]

216. From a *substantive* point of view, the Respondent holds that *Achmea* established three main prerequisites to reach its conclusion, all of which are met in the present case:

> *(1) [T]hat in order to resolve the dispute, the Arbitral Tribunal must be called on to interpret and/or applicate of EU law; (2) that the Principle of EU Autonomy is not respected because the CJEU cannot exercise its function of "ensuring the full application of EU regulation in all Member States and ensuring judicial protection of the rights of the people under that law"; and (3) that the Award issued by the Arbitral Tribunal is not subject to be reviewed by a Court of any Member State.[64]*

217. The Respondent summarizes its position on the relevance of *Achmea* to the present dispute as follows:

> *... the Achmea Judgment confirms that, precisely because of articles 267 and 344 of the TFEU, article 26 of the ECT is not applicable to intra-EU disputes due to the fact that this would not be compatible with the Principles of primacy, autonomy, sincere cooperation and mutual trust of the European Union, and even less so if the issue is related to State Aid, as in the present case, which is excluded from the ECT under article 10(8) of the ECT.[65]*

218. The Respondent further supports its thesis by resorting, *inter alia*, to three documents issued, respectively, by the European Commission, the Governments of 22 EU Member States, and the CJEU. The Respondent additionally supports its arguments on the

---

[61] *Republic of Slovakia v. Achmea BV*, CJEU Case C-284/16, Judgment of Court of Justice of the European Union, 6 March 2018 (**RL-0005**).

[62] Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶¶ 112-114.

[63] Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶¶ 115-116.

[64] Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶¶ 117-118.

[65] Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 131.

judgement of the CJEU of 2 September 2021, issued in the Case C-741/19, *Republic of Moldova v. Komstroy*, The Tribunal refers to those documents and decisions below.

(a)    **The European Commission's Communication of 19 July 2018**

219.    The Respondent refers to the European Commission's Communication to the European Parliament and the Council, of 19 July 2018, on the protection of Intra-EU investment.

220.    In this Communication, the European Commission stated that Article 26 of the ECT, if interpreted correctly, did not provide for an investor-State arbitration clause applicable between investors from EU Member States and other EU Member States. The Commission considered that, if that was the case, the clause would be incompatible with EU primary law and thus inapplicable. The Commission further emphasized that the reasoning in *Achmea* applied to the intra-EU application of such a clause.[66]

(b)    **The Declaration of the Governments of 22 EU Member States after *Achmea***

221.    The Respondent also refers to the Declaration, of 15 January 2019, issued by the Representatives of the Governments of 22 EU Member States on the legal consequences of the *Achmea* judgment and on investment protection (the "**2019 Declaration**", as opposed to other Member States' declarations on the issue, also referred to by the Respondent).

222.    The 2019 Declaration stated that arbitration proceedings between investors from one EU Member State and another EU Member State under the ECT are incompatible with EU law. In the Respondent's view, the 2019 Declaration constitutes a fundamental element in the interpretation of the ECT in accordance with Article 31(3)(a) of the Vienna Convention on the Law of Treaties (the "**VCLT**"). In the Respondent's view,

---

[66]    Communication from The European Commission to The European Parliament and The Council on the Protection of intra-EU investment. COM (2018) 547/2. 19 July 2018 (**RL-0084**), pp. 3-4. Cited in Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 125.

"    The Achmea judgment is also relevant for the investor-State arbitration mechanism established in Article 26 of the Energy Charter Treaty as regards intra-EU relations. This provision, if interpreted correctly, does not provide for an investor-State arbitration clause applicable between investors from Member States of the EU and another Member States of the EU. Given the primacy of Union law, that clause, if interpreted as applying intra-EU, is incompatible with EU primary law and thus inapplicable. Indeed, the reasoning of the Court in Achmea applies equally to the intra-EU application of such a clause which, just like the clauses of intra-EU BITs, opens the possibility of submitting the disputes to a body which is not part of the judicial system of the EU. The fact that the EU is also a party to the Energy Charter Treaty does not affect this conclusion: the participation of the EU in that Treaty has only created rights and obligations between the EU and third countries and has not affected the relations between the EU Member States."

the 2019 Declaration reflects an agreement of the signatory Member States, parties to the ECT, regarding the interpretation to be made of Article 26 of the ECT.[67]

223.    In its Reply on Jurisdictional Objections, the Respondent rejects the Claimant's contention that the interpretative force of the 2019 Declaration is limited by the fact that it has not been signed by all signatory parties to the ECT. Instead, the Respondent observes that Article 31(3)(a) of the VCLT merely refers to an agreement between parties, without further indication.[68]

224.    The Respondent notes that the two States relevant to the present dispute (Luxembourg and Spain) are signatories of the 2019 Declaration. It holds that they unequivocally stated their desire for their investors to be unable to submit any dispute with another Member State, signatory to the 2019 Declaration, to arbitration under the ECT.[69]

### (c)    The CJEU's Opinion 1/17, of 30 April 2019

225.    In its Reply on Jurisdictional Objections, the Respondent refers to the Opinion 1/17, of 30 April 2019, issued by the CJEU on the compatibility of EU law and the Comprehensive Economic and Trade Agreement between Canada and the European Union and its Member States ("**CETA**").[70] In the Respondent's view, the CJEU underlined the validity of the principles of autonomy and primacy of EU law and confirmed that *Achmea* is applicable to any international agreement, even to those to which the EU is a party.[71]

226.    The Respondent also contends that the *Eskosol* decision,[72] to which the Claimant refers in support of its arguments, is flawed because it did not take into account the aforementioned Opinion of the CJEU, even when it came before the *Ekosol* decision.[73]

---

[67]  Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶¶ 161, 162, 166, 173.

[68]  Respondent's Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶ 179.

[69]  Respondent's Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶¶ 179-180.

[70]  "An international agreement entered into by the Union may, moreover, affect the powers of the EU institutions provided, however, that the indispensable conditions for safeguarding the essential character of those powers are satisfied and, consequently, there is no adverse effect on the autonomy of the EU legal order." Opinion 1/17 of the Plenary session of the CJEU Court of Justice, CETA. 30 April 2019 (**RL-0118**), para 107. Cited in Respondent's Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶ 67.

[71]  Respondent's Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶¶ 167, 170.

[72]  *Eskosol S.p.A in Liquidazione v. Italian Republic*, ICSID Case No. ARB/15/50, Decision on Italy's Request for Immediate Termination and Italy's Jurisdictional Objection based on Inapplicability of the Energy Charter Treaty to Intra-EU Disputes, 7 May 2019 (**CL-122**).

[73]  Respondent's Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶ 67.

### (d) The CJEU's decision in *Komstroy*

227. In its submission of 10 September 2021, the Respondent refers to the judgement issued by the CJEU on 2 September 2021 in *Republic of Moldova v. Komstroy*.[74]

228. The Respondent states that, since the *Komstroy* decision was issued by the Grand Chamber of the CJEU, it expresses the final view of the CJEU on the matters at issue.[75] The Respondent considers that such issues go to the core of its objection that the Tribunal lacks jurisdiction to hear an intra-EU case.[76]

229. *First*, The Respondent asserts that, in *Komstroy*, the CJEU declares the applicability of the holding in *Achmea* to the dispute settlement mechanism provided for in Article 26 of the ECT.[77]

230. *Secondly*, the Respondent refers to the question of the compatibility of intra-EU arbitration under the ECT and the EU Treaties. The Respondent cites the CJEU's conclusion that "*Article 26(2)(c) ECT must be interpreted as not being applicable to disputes between a Member State and an investor of another Member State concerning an investment made by the latter in the first Member State.*"[78]

231. Furthermore, in its submission of 23 June 2022, the Respondent argues that the CJEU's Opinion 1/20, of 16 June 2022,[79] confirmed the relevance and binding nature of the *Komstroy* decision regarding Article 26(2)(c) of the ECT.[80]

### (e) The award rendered in *Green Power*

232. In its second submission of 23 June 2022, the Respondent refers to the award rendered in *Green Power and SCE Solar Don Benito v. Spain*.[81]

233. The Respondent asserts that the tribunal in Green Power held that it lacked jurisdiction to hear a dispute involving European law "*such as is the case of a claim based on the ECT (…) brought by a European investor against a European State regarding subsidies*

---

[74] *Republic of Moldova v. Komstroy*, CJEU Case C-741/19, Judgment of the Grand Chamber of the Court of Justice of the European Union, 2 September 2021 (**RL-0183**).

[75] Respondent's Letter to the Tribunal of 10 September 2021, ¶ 5.

[76] Respondent's Letter to the Tribunal of 10 September 2021, ¶ 6.

[77] Respondent's Letter to the Tribunal of 10 September 2021, ¶ 8.

[78] Respondent's Letter to the Tribunal of 10 September 2021, ¶ 10.

[79] Opinion 1/20 of the CJEU, 16 June 2022.

[80] Respondent's Letter to the Tribunal of 23 June 2022, requesting leave to introduce the CJEU Opinion 1/20, ¶ 6.

[81] *Green Power et al v. Spain* (SCC Arbitration V 2016/135), Award of 16 June 2022 (**RL-0128**).

*to the renewable energy producers which are according to EU Law state aid.*"[82]

234.    The Respondent argues that the tribunal in *Green Power* conducted its analysis both from the perspective of Articles 31 and 32 of the VCLT and EU Law. The Respondent refers to the tribunal's interpretation of the ECT *"following criterions laid down in the VCLT but as they are not conclusive it continues its exercise by analysing the Achmea and Komstroy rulings…"*.[83]

235.    The Respondent refers to three grounds identified by the *Green Power* tribunal in favour of the application of the *Achmea* holdings: (i) that in *Achmea* the CJEU clarified that EU Law was to be applied to address the validity of offers to arbitrate intra-EU disputes; (ii) that *Achmea* explained that Articles 267 and 344 of the TFUE were incompatible with intra-EU arbitration clauses; and (iii) that *Achmea* highlighted the relevance of the *"rationale"* behind its holdings which was the autonomy of EU Law.[84]

236.    The Respondent also contends that, in the view of the *Green Power* tribunal, after the *Komstroy* decision there should be no doubt regarding the lack of jurisdiction of arbitral tribunals to hear intra-EU disputes under the ECT.[85]

237.    Moreover, the Respondent asserts that the *Green Power* tribunal took account of the 2019 Declaration issued by the Representatives of the Governments of 22 EU Member States on the legal consequences of the *Achmea* judgment and on investment protection.[86]

238.    In addition, the Respondent states that the line of interpretation found in *Komstroy* and *Green Power* is likely to be followed by the Svea Court of Appeal when faced with setting aside proceedings.[87]

           (iii)    **An effective interpretation of the ECT upholds the lack of consent for intra-EU arbitration**

239.    The Respondent maintains that a literal interpretation of the ECT according to its purpose and context leads to the conclusion that, when signing the ECT, EU Member

---

[82]    Respondent's Letter to the Tribunal of 23 June 2022, Comments on the *Green Power* award, ¶ 5
[83]    Respondent's Letter to the Tribunal of 23 June 2022, Comments on the *Green Power* award, ¶ 9.
[84]    Respondent's Letter to the Tribunal of 23 June 2022, Comments on the *Green Power* award, ¶ 10.
[85]    Respondent's Letter to the Tribunal of 23 June 2022, Comments on the *Green Power* award, ¶ 11.
[86]    Respondent's Letter to the Tribunal of 23 June 2022, Comments on the *Green Power* award, ¶ 12.
[87]    Respondent's Letter to the Tribunal of 23 June 2022, Comments on the *Green Power* award, ¶ 14.

States were not making an arbitration offer to investors from other EU Member States.[88]

240.    In the Respondent's understanding, the conflict resolution mechanisms under Article 26 of the ECT only refer to disputes concerning alleged breaches of obligations derived from Part III of the ECT, regarding investor and investment protection. In the Respondent's position, since EU Member States cannot obligate each other under Part III, the dispute resolution mechanisms laid down in Article 26 do not apply to intra-EU disputes.[89]

241.    The Respondent points to other provisions of the ECT which, in its view, support its thesis.

242.    It argues, for instance, that Article 1(3) of the ECT, which defines a "*Regional Economic Integration Organisation*" (an "**REIO**"),[90] expressly recognizes that some matters governed by the ECT should be negotiated by the EU because its Member States do not have competence over them. The Respondent considers that among said matters, whose negotiation is reserved to the EU, are fundamental freedoms and State aid.[91]

243.    The Respondent also refers to Article 25 of the ECT, which defines an "*Economic Integration Agreement*" (an "**EIA**"),[92] and considers that it expressly recognizes the principle of primacy of EU law.[93]

244.    Although the Respondent denies, in principle, the existence of a conflict between the ECT and EU law, it entertains it as a hypothesis and examines possible solutions.

---

[88]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 132.

[89]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 133.

[90]    Article 1(3) of the ECT: "'Regional Economic Integration Organisation' means an organisation constituted by states to which they have transferred competence over certain matters a number of which are governed by this Treaty, including the authority to take decisions binding on them in respect of those matters."

[91]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶¶ 136-137.

[92]    Article 25 of the ECT:
"(1) The provisions of this Treaty shall not be so construed as to oblige a Contracting Party which is party to an Economic Integration Agreement (hereinafter referred to as "EIA") to extend, by means of most favoured nation treatment, to another Contracting Party which is not a party to that EIA, any preferential treatment applicable between the parties to that EIA as a result of their being parties thereto.
(2) For the purposes of paragraph (1), "EIA" means an agreement substantially liberalising, inter alia, trade and investment, by providing for the absence or elimination of substantially all discrimination between or among parties thereto through the elimination of existing discriminatory measures and/or the prohibition of new or more discriminatory measures, either at the entry into force of that agreement or on the basis of a reasonable time frame.
[…]"

[93]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 153.

245. The Respondent considers, *first*, that such a conflict would be resolved not by Article 16 of the ECT but by Articles 30 and 59 of the VCLT. It holds that the rules of the VCLT would lead to the application of EU law. It considers that if the aim and purpose of the ECT were compared with those of the EU Treaties, and even more of the Treaty of Lisbon, the EU Treaties would prevail.[94]

246. The Respondent observes that even if it were understood that the hypothetical conflict should be resolved on the basis of Article 16 of the ECT,[95] the ECT should prevail. Article 16 of the ECT prevents the derogation of a provision that is more favourable to the investor or the investment. The Respondent asserts, however, that neither the ECT introduces substantive rights that are more favourable than EU law, nor does Article 26 of the ECT provide for arbitration as the sole dispute resolution mechanism nor does it say that this mechanism is more favourable than the others.[96]

247. The Respondent takes notice of the Claimant's contention that the ECT terms are more preferable for investors and investments, both from a *substantive* and a *procedural* point of view. In its Reply on Jurisdictional Objections, the Respondent suggests that the Claimant's interpretation of Article 16 of the ECT is seriously flawed. In the Respondent's view, Article 16 of the ECT is narrow and reduced-scope, and will apply to treaties the terms of which refer to the matters of Parts III (investment protection) and V (dispute settlement) of the ECT itself. In that regard, the Respondent argues that Article 16 is directed at investment treaties and does not discipline EU law.[97]

248. *Secondly*, the Respondent observes that, by virtue of Article 26(6) of the ECT, tribunals must apply EU law and the ECT under equal conditions. In this vein, it considers that any hypothetical conflict of those *'international rules'* is resolved in Article 25 of the ECT which, in the Respondent's view, recognizes the principle of primacy of EU law in intra-EU relations.

---

[94] Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶¶ 146-149.
[95] ECT, Article 16:
(1) nothing in Part III or V of this Treaty shall be construed to derogate from any provision of such terms of the other agreement or from any right to dispute resolution with respect thereto under that agreement; and
(2) nothing in such terms of the other agreement shall be construed to derogate from any provision of Part III or V of this Treaty or from any right to dispute resolution with respect thereto under this Treaty, where any such provision is more favourable to the Investor or Investment.
[96] Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 152.
[97] Respondent's Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶¶ 158-159. The Tribunal understands the Respondent's references to ECT Part II and Part IV to be made, respectively, to ECT Part III and Part V.

249.    *Thirdly*, and alternatively, the Respondent holds that if we turn to the rules of conflict in Article 30 of the VCLT, the hypothetical conflict must also be resolved in favour of EU law. The Respondent contends that the rule *'lex posterior derogat legi priori'*, under Article 30(4) of the VCLT, compels the application of the later rule, which is the principle of primacy of EU law.[98]

### (iv)    The "*disconnection*" of EU law from international treaties

250.    The Respondent submits that it was not necessary to introduce a disconnection clause into the ECT with regard to intra-EU disputes. It holds that any hypothetical conflict is resolved by Article 25 of the ECT which, in its view, recognizes the principle of primacy of EU law in intra-EU relations.[99]

251.    In its Reply on Jurisdictional Objections, the Respondent elaborates further on the possibility of EU law to *'disconnect'* from international treaties. It states that, by virtue of the principles of autonomy and primacy of EU law, in the relations between EU Member States or between EU Member States and the EU, EU law disconnects from the international treaties.[100]

252.    In that context, the Respondent considers that the *Eskosol* decision[101] erred in more than one respect. For instance, the Respondent rejects that for EU law to disconnect from international treaties a disconnection clause is needed. The Respondent also argues that the manifestation of the autonomy and primacy of EU Law with regard to international conventions must not be understood in a purely hierarchical manner, since it operates intra-EU solely.[102]

253.    The Respondent further submits that both the autonomy and primacy of EU law, and the consequence of disconnecting from international treaties, find support in all sources of international law.[103]

254.    *First*, the Respondent asserts that the principles of autonomy and primacy of EU law, and the possibility of *'disconnecting'*, exist as customary international law, since they

---

[98]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 157.

[99]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶¶ 150-153.

[100]   Respondent's Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶ 72.

[101]   *Eskosol S.p.A in Liquidazione v. Italian Republic*, ICSID Case No. ARB/15/50, Decision on Italy's Request for Immediate Termination and Italy's Jurisdictional Objection based on Inapplicability of the Energy Charter Treaty to Intra-EU Disputes, 7 May 2019 (**CL-122**).

[102]   Respondent's Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶ 72.

[103]   Respondent's Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶ 74.

have been accepted by the international community.[104] The Respondent also submits that customary international law pertaining to the autonomy and primacy of EU law works bidirectionally: that is, in relation to previous and future international treaties.[105] The Respondent also observes that the determination of when there is a disconnection in favour of EU law is exclusively an EU decision.[106]

255.    *Secondly*, the Respondent states that the primacy of EU law over any national or international legal regime must be respected even from a strict perspective of Treaty Law. It supports such statement by reference to Declaration 17 of the Treaty of Lisbon, on the primacy of EU legislation.[107]

256.    *Thirdly,* the Respondent holds that the principles of autonomy and primacy of EU law, together with the consequence of *'disconnecting'*, fall under the category of general principles of law. The Respondent refers to *'pacta sunt servanda'*. It contends that, with the ratification of the Treaty of Lisbon, EU Member States accepted the commitment to respect the exclusive competence of the EU over foreign investment, the primacy of EU law, the jurisdictional system of the EU, and the CJEU's decisions.[108]

257.    The Respondent summarizes its argumentation by stating that Article 26 of the ECT has not been applicable to conflicts within the EU since the ratification of the ECT. Alternatively, the Respondent submits that the Treaty of Lisbon replaced Article 26 of the ECT and made it inapplicable to intra-EU disputes.[109] The Tribunal observes that both contentions of the Respondent are based on the alleged possibility of EU law to *'disconnect'* from international treaties for intra-EU affairs.

258.    The Tribunal further notes the Respondent's assertion that, if it were understood that the EU and its Member States did not previously disconnect from Article 26 of the ECT for intra-EU affairs, they would, in any case, have done so through the 2019 Declaration of the 22 EU Member States, after the *Achmea* decision.[110]

---

[104]    Respondent's Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶ 94.
[105]    Respondent's Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶ 106.
[106]    Respondent's Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶ 124.
[107]    Respondent's Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶¶ 188-190.
[108]    Respondent's Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶ 199.
[109]    Respondent's Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶ 186.
[110]    Respondent's Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶ 172.

## 2.    The Claimant's Position

259.    The Claimant's arguments address both the objection *ratione personae* and the objection *ratione materiae* raised against the jurisdiction of the Tribunal.

260.    With regard to the Tribunal's jurisdiction *ratione personae*, the Claimant contends that the Claimant is a proper *'investor'* with the requisite nationality under the ECT, and that the dispute concerns its substantial *'investments'* in Spain.[111] In its Rejoinder on Jurisdiction, the Claimant further notes that the Respondent has contested neither the Claimant's nationality nor the nature of its investments.[112]

261.    The Claimant states that no tribunal has ever accepted the position that the ECT does not apply to disputes between an investor of an EU Member State and another EU Member State. It points out that the Respondent has consented unconditionally to the jurisdiction of this Tribunal.[113] In that respect, the Claimant recalls that the tribunal in *Eskosol* concluded that "*nothing in the text of Article 26 itself suggests its scope was intended to be restricted to disputes involving either an investor or a Contracting Party outside the EU.*"[114] The Claimant notes that the *Eskosol* tribunal reached the same conclusion as at least 24 other ECT tribunals.[115]

262.    With regard to the Tribunal's jurisdiction *ratione materiae*, the Claimant rejects the arguments presented by the Respondent. The Tribunal summarizes below the sequence of counterarguments presented by the Claimant.

### (i)    EU law is not applicable to the present dispute

263.    The Claimant argues that the Respondent misreads the ECT's governing law clause and misconstrues EU law. The Claimant argues that the ECT, and not EU law, applies to the Tribunal's jurisdiction. In the Claimant's view, Article 26(6) of the ECT applies to the merits and not to the Tribunal's jurisdiction. It further asserts that, in any event, the reference to *'rules and principles of international law'* in Article 26(6) of the ECT does not include EU law, which is not international but regional law.

---

[111]    Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶¶ 37, 40.

[112]    Claimant's Rejoinder on Jurisdiction, ¶ 5.

[113]    Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 55.

[114]    *Eskosol S.p.A in Liquidazione v. Italian Republic*, ICSID Case No. ARB/15/50, Decision on Italy's Request for Immediate Termination and Italy's Jurisdictional Objection based on Inapplicability of the Energy Charter Treaty to Intra-EU Disputes, 7 May 2019 (**CL-122**), ¶ 85.  Cfr. Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 58.

[115]    Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 60.

264.   Consequently, the Claimant rejects the Respondent's argument that, because EU law is applicable, EU State aid law removes the dispute from the Tribunal's jurisdiction. The Claimant additionally maintains that, even if EU State aid law were relevant to the dispute, it would apply only to the merits and not to the Tribunal's jurisdiction.

265.   In its Rejoinder on Jurisdiction, the Claimant also denounces the lack of evidence that either the Respondent or the European Commission considered RD 661/2007 and RD 1578/2008 as State aid when such measures were in force.[116]

<strong>(ii)      The decision in <em>Achmea</em> does not embrace the present case</strong>

266.   The Claimant rejects the Respondent's argument that the *Achmea* decision extends to the ECT. It maintains, on the contrary, that neither the conclusion nor the reasoning in *Achmea* are relevant to the dispute.[117]

267.   The Claimant observes that *Achmea* concerned an intra-EU BIT and, therefore, it does not extend to multilateral treaties to which the EU is a party.[118] It also recalls that the dispute settlement mechanism in the BIT at issue (the Netherlands-Slovakia BIT) was found incompatible with EU law because it potentially required a tribunal to interpret and apply EU law, although such a tribunal did not constitute a *'tribunal or court'* for the purposes of Article 267 of the Treaty on the Functioning of the European Union ("**TFEU**"). The Claimant warns that this is not the case of the ECT.[119] In addition, the Claimant points out that the *Achmea* decision express carves out treaties to which the EU is a party, such as the ECT.[120]

268.   The Claimant also observes that no ECT tribunal has held that the *Achmea* decision extends to the ECT, and that at least 15 ECT tribunals have held the contrary.[121]

269.   The Tribunal notes the Claimant's additional counterargument regarding *Achmea*. The Claimant holds that, even if *Achmea* extended to the ECT, that would not impact or preclude the Tribunal's jurisdiction. In the Claimant's view, a decision of an EU court under EU law is not binding on an international investment tribunal empanelled under

---

[116]   Claimant's Rejoinder on Jurisdiction, ¶ 100.

[117]   Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 97.

[118]   Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶¶ 109-110, 120.

[119]   Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶¶ 125-132.

[120]   *Republic of Slovakia v. Achmea BV*, CJEU Case C-284/16, Judgment of Court of Justice of the European Union, 6 March 2018 (**RL-0005**), ¶¶ 57-58. Cfr. Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶¶ 117-119.

[121]   Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 133.

a different legal instrument.[122] The Claimant invokes the International Law Commission (the "**ILC**") 2006 Report on Fragmentation of International Law, which provides that "*when conflicts emerge between treaty provisions that have their home in different regimes, care should be taken so as to guarantee that any settlement is not dictated by organs exclusively linked with one or the other of the conflicting regimes.*"[123] The Claimant maintains that this conclusion is consistent with the rulings in many recent intra-EU ECT cases decided by experts on international law.[124]

270.    In addition, the Claimant rejects that *Achmea* is likely to have an impact upon enforcement of ECT awards. It, nevertheless, considers that matters related to the enforcement of an eventual award are *"of no relevance to the current task before the Tribunal which simply is to decide the merits of the dispute"*.[125]

271.    The Tribunal notes that the Claimant refers, *inter alia*, to three documents to which the Respondent resorts to in its submissions: the European Commission's Communication to the European Parliament and the Council, of 19 July 2018, on the protection of Intra-EU investment; the 2019 Declaration of the Governments of EU Member States on the legal consequences of the *Achmea* decision; and CJEU's Opinion 1/17, of 30 April 2019, on the compatibility between EU law and CETA. The Tribunal summarizes the Claimant's views below.

(a)    The European Commission's Communication of 19 July 2018

272.    In its Rejoinder on Jurisdiction, the Claimant refers to the European Commission's Communication to the European Parliament and the Council, of 19 July 2018, on the protection of intra-EU investment, noted by the Respondent.

273.    The Claimant considers that, while the European Commission discussed, to considerable extent, substantive rights under EU law, it did not attempt to link or compare those rights to the rights afforded by any investment treaty, including the

---

[122]    Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶¶ 134, 137, 139.

[123]    UN International Law Commission, Study Group of the ILC, Fragmentation of International Law: Difficulties Arising from the Diversification and Expansion of International Law, U.N. Doc. A/CN.4/L.682, Apr. 13, 2006 (**CL-146**), p. 252. Cfr. Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 139.

[124]    Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 140.

[125]    Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 147.

ECT.[126]

274.    On this ground, the Claimant rejects the Respondent's suggestion that the substantive rights afforded by EU law to investors and investments could be superior to the rights and protections enshrined in the ECT.[127]

(b)    **The Declaration of the Governments of 22 EU Member States after *Achmea***

275.    In its Counter-Memorial on Jurisdiction, the Claimant rejects that the 2019 Declaration of the Governments of EU Member States on the legal consequences of the *Achmea* decision are relevant to the Tribunal's evaluation of its jurisdiction under the ECT. It contends that those declarations are political statements with no legal weight regarding the applicability of the ECT to the present dispute.[128]

276.    In its Rejoinder on Jurisdiction, the Claimant states that numerous tribunals have recently confirmed that the EU Member States' various Declarations are not EU legal instruments and do not have an interpretive effect regarding EU law.[129]

(c)    **The CJEU's Opinion 1/17, of 30 April 2019**

277.    In its Rejoinder on Jurisdiction, the Claimant refers to the CJEU's Opinion 1/17, of 30 April 2019, on the compatibility between EU law and CETA.

According to the Claimant, the Respondent severely mischaracterizes the CJEU's Opinion when it claims that it shows that *Achmea* applies to multilateral treaties. The Claimant further notes that the CJEU found no conflict between the dispute resolution framework envisioned for CETA and EU law, despite the lack of an ability for potential tribunals constituted under CETA to refer questions of EU law to European courts.[130]

(d)    **The CJEU's decision in *Komstroy***

278.    In its submission of 16 May 2022, the Claimant opposes the Respondent's reliance on the CJEU's decision in *Komstroy* to support its objection to the jurisdiction of the Tribunal.

279.    In the Claimant's view, the *Komstroy* decision is irrelevant to the issues before this

---

[126]    Claimant's Rejoinder on Jurisdiction, ¶ 53.
[127]    Claimant's Rejoinder on Jurisdiction, ¶ 53.
[128]    Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶¶ 175, 181-182.
[129]    Claimant's Rejoinder on Jurisdiction, ¶ 89.
[130]    Claimant's Rejoinder on Jurisdiction, ¶ 45.

Tribunal, which is bound by the terms of the ECT. The Claimant notes that seven ECT tribunals and three ICSID annulment committees found that *Komstroy* was irrelevant to the analysis of whether the ECT applies to intra-EU disputes.[131]

280.   Moreover, the Claimant rejects the Respondent's argument that, in light of the *Komstroy* decision, the Svea Court of Appeal will not confirm the jurisdiction of SCC tribunals to hear intra-EU disputes regarding the ECT. The Claimant observes that neither the Svea Court of Appeal nor any other court situated within the EU and subject to EU had invoked *Komstroy* to set aside any intra-EU ECT award.[132]

281.   In its submission of 1 July 2022, the Claimant considers that the CJEU's Opinion 1/20, of 16 June 2022, is irrelevant to any issue this Tribunal is called upon to decide. In the Claimant's view, this Opinion does not develop the current state of EU law, but simply confirms that the original ECT has not been modified.[133]

### (e)    The award rendered in *Green Power*

282.   In its second submission of 1 July 2022, the Claimant refers to the *Green Power* award, on which the Respondent relies to support its objection to the jurisdiction.

283.   In the Claimant's view, the tribunal in *Green Power* erred when it found that matters of EU law were relevant as part of the governing law by virtue of an EU seat of the arbitration.[134]

284.   The Claimant argues that *Green Power* is unpersuasive for two reasons.

285.   *First*, the Claimant asserts that the *Green Power* tribunal adopts *"an extreme view"* of the relevant factual and legal issues, which has not been adopted by any other arbitral tribunal.[135]

286.   *Second*, the Claimant contends that the reasoning in *Green Power* is *"faulty and illogical"*. The Claimant considers that the *Green Power* tribunal: (i) *"misapplied international law on treaty interpretation,"* since it concluded that a treaty may have different meanings depending on different facts; (ii) *"incorrectly interpreted and applied the so-called principle of EU 'primacy'"*, assuming that "primacy" means that

---

[131]   Claimant's Letter to the Tribunal of 16 May 2022, pp. 1-2, 6.
[132]   Claimant's Letter to the Tribunal of 16 May 2022, p. 4.
[133]   Claimant's Letter to the Tribunal of 1 July 2022, regarding the CJEU's Opinion 1/20 of 16 June 2022, p. 2.
[134]   Claimant's Letter to the Tribunal of 1 July 2022, regarding the *Green Power* award, p. 1.
[135]   Claimant's Letter to the Tribunal of 1 July 2022, regarding the *Green Power* award, pp. 1-2.

EU law can be superior to international law, which is incorrect; (iii) *"failed to take appropriate account of the drafting history of the ECT"*, which includes the Contracting Parties' decision not to include a disconnection clause for intra-EU disputes; (iv) *"incorrectly conflated its mandate to determine a dispute under the ECT with the* [European Commission]*'s competence to determine the compatibility of state aid regimes"*, when, in the Claimant's view, there is no conflict between the European Commission's competence to determine the compatibility of state aid schemes and an arbitral tribunal's assessment of the relevance of that determination, if any; and (v) based its *"entire conclusion* [] *on an assumption that Swedish courts will apply Komstroy to 'disapply' the ECT to intra-EU disputes and that the courts will do so retroactively"*, adding that it is a well-settled international legal rule that the tribunal's jurisdiction must be assessed as of the date the arbitration commenced.[136]

### (iii) The interpretation of the ECT does not uphold a lack of consent for intra-EU arbitration

287. The Claimant rejects the Respondent's position that EU law and the dispute resolution provision in the ECT are incompatible.[137] It rejects the contention that EU law would prevail under Article 16 of the ECT and under the *lex posterior* rule of the VCLT.

288. According to the Claimant, when two international agreements between the same Contracting Parties are in force, Article 16 of the ECT gives preference to the more favourable provisions for investors and investments. In the Claimant's view, the predominance of the more preferable ECT terms is preserved both from a *substantive* and a *procedural* point of view: by explicitly referring only to the ECT Parts III (Investment Promotion and Protection) and V (Dispute Settlement). The Claimant considers that, to prevail on its argument, the Respondent would have to establish that the EU treaties offer more favourable provisions than the substantive protections afforded in Part III of the ECT and the access to arbitration granted under Part V of the ECT.[138]

289. As to the Respondent's *lex posterior* argument under the VCLT, the Claimant asserts that Articles 30(3) and 30(4) of the VCLT are only applicable where the treaties at issue share the same subject matter and are incompatible. In the Claimant's view, that is not

---

[136] Claimant's Letter to the Tribunal of 1 July 2022, regarding the *Green Power* award, pp. 2-3.
[137] Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 152.
[138] Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶¶ 153-155.

the case between the ECT and the EU treaties.[139]

290.    Furthermore, in its Rejoinder on Jurisdiction, the Claimant recalls that Article 30 of the VCLT provides that the parties to a treaty are free to determine the hierarchy of norms through special agreements or *'leges speciales'*. The Claimant considers that the Parties to the ECT agreed to a *'lex specialis'* in Article 16 of the ECT, where they agreed on the relationship between the ECT and any other prior or subsequent agreements. In the Claimant's view, the *'conflict of treaties rules'* in Article 16 of the ECT would trump the principle of primacy.

291.    What is more, the Claimant observes that, under Articles 31 and 32 of the VCLT, only if the interpretation of the relevant treaty language leaves a meaning that is *'ambiguous or obscure'* or *'manifestly absurd or unreasonable'* may recourse be had to supplementary means of interpretation.[140] The Claimant insists on the plain meaning of the terms of Article 24(3) of the ECT, which provide that every Contracting Party to the ECT gave its *'unconditional consent'* to investor-State dispute resolution in accordance with the provision. The Claimant denies any ambiguity in the language.[141]

292.    The Claimant then recalls the *Eskosol* tribunal's conclusion in the sense that nothing in the context of the ECT indicates an intent to exclude intra-EU disputes from the scope of application of Article 26 of the ECT.[142] The Claimant maintains that the *Eskosol* tribunal reached the same conclusion as "*every other tribunal that has addressed the issue.*"[143]

(iv)    **A disconnection clause is not** *'unnecessary'*

293.    The Claimant rejects the Respondent's argument that a disconnection clause was unnecessary to carve-out intra-EU arbitration from the ECT.

294.    The Claimant notes that the text of the ECT provides no limitations or exceptions that would indicate that investors from certain Contracting Parties may not resolve their

---

[139]   Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶¶ 163-166. Also, Claimant's Rejoinder on Jurisdiction, ¶ 31.

[140]   Claimant's Rejoinder on Jurisdiction, ¶ 17.

[141]   Claimant's Rejoinder on Jurisdiction, ¶ 21.

[142]   *Eskosol S.p.A in Liquidazione v. Italian Republic*, ICSID Case No. ARB/15/50, Decision on Italy's Request for Immediate Termination and Italy's Jurisdictional Objection based on Inapplicability of the Energy Charter Treaty to Intra-EU Disputes, 7 May 2019 (**CL-122**), Sections V.A.1-2.  Cfr. Claimant's Rejoinder on Jurisdiction, ¶ 25.

[143]   Claimant's Rejoinder on Jurisdiction, ¶ 26.

disputes against certain other Contracting Parties under the ECT. The Claimant further denies the possibility of such a reservation because Article 46 of the ECT provides that *'[n]o reservations may be made to this treaty'*.[144]

295.    In addition, the Claimant observes that the ECT's *travaux préparatoires* demonstrate that the European Economic Community unsuccessfully attempted to introduce a disconnection clause into the ECT.[145] The Claimant observes that no ECT Contracting Party has taken any step to amend the provisions of this Treaty afterwards.[146]

296.    In its Rejoinder on Jurisdiction, the Claimant also submits that no ECT tribunal has ever accepted the Respondent's contention that disconnection clauses are unnecessary to render international treaties that EU Member States have ratified ineffective between them. The Respondent asserts that such scenario *'flies in the face of the [VCLT] and the established practice of the EU and its Member States'*.[147]

297.    The Claimant also rejects the Respondent's contention that the principle of primacy of EU law was codified in Declaration 17 to the Lisbon Treaty. The Claimant observes, *first*, that the Respondent points to no authority in support of its argument. *Secondly*, the Claimant asserts that the plain text of the Treaty of Lisbon demonstrates that the ECT fully applies. The Claimant specifically refers to Article 188(N) of the Treaty of Lisbon, which provides that *'[a]greements concluded by the Union are binding upon the institutions of the Union and on its Member States'. Thirdly*, the Claimant argues that EU law does not prevail over the ECT.[148]

298.    Moreover, the Claimant criticizes the Respondent's argument that the principles of autonomy and primacy, and the implied *'disconnection'* of EU law, amount to customary international law. In the Claimant's view, the Respondent fails to demonstrate the existence of an international custom.[149]

### 3.    The submission by the European Commission

299.    Under Procedural Order No. 2, the Tribunal granted the European Commission's application to intervene in the present arbitration as a non-disputing party. The Tribunal

---

[144]    Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶¶ 76-77.
[145]    Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶¶ 80-81.
[146]    Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 83.
[147]    Claimant's Rejoinder on Jurisdiction, ¶ 9.
[148]    Claimant's Rejoinder on Jurisdiction, ¶¶ 28-31.
[149]    Claimant's Rejoinder on Jurisdiction, ¶¶ 58-82.

authorized the European Commission to submit a precise statement of its positions on the following issues of treaty interpretation, to the extent they were material to the outcome of the case:

(i)     Whether Article 26 of the ECT applies to a dispute between a Contracting Party and an Investor of a Contracting Party where both Contracting Parties are EU Member States; and

(ii)    Whether and to what extent the rules of EU law on State aid are relevant to the interpretation of the substantive provisions of Part III of the ECT, including Article 16 of the ECT.[150]

300.    On 9 August 2019, the European Commission submitted its observations, which the Tribunal summarizes below.

**(i)     Whether Article 26 of the ECT applies to a dispute between a Contracting Party and an Investor of a Contracting Party where both Contracting Parties are EU Members**

301.    *First*, the European Commission recalls that Article 19(1) of the Treaty on European Union ("TEU") obliges Member States to provide sufficient remedies to ensure effective legal protection in the fields covered by EU law. The Commission states that the integrity of the EU legal order is protected via a comprehensive judicial system.[151]

302.    The Commission then refers to Articles 267 and 344 of the Treaty on the Functioning of the European Union ("TFEU"). It explains that Article 267 describes the preliminary ruling procedure, which is the keystone of uniform interpretation and application of EU law. Article 344, the Commission continues, prohibits Member States from creating, in relation to any matter implicating EU law, dispute settlement mechanisms other than those set out in the EU Treaties. The Commission states that by virtue of this arrangement the specific characteristics and the autonomy of the EU legal order are preserved.[152]

303.    The Commission also points to two principles: primacy of EU law and mutual trust.

304.    With regard to *primacy of EU law*, the Commission asserts that EU law is an integral part of, and takes precedence over, the legal order applicable in the territory of each of

---

[150]    Procedural Order No. 2, Section 3.8.3.
[151]    European Commission's Amicus Curiae, ¶ 5.
[152]    European Commission's Amicus Curiae, ¶ 6.

the Member States.[153]

305.    As to *mutual trust*, the Commission contends that this principle may be called into question if a system of dispute resolution is introduced in a situation covered by EU law but is set up outside the EU system of effective legal protection.[154]

306.    *Secondly*, the European Commission refers to the *Achmea* decision. It recalls that the CJEU confirmed that the TFEU prohibits the Member States from offering to resolve intra-EU investor-State disputes before international arbitral tribunals.[155]

307.    The Commission observes that the question before this Arbitral Tribunal is how to apply the interpretation of Articles 267 and 344 of the TFEU handed down by the CJEU in *Achmea* to the arbitration clause in the ECT.[156]

308.    The Commission holds that the considerations set out by the CJEU in *Achmea* apply equally to an intra-EU application of Article 26 of the ECT, in the following manner:

    (i)    EU law is international law applicable between all EU Member States;

    (ii)    EU law is covered by the term *'applicable rules and principles of international law'* under Article 26 of the ECT and is explicitly recognized as binding in an intra-EU context under Article 1(3) of the ECT;

    (iii)    Arbitral tribunals are not *'national courts or tribunals'* within the meaning of Article 267 of the TFEU; and

    (iv)    There is no full review of the award by a court in an EU Member State.[157]

309.    *Thirdly*, the Commission considers that in any situation concerning both the ECT and EU law, the former would, pursuant to Article 30(4)(a) of the VCLT, only apply to the extent that it is compatible with the latter. It concludes that the dispute settlement mechanisms under Article 26 of the ECT are not compatible with EU law when dealing with intra-EU disputes.[158]

---

[153]    European Commission's Amicus Curiae, ¶ 7.
[154]    European Commission's Amicus Curiae, ¶ 9.
[155]    European Commission's Amicus Curiae, ¶ 11.
[156]    European Commission's Amicus Curiae, ¶ 12.
[157]    European Commission's Amicus Curiae, ¶ 13.
[158]    European Commission's Amicus Curiae, ¶¶ 20-21.

> **(ii)** **Whether and to what extent the rules of EU law on State aid are relevant to the interpretation of the substantive provisions of Part III of the ECT, including Article 16 of the ECT**

310. *First*, the European Commission recalls that the EU Treaties charge the Commission with the enforcement of EU competition law and that this includes the investigation and control of State aid. The Commission observes that it has exclusive competence to declare State aid compatible with the EU Treaties, subject to review by the CJEU.[159]

311. The Commission explains that State aid is, as a matter of principle, forbidden under EU law,[160] but that the Commission enjoys wide discretion under the TFEU to declare it compatible with the internal market.[161] Pursuant to Article 108(3) of the TFEU, Member States must inform the Commission of any plans to grant new aid or to alter existing aid. Member States are precluded from implementing new State aid measures before they are approved by the Commission (the "stand-still obligation").[162]

312. The Commission further observes that the effective implementation of EU competition rules, which includes EU State aid rules, has been considered as a matter of EU public policy.[163]

313. *Secondly*, the Commission recalls that Article 16 of the ECT deals with the ECT's relation to other agreements that form part of the international law corpus.[164] The Commission asserts that since the provisions on EU State aid law are contained in Articles 107 to 109 of the TFEU, it is not so much EU State aid law that would be relevant to an interpretation of Article 16 of the ECT in an intra-EU situation. It rather considers that Articles 267 and 344 of the TFEU, and Articles 2, 4, and 19 of the TEU, would be relevant.[165]

314. In this context, the Commission submits that Article 16 of the ECT cannot be usefully invoked to reach a different outcome to that which flows logically from the decision in *Achmea*.[166] To arrive at that conclusion, the Commission asserts that Article 16 of the

---

[159] European Commission's Amicus Curiae, ¶ 29.
[160] European Commission's Amicus Curiae, ¶ 30.
[161] European Commission's Amicus Curiae, ¶ 31.
[162] European Commission's Amicus Curiae, ¶ 34.
[163] European Commission's Amicus Curiae, ¶ 40.
[164] European Commission's Amicus Curiae, ¶ 72.
[165] European Commission's Amicus Curiae, ¶¶ 72-73.
[166] European Commission's Amicus Curiae, ¶ 79.

ECT cannot be deemed a rule of conflict for the purposes of the ECT but, instead, a rule of interpretation. The Commission also contends that nothing in the text of Article 16 of the ECT appears to override later and special rules of conflict put in place by self-contained systems of international law, such as the rule of primacy of EU law.[167]

### 4.    The Tribunal's Analysis

315.    The Arbitral Tribunal derives its jurisdiction from ECT Article 26, in which Spain expresses its consent to submit disputes with qualifying investors arising out of Part III of the ECT to international arbitration.  The Claimant argues that it has expressed its consent in corresponding terms and that there is accordingly binding mutual consent to submit the present dispute to arbitration before the Arbitral Tribunal.  The Respondent argues that on a proper reading of the ECT the Respondent's consent does not extend to investors of other EU Member States.  The Claimant rejects the Respondent's contention.

316.    The meaning and scope of ECT Article 26 are to be determined in accordance with the rules and principles of international law on the interpretation of treaties.  Articles 31 and 32 of the VCLT express the applicable international law rules for this purpose.  The Arbitral Tribunal shall therefore proceed on this basis.

317.    Article 31(1) of the VCLT provides as follows: "A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose."

318.    It is well settled that this provision contains a single rule of interpretation that must be applied in an integral manner, as opposed to applying partial elements of the rule in a fragmented and separate manner.  The starting point for the interpretation of a treaty is its text, according to the ordinary meaning of its terms or, as provided by Article 31(4) of the VCLT, in accordance with a special meaning ascribed to a term of the treaty by the Contracting Parties.

319.    The relevant terms of the ECT in this case are found in ECT Article 26(1) and (3):

> *(1) Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the*

---

[167]    European Commission's Amicus Curiae, ¶ 75.

*former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably.*

*[...]*

*(3) Subject only to subparagraphs (b) and (c), each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article.*

320.    The EU, Luxembourg and Spain have each been a Contracting Party to the ECT since 16 April 1998.  They ascribed a special meaning to the phrase "*Investor of another Contracting Party*" through the definition of "*Investor*" in ECT Article 1(7)(a)(ii), the meaning of which includes, with respect to a Contracting Party, "*a company or other organization organized in accordance with the law applicable in that Contracting Party*".  ECT Article 1(6) defines the term "*Investment*" to mean "*every kind of asset, owned or controlled directly or indirectly by an Investor*", including "a company or business enterprise".  ECT Article 1(10) defines the term "Area" for two types of Contracting Parties.  With respect to "*a state that is a Contracting Party*" it means "*the territory under its sovereignty*," including its land territory.  With respect to "*a Regional Economic Integration Organization which is a Contracting Party, Area means the Areas of the member states of such Organization.*"

321.    ECT Article 26(3), subparagraphs (b) and (c), limit the scope of consent given by each Contracting Party under ECT Article 26(3)(a).  ECT Article 26(3)(b) refers to the Contracting Parties listed in ECT Annex ID, which include Spain.  Annex ID contains a so-called fork-in-the-road provisions.  It is common ground that ECT Article 26(3)(b) does not apply to the facts of this case.  ECT Article 26(3)(c) refers to the Contracting Parties listed in ECT Annex IA, which do not include either the EU, Luxembourg or Spain and is therefore not applicable.

322.    In accordance with Article 31(2) of the VCLT, the context of the ECT for this purpose comprises, "in addition to the text, including its preamble and annexes: (a) any agreement relating to the treaty which was made between all the parties in connection with the conclusion of the treaty;" and "(b) any instrument which was made by one or more parties in connection with the conclusion of the treaty and accepted by the other parties as an instrument related to the treaty."

323.    Spain invokes several ECT provisions as context to ECT Article 26.  These include the

definition of Regional Economic Integration Organization ("REIO") as an organization to which its members states "*have transferred competence over certain matters a number of which are governed by this Treaty, including the authority to take decisions binding on them in respect of those matters*"; the conditional weighted vote of an REIO; the non-extension to investors of third states of the preferential treatment granted under an EIA;  and the broad formulation of the law applicable to solving "*the issues in dispute*".  Spain argues that the context of these provisions supports the conclusion that REIO norms, and in the present case the norms of EU law, prevail over ECT Article 26(1).

324.    The Claimant questions the relevance of the provisions invoked by Spain and invokes the absence of any express or implied derogation in those or other ECT provisions from the core terms of ECT Article 26(1) and (3).  The Claimant relies on ECT Article 16 as dispositive of any conflict between ECT Article 26 and EU law (given that the EU qualifies as an REIO Contracting Party) in favour of ECT Article 26.

325.    In addition to the text, preamble and annexes of the ECT, the publication containing the ECT submitted by both Parties contains and cross-references certain agreements and other instruments relating to the ECT which were made by the ECT Contracting Parties in connection with the conclusion of the ECT.

326.    Article 31(3) of the VCLT provides that, together with the context, the interpretation of a treaty shall take into account "(a) any subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions; (b) any subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation; [and] (c) any relevant rules of international law applicable in the relations between the parties."

327.    Spain argues that the 2019 Declaration reflects a "subsequent agreement between the parties regarding the interpretation of the [ECT] or the application of its provisions" and amounts to an "authentic interpretation" of the ECT.  In the alternative, Spain argues that the 2019 Declaration constitutes "subsequent practice in the application of the [ECT] which establishes the agreement of the parties regarding its interpretation" and that it is a "formal and binding statement" in this respect.

328.    The Claimant counters that "*the Declaration is not an agreement interpreting the ECT*", both on the terms of the 2019 Declaration and because it is not subscribed by all ECT

Contracting Parties or all EU Member States. The Claimant adds that the 2019 Declaration does not qualify as "*subsequent practice in the application*" of the ECT because it does not denote sufficiently extensive, concordant, common or consistent practice.

329.  Spain invokes EU law as the main source among the "*relevant rules of international law applicable in the relations between the parties*" that the Arbitral Tribunal must take into account under Article 31(3)(c) of the VCLT. Spain argues, in addition, that EU law is part of the applicable law under ECT Article 26(6). In both cases, however, the Arbitral Tribunal needs to decide, as a threshold question, which rules are relevant and applicable.

330.  Spain argues that the relevance of EU law derives from its pervasive character for EU Member States, which requires the ECT to be interpreted in a manner harmonious with EU law or, if harmonious interpretation is not possible, acknowledgement of the primacy and prevalence of EU law over conflicting provisions of the ECT. This includes the prevalence of any binding decision by a competent EU body, such as the Commission, as a matter of public policy. The 2019 Declaration, in Spain's view, has confirmed its position on jurisdiction.

331.  The Claimant rejects both the premise and conclusions of Spain's objection. The Claimant argues that ECT Article 26(6) provides for the law applicable to the merits of the dispute, not to jurisdiction, and that EU law is not relevant to the proper meaning and scope of ECT Article 26(1) and (3). The Claimant adds that neither the internal assignment of competence between the EU and its Member States nor the powers of the CJEU have any bearing on the application of ECT Article 26. The 2019 Declaration, in the Claimant's submission, can provide no further support to the Respondent's position.

332.  Article 31(1) of the VCLT requires interpretation of the terms of the ECT to be done "*in the light of its object and purpose*". Spain draws on ECT Article 2 and 6(1) to propose that the over-arching purpose of the ECT is focused on the creation of an efficient, non-discriminatory and transparent energy market, which converges with the purpose of EU law in the same field. These common objectives, argues Spain, support the prevailing role of EU law over conflicting ECT rules among EU Member States. The Claimant rejects the Respondent's conclusions. Among other things, the Claimant

argues that, because convergence of purpose is not matched by convergence of substance, there is no inconsistency between the ECT and EU law.

333. Neither Party relies on Articles 32 or 33 of the VCLT.

334. In principle, the ordinary meaning of ECT Article 26 upholds the Arbitral Tribunal's jurisdiction. The central question is whether the ordinary meaning of the terms of ECT Article 26 in their context and in the light of the object and purpose of the treaty excludes so-called intra-EU disputes from the Tribunal's jurisdiction. For the reasons set out below, the Arbitral Tribunal concludes that ECT Article 26 does not exclude intra-EU disputes, and that the Arbitral Tribunal therefore has jurisdiction over the present dispute.

335. The Parties have placed before the Arbitral Tribunal a fulsome set of sources for the interpretation of ECT Article 26, including a published compendium of the ECT with related documents and information. Those sources indicate, among other things, several relevant features. The EU is an ECT Contracting Party as are the EU Members States including the Parties. The EU qualifies as an REIO under Article 1(3). EU Member States have transferred, and may transfer, to the EU "*competence over certain matters that are governed by*" the ECT. The EU, in turn, may take decisions on those matters that are binding on EU Member States. The scope of the competence transferred to the EU by its Members States, or the understanding of the specific consequences of such transfer, has grown over time. The ECT Contracting Parties provided for the possibility of prior or subsequent international agreements between "*two or more Contracting Parties*" the terms of which "*concern the subject matter of Part III or Part V*" of the ECT.

336. These features do not require, as a matter of interpretation in accordance with Article 31 of the VCLT, a conclusion that intra-EU disputes are excluded from the scope of ECT Article 26 on the ground that a contrary conclusion would be incompatible with tenets of EU law. Indeed, ECT Article 16 does not allow such a conclusion.

337. ECT Article 16 expressly provides that nothing in other prior or subsequent international agreements between "*two or more Contracting Parties,*" such as the EU Member States, "*shall be construed to derogate from any provision of Part III or V of this Treaty or from any right to dispute resolution with respect thereto under*" the ECT, except to the extent that the relevant provision of the other agreement "*is more*

64

*favourable to the Investor or Investment.*"

338.  On the basis of the foregoing context of the terms of ECT Article 26, the Arbitral Tribunal examines three scenarios in which to apply the provisions of the ECT in the light of its object and purpose.

339.  The first scenario concerns a supposed initial incompatibility between ECT Article 26 and EU law.  None of the terms of ECT Article 26, of the ECT text as a whole or of any of the instruments or agreements made in connection with the conclusion of the ECT indicate any such incompatibility.  ECT Article 16 provides in conclusive terms that any such incompatibility, including one regarding "*any right to dispute resolution*" is to be resolved in favour of the Investor or the Investment.  This can only mean that international arbitration under ECT Article 26 is preserved.

340.  This conclusion is superabundantly confirmed by the absence of any reference to the exclusion of intra-EU disputes either in the Contracting Parties' Understandings, in their Declarations, or in the Decisions with Respect to the ECT.  These instruments in fact contain indications that ECT Part V, including ECT Article 26, was meant to apply concurrently with EU law.[168]

341.  The object and purpose of the ECT is also consistent with this conclusion.  The ECT "*establishes a legal framework*" to "promote long-term cooperation in the energy field".  It does so in accordance with the objectives of the European Energy Charter of 17 December 1991, according to which co-operation in the energy field entails "*formulation of stable and transparent legal frameworks creating conditions for the development of energy resources.*"  This purpose and objective are compatible with the application of ECT Article 26 among EU Member States.[169]

342.  The second scenario concerns a supposed amendment of the ECT among EU Member States that would override both ECT Article 26 and ECT Article 16.  It seems clear that this scenario has not transpired.  ECT Article 42 provides express procedures for amendments to the ECT, including amendments which enter into force for only certain

---

[168]  The International Energy Charter, Consolidated Energy Charter Treaty with Related Documents, last updated on 15 January 2016. See Decisions with Respect to the ECT, Part IV (With respect to Articles 24(4)(a) and 25), pages 75-77; and Declarations, Part IV (With respect to Article 25), page 76.

[169]  The European Energy Charter itself stated that "it is important for the Signatory States to negotiate and ratify legally binding agreements on promotion and protection of investments which ensure a high level of legal security […]".  European Energy Charter, II. 4.  The ECT is the result of the negotiations called upon by this statement of purpose.

Contracting Parties. There has been no amendment to ECT Article 26 in accordance with these procedures. Article 41 of the VCLT subordinates a tacit amendment among some but not all parties to a multilateral treaty to the provisions of the multilateral treaty itself. ECT Article 42 leaves no allowance for a group of Contracting Parties (such as EU Member States) to bypass all other Contracting Parties and effect a tacit amendment only among themselves.

343.   The third scenario concerns the evolution of EU law in such a way that, within the legal framework of the ECT, the tenets of EU law would displace or qualify the meaning of the terms of ECT Article 26. The main route proposed by Spain for this scenario would be the application of EU law as part of the rules and principles of international law, as provided by ECT Article 26(6), according to which a tribunal shall decide the issues in dispute. Through ECT Article 26(6), the principle of the primacy of EU law and the correspondent role of EU institutions, such as the CJEU, would displace the application of ECT Article 26 for intra-EU disputes.

344.   The Parties debated whether ECT Article 26(6) applies to issues of jurisdiction. The Arbitral Tribunal sees this as a sterile debate because, (i) if this provision did apply to issues of jurisdiction, the Tribunal would need to determine which are the relevant and applicable rules and principles of international law on jurisdiction; and (ii) if the provision did not apply to jurisdiction, the Tribunal would need to interpret ECT Article 26 in accordance with international law, taking into account the "relevant rules of international law applicable in the relations between the parties" under Article 31(3)(c) of the VCLT.

345.   The Arbitral Tribunal finds that the third scenario is not consistent with the ordinary and agreed meaning of the terms of ECT Article 26 in their context and in the light of the object and purpose of the ECT. The terms of ECT Article 26 and of related provisions do not exclude intra-EU disputes. The ECT Contracting Parties stipulated a specific provision to deal with conflicting prior or subsequent treaties among two or more Contracting Parties and a specific provision requiring notice of "*the text of any proposed amendment to*" the ECT. These provisions are *leges speciales* which are designed to apply precisely to avoid implied derogation by virtue of general rules of international law not having the character of *ius cogens* – a character that none of the general rules invoked by the Respondent is claimed to have. In addition, the proposition that the exclusion of intra-EU disputes nevertheless results from a general reference to

international law in ECT Article 26(6) strikes the Tribunal as running against the above context of ECT Article 26, in the light of the object and purpose of the ECT to establish a legal framework to promote long-term cooperation in the energy field among all Contracting Parties.

346.    The particular EU-related instruments invoked by Spain do not affect the Arbitral Tribunal's conclusions on its jurisdiction. These are the *Achmea* decision, the *Komstroy* decision, the 2019 Declaration, the EC Decision, and the *Green Power* award.

*The Achmea and the Komstroy decisions*

347.    The *Achmea* decision by its terms is not concerned with the application of the ECT. The scope of the *Achmea* decision appears limited to dispute resolution provisions contained in intra-EU BITs, such as Article 8 of the Netherlands-Slovakia BIT at issue in that case.  Nowhere in the *Achmea* decision does the CJEU address international arbitration between Member States under the auspices of a multilateral international treaty such as the ECT.  Moreover, Article 8 of the Netherlands-Slovakia BIT provided that the law applicable to the merits includes the "*provisions of other relevant Agreements between the Contracting Parties,*" which arguably encompasses the provisions of the EU Treaties.  By contrast, ECT Article 26(6) requires this Tribunal to resolve this dispute in accordance with the provisions of the ECT and "*applicable rules and principles of international law.*"

348.    This overcomes the primary concern referred to the CJEU in the *Achmea* case, *i.e.* the possibility that an international arbitral tribunal outside the EU legal order and out of reach of the CJEU's supervisory powers could apply and interpret provisions of EU law.

349.    The *Komstroy* decision does refer to the ECT.  As the *Achmea* decision before it, the *Komstroy* decision derives from and operates within the normative sphere of EU law, framed and informed by the relevant provisions of the EU Treaties. As noted above, the EU itself is a Contracting Party to the ECT.  As a result, neither the *Komstroy* decision nor the *Achmea* decision can have any binding effect, without more, on an international arbitral tribunal constituted under the provisions of a multilateral treaty such as the ECT, which is external to the EU Treaties.  The impact of both decisions on the scope of the Respondent's consent must therefore be resolved not in accordance with the legal norms under EU law, which are not binding upon this Tribunal, but rather in accordance

with the terms of the ECT and the "*rules and principles of international law,*" including the provisions of the VCLT.

350.    Assessed under the provisions of the ECT, the *Achmea* and the *Komstroy* decisions do not invalidate or diminish the Respondent's consent to arbitration. Under ECT Article 26(3), Respondent tendered its "*unconditional consent*" to refer to international arbitration the disputes that fall within the scope of that provision, which include disputes between an investor incorporated in an EU Member State such as the Claimant, and another EU Member State such as the Respondent.

351.    The application of the rules of interpretation of Article 31 VCLT do not alter this conclusion. For the reasons mentioned above, the *Achmea* and *Komstroy* decisions do not qualify as an "*instrument,*" "*agreement,*" "*practice,*" or "*a relevant rule of international law*" under Articles 31(2) or 31(3) VCLT, because neither decision has met with the consent of all ECT Contracting Parties, and neither is binding between, or applicable to, those ECT Contracting Parties that are not EU Member States.

*The 2019 Declaration*

352.    The 2019 Declaration does not purport to set out a binding legal conclusion that intra-EU disputes are excluded from the scope of ECT Article 26, whether as at the original date of the ECT or as at some subsequent date. It is instead a policy statement. The 2019 Declaration is not subscribed to by all EU Member States or by all ECT Contracting Parties and seems to have been taken outside the procedures and processes prescribed and referenced by the ECT. As a result, the 2019 Declaration is not binding on the Arbitral Tribunal, is not part of the law to be applied in this case, and it does not affect the Tribunal's conclusion that it has jurisdiction to hear the present dispute.

*The EC Decision*

353.    The EC Decision is not a decision that, under the above analysis of the Arbitral Tribunal, can have legal weight for the Tribunal's examination of its jurisdiction. As the EC Decision is purportedly grounded on the EU Treaties, it cannot have greater legal significance than the EU Treaties on this Tribunal's jurisdiction. The Tribunal has determined that the EU Treaties do not deprive it of jurisdiction.

354.    Moreover, the context of the ECT (in the sense of the term "context" under VCLT Article 31(2)) expressly excludes "*decisions taken by international organizations, even if they are legally binding,*" from the scope of the treaty obligations referred to in ECT

Article 10(1) and with respect to ECT Article 26 on investor-State dispute settlement.[170]

*The Green Power Award*

355.    The *Green Power* award, dated 16 June 2022, is the first investment treaty award to accept the Intra-EU Objection.  It did so in a dispute between investors in photovoltaic plants and the Kingdom of Spain under the ECT.

356.    The central question addressed by the tribunal in Green Power was "whether a unilateral offer to arbitrate under Article 26(3)(a) ECT can be validly given by an EU Member State to the investors of another EU Member State despite the existence of another agreement between these EU Member States which prevents them from making such offer."[171]  The Green Power tribunal's discussion of this question is relatively lengthy and addresses the same ECT provisions discussed above.[172]  The Arbitral Tribunal, however, understands those provisions differently from the Green Power tribunal and is not persuaded by that tribunal's reasoning.  In particular, the Arbitral Tribunal disagrees that EU law prevails over the clear terms of ECT Article 16.  Nor does ECT Article 25 provide a basis for that conclusion.  The conclusion in Green Power is premised on the declaratory character of the CJEU's judgments in Achmea, Komstroy, and PL Holdings.  The Arbitral Tribunal cannot follow those judgments without relinquishing its responsibility to apply the ECT as the source of its mandate in this case.  As a result, the Arbitral Tribunal does not share the Green Power tribunal's conclusion that the principles of autonomy and primacy of the EU legal order deprive it of jurisdiction under ECT Article 26.[173]

357.    In conclusion, the Arbitral Tribunal rejects the Intra-EU Objections.

D.    **The Taxation Measure Objection**

1.    **The Respondent's Position**

358.    The Respondent objects to the Tribunal's jurisdiction to hear a dispute on an alleged breach of Article 10(1) of the ECT on the basis of the introduction of the TVPEE by

---

[170] Final Act of the European Energy Charter Conference, Understandings, No. 17 (**CLA-003, RL-006**), p. 28.

[171] *Green Power et al v. Spain* (SCC Arbitration V 2016/135), Award of 16 June 2022 (**RL-0128**), ¶ 348.

[172] See, e.g., ECT Articles 1(3), 16(2), 25 and 26(3)(b); *Green Power et al v. Spain* (SCC Arbitration V 2016/135), Award of 16 June 2022 (**RL-0128**), ¶¶ 350, 358-360, 376, 412 and 452.

[173] See, *Green Power et al v. Spain* (SCC Arbitration V 2016/135), Award of 16 June 2022 (**RL-0128**), ¶ 456.

Act 15/2012, of 27 December, on fiscal measures for energetic sustainability.[174]

359.    The Respondent explains that, according to the Claimant, the introduction of the TVPEE would have breached standards of protection included in Article 10(1) of the ECT. The Respondent holds that the Contracting Parties of the ECT only consented to submit to investment arbitration alleged breaches of obligations derived from Part III of the ECT. The Respondent argues that, pursuant to Article 21 of the ECT, Section Article 10(1) of the ECT, although located in Part III, does not generate obligations regarding taxation measures of the Contracting Parties.[175]

360.    Article 21 of the ECT provides, in the relevant part, as follows:

> *(1) Except as otherwise provided in this Article, nothing in this Treaty shall create rights or impose obligations with respect to Taxation Measures of the Contracting Parties. In the event of any inconsistency between this Article and any other provision of the Treaty, this Article shall prevail to the extent of the inconsistency.*
>
> *[...]*
>
> *(7) For the purposes of this Article:*
>
> *(a) The term "Taxation Measure" includes:*
>
> *(i) any provision relating to taxes of the domestic law of the Contracting Party, or of a political subdivision thereof or a local authority therein; [...]*

361.    The Respondent submits that pursuant to Article 21(7) of the ECT, the term *'Taxation Measure'* includes any provision relating to taxes of the domestic law of the Contracting Party.[176]

362.    The Respondent considers that it should be the domestic law of the Contracting Party, and not international law, the one to determine whether the TVPEE qualifies as a *'Taxation Measure'* for the purposes of Article 21 of the ECT.[177] Nevertheless, the Respondent holds that the TVPEE qualifies as a tax both under the domestic law of the Kingdom of Spain and under international law.[178]

---

[174]    Law 15/2012, of 27 December, regarding fiscal measures for energy sustainability, published 28 December 2012, **C-40, R-2, BRR-10**.

[175]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 194.

[176]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 226.

[177]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶¶ 227-232.

[178]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 236.

363.  With regard to *domestic law*, the Respondent states that, according to Article 1 of Act 15/2012, of 27 December, the TVPEE is a direct tax on the performance of the activities of production and incorporation into the electricity system of electrical energy within the Spanish Electricity System.[179] The Respondent also refers to the concept of tax provided by Article 2 of Act 58/2003, of 17 December, on General Taxation.[180] It additionally mentions that the Spanish Constitutional Court ratified the taxation nature of the TVPEE, by means of a Judgment of 6 November 2014.[181]

364.  With regard to *international law*, the Respondent maintains that the TVPEE is a tax according to the concept of tax under international law used by arbitration case-law. It states that arbitral tribunals[182] have repeatedly ruled along the same lines as the definition of tax provided by the Black's Law Dictionary.[183] The Respondent argues that this definition is substantially similar to that included in Article 2 of Act 58/2003, of 17 December, on General Taxation: *'in essence, a mandatory contribution to the Public Treasury'.*[184]

---

[179]  Law 15/2012, of 27 December, regarding fiscal measures for energy sustainability, published 28 December 2012, **C-40, R-2, BRR-10**, Article 1: '*The tax on the value of the production of electric energy is a tax of direct character and real nature that taxes the performance of activities of production and incorporation into the electric system of electric energy, measured in power plant busbars, through each of the facilities indicated in Article 4 of this Law.*' *Cfr.* Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 245.

[180]  Law 58/2003, of 17 December, on General Taxation (**R-0166**), Article 2.1: 'Taxes are public incomes that consist of monetary contributions required by a public Administration as a consequence of the performance of an act to which the law connects the duty to contribute, with the primary purpose of obtaining the necessary income to support public spending. As well as being a means to obtain the resources needed to support public spending, taxes may also serve as instruments of general economic policy and attend to the compliance with the principles and purposes established in the Constitution.' Cfr. Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 246.

[181]  The Respondent refers to a Judgment, of 6 November 2014, by which the Spanish Constitutional Court dismissed the unconstitutionality appeal No. 1780-2013 filed before it against the TVPEE, in particular against Articles 4, 5 and 8 of Law 15/2012, concerning the taxable event, the taxpayers and the tax rate of the TVPEE. According to the Respondent, in said Judgment, the Spanish Constitutional Court ruled that the regulation of the TVPEE contained in Law 15/2012 was perfectly valid and in accordance with the Spanish Constitution. See, Judgment 183/2014, of 6 November 2014, issued by the Plenary of the Constitutional Court (**R-0177**). Cfr. Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶¶ 255-256.

[182]  *EnCana Corporation v. Republic of Ecuador*, LCIA Case No. UN3481, UNCITRAL, Award of 3 February 2006 (**RL-0023**), ¶ 142); *Duke Energy Electroquil Partners & Electroquil S.A. v. Republic of Ecuador*, ICSID Case No. ARB/04/19, Award of 18 August 2008 (**RL-0053**), ¶ 174; and *Burlington Resources Inc. v. Republic of Ecuador*, ICSID Case No. ARB/08/5, Decision on Jurisdiction of 2 June 2010 (**RL-0054**), ¶¶ 164-165.  Cfr. Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶¶ 264-266.

[183]  Black's Law Dictionary, Ninth Edition, Bryan A. Garner Editor in Chief (**RL-0051**), p. 1594 ('tax, n. (14c) A charge, usu. monetary, imposed by the government on persons, entities, transactions, or property to yield public revenue. [...]'). Cfr. Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 261.

[184]  Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 259-267.

365.    The Respondent also notes that the European Commission ratified the tax nature of the TVPEE and its conformity with EU law, by closing EU Pilot procedure 5526/13/TAXU, as it considered that the TVPEE was in accordance with EU law.[185]

366.    While the Respondent acknowledges that Article 21 of the ECT establishes, in Sections (2) to (5), the articles or sections of articles of the ECT that do apply to taxation measures of the Contracting Parties, it emphasizes that Section (1) of Article 10 is not found among those provisions.

367.    The Respondent further notes that all arbitral tribunals that have ruled on this same jurisdictional objection have unanimously concluded that the TVPEE is a taxation measure for the purposes of the ECT, and have unanimously declared to have no jurisdiction to hear the claim of an alleged breach of Article 10(1) of the ECT through the introduction of the TVPEE.[186]

368.    In its Reply on Jurisdictional Objections, the Respondent rejects the Claimant's contention that, in order to determine whether the TVPEE is a tax, it is necessary to examine its economic effects.[187] In the Respondent's view, what is relevant is the legal operation of a tax measure and not its economic effect.[188]

369.    The Respondent also replies to the Claimant's suggestion that the TVPEE was not a *bona fide* taxation measure. The Respondent considers, *first*, that the fact that the TVPEE applied to all energy producers, renewable and conventional, was a legitimate option of the State legislator and took into account the environmental impacts generated by *all* electricity generating facilities.[189] *Secondly*, the Respondent denies that the TVPEE discriminated against renewable producers, either from the perspective of legal repercussion or of economic repercussion.[190] *Thirdly*, the Respondent argues that the TVPEE was public revenue which was integrated in the General State Budgets.[191]

## 2.    The Claimant's Position

370.    The Claimant argues that its claims with respect to Law 15/2012, of 27 December, do

---

[185]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 283-294.
[186]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 295-296. Also, Respondent's Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶ 259-262.
[187]    Respondent's Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶ 217-218.
[188]    Respondent's Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶ 220-221.
[189]    Respondent's Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶¶ 225-235.
[190]    Respondent's Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶¶ 236-251.
[191]    Respondent's Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶¶ 252-258.

not contest the application of a *'Taxation Measure'* as defined in Article 21 of the ECT. Consequently, it argues that those claims are not excluded from the ambit of Article 10(1) of the ECT.

371. In the Claimant's position, Article 21 of the ECT does not exclude the application of Article 10 to the measures imposed by Law 15/2012, of 27 December, because they are not *bona fide* taxes.[192]

372. The Claimant notes that investment treaty tribunals have consistently confirmed that while the domestic characterization of a disputed measure may be helpful in ascertaining its nature, domestic law is not determinative.[193] The Claimant maintains that tribunals must examine the legal characteristics of a measure to determine whether it is a tax that falls within the scope of Article 21 of the ECT.[194]

373. The Claimant refers to legal tests developed by some investment treaty tribunals.[195] It considers that, against that background, the relevant part of Law 15/2012, of 27 December, does not constitute a *'Taxation Measure'* in the terms of Article 21 of the ECT. The Tribunal notes the following views of the Claimant: (i) the TVPEE did not serve a public purpose; (ii) Law 15/2012, of 27 December, did not advance its stated environmentally orientated purposes, since the so-called tax applied to renewable energy producers in the same manner as it applied to conventional energy producers; and (iii) Law 15/2012, of 27 December, was a means to reduce the tariff incentives paid to renewable plants through a measure that resembled a tax of general application on its face.[196]

374. The Claimant acknowledges that several tribunals have accepted the Respondent's argument that the carve-out for taxation measures in Article 21 of the ECT applies to the TVPEE. The Claimant considers, however, that none of those awards engaged in

---

[192] Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 186.

[193] E.g., *Murphy Exploration & Production Company International v. Republic of Ecuador*, PCA Case No. 2012-16, UNCITRAL, Partial Final Award of 6 May 6, 2016 (**CL-155**), ¶185. Cfr. Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 188.

[194] Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 189.

[195] Murphy Exploration & Production Company International v. Republic of Ecuador, PCA Case No. 2012-16, UNCITRAL, Partial Final Award of, 6 May 6, 2016 (**CL-155**), ¶¶ 159, 189-190; Occidental Petroleum Corp., Occidental Exploration and Prod. Co. v. Republic of Ecuador, (ICSID Case No. ARB/06/11), Award of, 5 October. 5, 2012 (**CL-158**), ¶¶ 492-495; and Yukos Universal Ltd. (Isle of Man) v. Russian Federation, PCA Case No. AA 227, UNCITRAL, Final Award of, 18 July 18, 2014 (**CL-90**), ¶¶ 1407, 1430-1431, 1433. Cfr. Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶¶ 189-192.

[196] Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 193-202.

any significant analysis of the characteristics of the TVPEE that, in the Claimant's view, cause it to function as an indirect reduction of tariffs rather than a true taxation measure.[197]

375.    In its Rejoinder on Jurisdiction, the Claimant questions the Respondent's description of how its domestic authorities have treated Law 15/2012, of 27 December. For instance, the Claimant observes that the Respondent fails to mention that, in 2016 and 2018, its own Supreme Court raised doubts regarding the constitutionality of the TVPEE under Spanish law. The Claimant also notes that the Constitutional Court deferred addressing the question until the CJEU ruled on whether the measure complied with EU law.[198]

376.    Having received the Respondent's counterarguments with regard to the *bona fide* tax nature of the TVPEE, the Claimant pursues its argumentation. In its Rejoinder on Jurisdiction, the Claimant insists on the lack of a public purpose of the TVPEE. In addition, it rejects the Respondent's contention that the TVPEE was not discriminatory against renewable energy producers who, in the Claimant's view, suffered a higher impact than the rest of electricity producers.[199]

### 3.    The Tribunal's Analysis

377.    Spain's Taxation Measure Objection is based on ECT Article 21.  Consistent with its analysis of the Intra-EU Objections, the Arbitral Tribunal must determine the meaning and scope of ECT Article 21, as relevant to the facts of this case, in accordance with Article 31 of the Vienna Convention.

378.    ECT Article 21(1) provides as follows:

> *Except as otherwise provided in this Article, nothing in this Treaty shall create rights or impose obligations with respect to Taxation Measures of the Contracting Parties. In the event of any inconsistency between this Article and any other provision of the Treaty, this Article shall prevail to the extent of the inconsistency.*

379.    The remaining provisions of ECT Article 21 do not exempt claims made under ECT Article 10(1) from the scope of ECT Article 21(1).  To examine the Taxation Measure Objection, therefore, the Arbitral Tribunal must determine whether the Claimant's

---

[197]    Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 203.
[198]    Claimant's Rejoinder on Jurisdiction, ¶ 109-110.
[199]    Claimant's Rejoinder on Jurisdiction, ¶ 115-116.

claim in connection with the TVPEE introduced by Law 15/2012 is premised on rights or obligations under the ECT with respect to Taxation Measures of Spain.

380.    ECT Article 21(7)(a)(i) provides that the term "Taxation Measure" includes "any provision relating to taxes of the domestic law of the Contracting Party".  The question is therefore whether the Claimant's claim in connection with the TVPEE is made with respect to a provision of Spanish law "*relating to taxes*".

381.    The Arbitral Tribunal, based on the ordinary and agreed meaning of the terms of ECT Article 21 in their context and in the light of the object and purpose of the ECT, holds that the TVPEE is a Taxation Measure for the purpose of ECT Article 21(1).  The Claimant's claim in connection with the TVPEE is therefore outside the jurisdiction of the Tribunal.

382.    The TVPEE is a tax in the ordinary meaning of this term.  It was imposed by legislation upon a defined class of taxpayers for the collection of defined revenues to the State for public purposes.

383.    There is nothing in the context of the ECT that suggests that there are further qualifications, exceptions or limitations to ECT Article 21(1) in addition to those provided for expressly in ECT Article 21.  In particular, the phrase "nothing in this Treaty shall create rights or impose obligations with respect to Taxation Measures" embraces ECT Article 26.  This is consistent with the object and purpose of the Treaty to foster long-term co-operation within "*the framework of State sovereignty*".  It is common ground that the exceptions set out in ECT Article 21 do not apply in this case.

384.    The Claimant argues that Article 21 cannot apply to Taxation Measures that are not taken in good faith.  Good faith is a general principle of international law which controls, *inter alia*, the interpretation of treaty obligations and the performance of such obligations, as expressly provided by VCLT Articles 26 and 31(1).  The question presented is whether the TVPEE is a *bona fide* Taxation Measure.  Expressed in other terms, the question is whether the Respondent has acted with such a lack of good faith that it cannot rely on the jurisdictional limitation of ECT Article 21.  The Claimant argues that the characteristics, motivations, and/or effects of the measure evidence that it was adopted in bad faith, a claim that, if valid, would amount to a breach by the Respondent of its obligation to perform the ECT in good faith (VCLT Article 26) and may cause it to be excluded from the category of "Taxation Measures" for the purposes

of ECT Article 21(1).  Having considered all of the Parties' arguments in this regard, the Tribunal concludes that the Claimant has failed to discharge its burden of proving that the TVPEE was enacted in bad faith. The Tribunal does not consider it necessary to discuss in detail all the factors that the Claimant cites as evidence of bad faith in the enactment of the TVPEE.  Suffice it to note, in particular, that the TVPEE was not applied solely to the energy producers in the Claimant's class, and even though it may have had a larger impact on some producers than on others, a tax is not enacted in bad faith just because it has a disparate impact on different groups of taxpayers subjected to it.[200]  Accordingly, the Tribunal finds no valid grounds for concluding that the TVPEE does not constitute a "Taxation Measure" for the purposes of the carve-out of ECT Article 21(1).

385.    It follows that the Arbitral Tribunal has no jurisdiction over the Claimant's claim in connection with the TVPEE, introduced by Law 15/2012.

## V.    LIABILITY

### A.    Introduction

386.    The Tribunal summarizes below the Parties' respective positions on liability.  It then analyses and rules on the Parties' arguments on liability.  The Tribunal clarifies that it has considered the totality of the Parties' evidence and arguments and that the following summaries highlight only the most relevant aspects of each Party's case.

### B.    The Claimant's Position on Liability

#### 1.    Applicable Law

387.    The Claimant maintains that, in agreeing to resolve the dispute under the ECT, the Parties agreed to apply the ECT's governing law provision, Article 26(6).[201] Article 26(6) provides: *'A Tribunal established under paragraph 4 shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law.'*

388.    The Claimant refers to the awards issued in *Hulley Entreprises Ltd. v. Russia*,[202] *Stati*

---

[200]    Law 15/2012 (**BRR-10**), Article 8; Brattle First Regulatory Report, ¶ 135.
[201]    Claimant's Statement of Claim, ¶ 368.
[202]    *Hulley Enterprises Ltd. v. Russian Federation*, PCA Case No. AA 226, Final Award, 18 July 2014 (**CL-6**).

*v. Kazakhstan*,[203] and *AES v. Hungary*,[204] in all of which the tribunals were constituted under the ECT. The Claimant recalls that the substantive law applied by those tribunals consisted of the ECT and the applicable rules and principles of international law.[205]

389.   The Claimant argues that Spanish law is relevant to the dispute only as a matter of fact. It also argues that Spanish law does not provide and cannot influence the legal standards that the Tribunal applies to determine whether the Respondent violated the ECT and international law.[206]

390.   The Claimant further argues that it is well-settled that a State cannot avoid liability under international law by relying upon its domestic law. The Claimant refers to Article 27 of the VCLT, which provides that *'[a] party may not invoke the provisions of its internal law as justification for its failure to perform a treaty'*. The Claimant also refers to the ILC's Articles on Responsibility of States for Internationally Wrongful Acts, which provide that *'[t]he characterization of an act of a State as internationally wrongful is governed by international law. Such characterization is not affected by the characterization of the same act as lawful by internal law'*.[207]

391.   In its Reply on the Merits, the Claimant rejects the Respondent's contention that EU law applies to the merits of the case. The Claimant specifically confronts the two arguments raised by the Respondent, namely: (i) that the governing law provision of the ECT, Article 26(6), includes EU law, and (ii) that the present case is a dispute on State aid and, therefore, implicates EU law.[208]

392.   As to the *first* argument, that Article 26(6) of the ECT includes EU law, the Claimant refers to the counterarguments it made with regard to the jurisdiction of the Tribunal.[209] The Claimant additionally contends that the authorities on which the Respondent relies, in order to claim that EU law applies to the merits of the case, do not support such position. The Claimant specifically refers to the decisions in *Wirgten v. Czech*

---

[203]   Anatolie Stati, Gabriel Stati, Ascom Group SA and Terra Raf Trans Traiding Ltd v. Republic of Kazakhstan, SCC Case No. V (116/2010), Award, 19 December 2013 (**CL-7**).

[204]   AES Summit Generation Limited and AES-Tisza Erömö Kft. v. Republic of Hungary, ICSID Case No. ARB/07/22, Award, 23 September 2010 (**CL-8**).

[205]   Claimant's Statement of Claim, ¶¶ 369-379.

[206]   Claimant's Statement of Claim, ¶ 372.

[207]   Claimant's Statement of Claim, ¶ 373.

[208]   Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 204.

[209]   Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 205.

*Republic*,[210] *Blusun v. Italy*,[211] and *Electrabel v. Hungary*.[212]

393.   Moreover, the Claimant refers to three decisions in which the incorporation of EU law to the merits of the case under Article 26(6) of the ECT was rejected. The decisions are *Eskosol v. Italy*,[213] *Greentech v. Italy*,[214] and *OperaFund v. Spain*.[215]

394.   As to the *second* argument of the Respondent, that the present case is a dispute on State aid, the Claimant considers that the Respondent relies heavily on the European Commission's Decision on State Aid of November 10, 2017. The Claimant considers that this Decision did not assess whether RD 661/2007 and RD 1578/2008 were State aid and, if so, whether they were compatible with EU State aid law.[216]

395.   In addition, the Claimant insists on its argument, already submitted with regard to the jurisdiction of the Tribunal,[217] that the Respondent itself did not view RD 661/2007 and RD 1578/2008 as *'State aid'*, much less as incompatible State aid.[218]

396.   The Claimant considers that, even assuming that RD 661/2007 and RD 1578/2008 were State aid, there would be no reason for the Tribunal to analyse whether they were

---

[210]   The Claimant states the following: (i) the governing law provision in the applicable BIT was incomparable to Article 26(6) of the ECT; (ii) the Terms of Appointment that the parties agreed to govern the case provided that the applicable law would be 'subject to briefing by the Parties and determined by the Tribunal'; and (iii) the case was seated in Geneva, therefore, the Swiss Federal Act on Private International Law applied. *Jürgen Wirgten et al v. Czech Republic*, PCA Case No. 2014-03, Award of 11 October 2017 **(CL-107)**, ¶¶ 171, 174. *Cfr.* Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶¶ 206-207.

[211]   The Claimant states, inter alia, that the tribunal did not consider whether EU law was applicable to the merits of the dispute. *Blusun S.A. et al. v. Italian Republic*, ICSID Case No. ARB/14/3, Award of 27 December 2016 **(CL-103)**, ¶ 303. *Cfr.* Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 208.

[212]   The Claimant states the following: (i) the tribunal acknowledged that EU law is part of a *regional* system of international law; (ii) the tribunal ultimately did not apply EU law to the merits and only took it into account as a fact; and (iii) the tribunal rejected many of the arguments put forward by the Respondent regarding the interplay between the ECT and EU law. *Electrabel S.A. v. Republic of Hungary*, ICSID Case No. ARB/07/19, Award of 25 November 2015 **(CL-99)**, ¶¶ 4.166, 4.134. *Cfr.* Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 209.

[213]   *Eskosol S.p.A in Liquidazione v. Italian Republic*, ICSID Case No. ARB/15/50, Decision on Italy's Request for Immediate Termination and Italy's Jurisdictional Objection based on Inapplicability of the Energy Charter Treaty to Intra-EU Disputes of 7 May 2019 **(CL-122)**, ¶ 173. *Cfr.* Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 210.

[214]   *Greentech Energy Systems A/S et al. v. Italian Republic*, SCC Case No. 2015/095, Award of 23 December 2018 **(CL-127)**, ¶ 397. *Cfr.* Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 215.

[215]   *OperaFund Eco-Invest SICAV PLC and Schwab Holding AG v. Kingdom of Spain*, ICSID Case No. ARB/15/36, Award (not publicly available) of 5 August 2019 **(CL-132)**, ¶ 330. *Cfr.* Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 216.

[216]   Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 219.

[217]   *See* Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 253.

[218]   Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 220.

unlawful. The Claimant maintains that the Tribunal is not called on to interpret or apply EU law in an ECT arbitration.[219]

397.    The Claimant also rejects the Respondent's arguments that a potential award issued in the present arbitration (i) would constitute State aid and be subject to the European Commission's control, and (ii) could be annulled. In this respect, the Claimant insists on its, already submitted,[220] argument that post-award matters are irrelevant to the Tribunal's consideration of issues before it.[221]

398.    In addition, the Claimant states that every single ECT tribunal has so far rejected the Respondent's argument on State aid.[222]

### 2.    Violation of standards of protection under the ECT

399.    The Claimant maintains that, through the measures implemented between late 2010 and 2014, the Respondent violated not only the spirit and purpose of the ECT, but also each of the following standards of protection contained therein:

(i)     The right to Fair and Equitable Treatment;

(ii)    The protection against impairment of investments by unreasonable or discriminatory measures; and

(iii)   A guarantee to observe all obligations entered into with respect to the Claimant's investments (the "**Umbrella Clause**").

400.    In the following sections, the Tribunal summarizes the main arguments submitted by the Claimant.

### 3.    The Respondent breached its obligation to provide FET

401.    The Claimant states that Article 10(1) of the ECT requires the Respondent to accord Fair and Equitable Treatment ("**FET**") to the Claimant's investments.[223]

402.    The Claimant argues that the VCLT requires an investment treaty tribunal to apply the

---

[219]    Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 225.

[220]    *See* Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 258.

[221]    Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 228.

[222]    E.g., *Novenergia II – Energy & Env't (SCA), SICAR v. Kingdom of Spain*, SCC Arb No. 2015/063, Final Award of 15 February 2018 **(CL-3);** *Foresight Lux. Solar 1 S.à.r.l. et al. v. Kingdom of Spain*, SCC Arb. No. 2015/150, Final Award of 14 November 2018 **(CL-110)**, ¶ 381; and *9REN Holdings S.à.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/15/15, Award of 31 May 2019 **(CL-130)**, ¶ 169. *Cfr.* Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶¶ 235-236.

[223]    Claimant's Statement of Claim, ¶ 377.

FET standard in accordance with the object and purpose of the treaty in question. It maintains that the *'fundamental aim'* of the ECT is *'to strengthen the rule of law on energy issues'*.[224] It then contends, on the basis of Article 2 of the ECT Preamble, that two *'overarching purposes'* of the ECT are to *'catalyze economic growth through investment and trade in energy'* and to *'establish a legal framework to promote long-term cooperation between States and investors'*.[225]

403.   The Claimant argues that the Respondent breached the FET standard in at least three distinct ways:

> *(1) [B]y violating Claimant's legitimate expectation of fixed tariffs on all the electricity its plants could produce during the applicable duration of each regime;*
>
> *(2) by fundamentally altering the essential characteristics of the investment framework that formed the basis for Claimant's investment decision;*
>
> *(3) and by failing to treat Claimant's investments transparently and consistently.*

404.   The Tribunal refers below to each of these allegations submitted by the Claimant.

### (i)   Violation of the Claimant's Legitimate Expectations of Fixed Feed-in Tariffs for its Photovoltaic Facilities

405.   The Claimant states that investment treaty tribunals[226] and scholars[227] have identified the protection of legitimate expectations as one of the major components of the FET standard.[228]

406.   It also holds that investment treaty jurisprudence[229] establishes a three-step approach to

---

[224]   The Claimant cites "ECT, An Introduction to the Energy Charter Treaty" (**C-1**).

[225]   Claimant's Statement of Claim, ¶ 378.

[226]   *EDF (Services) Ltd. v. Romania* (ICSID Case No. ARB/05/13), Award of 8 October 2009 (**CL-15**), ¶ 216; *Saluka v. Czech Republic,* UNCITRAL-PCA, Partial Award of 17 March 2006 (**CL-16**), ¶ 302; *Técnicas Medioambientales Tecmed, S.A. v. United Mexican States* (ICSID Case No. ARB(AF)/00/2), Award of 29 May 2003 (**CL-17**), ¶ 154; *Waste Management v. United Mexican States* (ICSID Case No. ARB(AF)/00/3), Award of 30 April 2004 (**CL-18**), ¶ 98; *Occidental Exploration and Production Co. v. Republic of Ecuador* (LCIA Case No. UN 3467, Final Award of 1 July 2004 (**CL-19**), ¶ 183; and *Gold Reserve Inc. v. Bolivarian Republic of Venezuela* (ICSID Case No. ARB(AF)/09/1), Award of 22 September 2014 (**CL-12**), ¶¶ 575-576). Cf. Claimant's Statement of Claim, ¶ 381.

[227]   Michele Potestà in '*Legitimate Expectations in Investment Treaty Law: Understanding the Roots and the Limits of Controversial Concept'*, ICSID Review, No. 28 (1), 2013 (**CL-21**), p. 100. Cfr. Claimant's Statement of Claim, ¶ 381 and footnote 613.

[228]   Claimant's Statement of Claim, ¶ 381.

[229]   International Thunderbird Gaming Corporation v. The United Mexican States (UNCITRAL), Final Award of 26 January 2006 (**CL-22**), ¶ 147; Mobil Investments Canada Inc. and Murphy Oil Corporation v.

determine whether a host State has breached the FET standard by frustrating an investor's legitimate expectations. The Claimant refers to the following steps:

(i)     Whether the host State induced the investments by creating legitimate expectations on the part of the investor;

(ii)    whether the investor reasonably relied on the host State's representations when deciding to invest; and

(iii)   whether the host State subsequently failed to honour the expectations it created.[230]

407.    In the Claimant's view, each of these elements is satisfied in the present case. The Tribunal briefly describes the Claimant's considerations below.

### (a)     The Respondent induced the investments by creating legitimate expectations on the part of the Claimant

408.    The Claimant states that investment treaty jurisprudence recognizes that if a host State induces an investment, that State will be bound to maintain the conditions that led to the inducement.[231]

409.    The Claimant considers that the Tribunal's task in the present arbitration is to determine whether an element of inducement on the part of the Respondent formed part of the Claimant's decision to invest. It maintains that the element of inducement can take many forms, *'including a "promise", a "guarantee", a "commitment", an "assurance" or otherwise'*. The Claimant also asserts that such element of inducement can be enshrined in a variety of sources, *'including statutory commitments, repeated statements from the State, the investment context, the State's conduct, and/or a specific undertaking between the affected investor and the State itself'*.[232]

410.    The Claimant notes that many awards hold that specific commitments are not required

---

Government of Canada (ICSID Case No. ARB(AF)/07/4), Decision on Liability and on Principles of Quantum of 22 May 2012 (**CL-23**), ¶ 152; Mohammad Ammar Al-Bahloul v. Republic of Tajikistan (SCC Case No. V064/2008), Partial Award on Jurisdiction and Liability of 2 September 2009 (**CL-24**), ¶ 200; and Waste Management, Inc. v. United Mexican States (ICSID Case No. ARB(AF)/00/3), Award of 30 April 2004 (**CL-18**), ¶ 98.  Cfr. Claimant's Statement of Claim, ¶ 382.

[230]   Claimant's Statement of Claim, ¶ 382.

[231]   E.g., *Ioan Micula et al. v. Romania* (ICSID Case No. ARB/05/20), Award of 11 December 2013 (**CL-27**), ¶ 686; and *Total S.A v. Argentine Republic* (ICSID Case No. ARB/04/1), Decision on Liability of 27 December 2010 (**CL-11**), ¶¶ 117-118.  Cfr. Claimant's Statement of Claim, ¶¶ 384-385.

[232]   Claimant's Statement of Claim, ¶ 386.

for a finding that an investor had a legitimate expectation.[233] In its Reply on the Merits, the Claimant elaborates further on this point, in reply to the Respondent's assertion that *'specific commitments'* are required.[234] The Claimant cites, for instance, a statement by the United Nations Conference on Trade and Development ("**UNCTAD**") in the sense that legitimate expectations may derive from legislation that is put in place in order to induce investment.[235] The Claimant then refers to arbitral decisions which, in its understanding, recently applied such standard to facts very similar to the present case.[236]

411. Notwithstanding the abovementioned, in its Reply on the Merits, the Claimant also considers that the Respondent fails to explain what those *'specific commitments'* would need to be under its claimed standard.[237] The Claimant then states that arbitral tribunals have recognized that specific commitments or assurances may be found in statutory provisions or regulations.[238]

412. The main argument of the Claimant, in this aspect, is that the Respondent created legitimate expectations that the feed-in tariffs granted to eligible plants under RD 661/2007 and RD 1578/2008 would be paid as stated in those royal decrees and that no retroactive reductions would be applied. The Claimant argues that the Respondent gave numerous *explicit representations* to that effect. It also argues that, even without the

---

[233] *Electrabel v. Republic of Hungary* (ICSID Case No. ARB/07/19), Decision on Jurisdiction, Applicable Law and Liability of 20 November 2012 (**CL-33**), ¶ 7.78); *El Paso Energy International Co. v. Argentine Republic* (ICSID Case No. ARB/03/15), Award of 10 October 2011 (**CL-14**), ¶ 364); and *Saluka Investments B.V. v Czech Republic* (UNCITRAL), Partial Award of 17 March 2006 (**CL-16**), ¶ 329. Cfr. Claimant's Statement of Claim, ¶ 386.

[234] Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶¶ 566-580. The Claimant refers to the Respondent's assertion at Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 992.

[235] The Claimant cites United Nations Conference on Trade and Development (UNCTAD), *Fair and Equitable Treatment, UNCTAD, Series on Issues in International Investment Agreements II, A Sequel* (**CL-160**), p. 69.  Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 566.

[236] E.g., *9REN Holdings S.à.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/15/15, Award of 31 May 2019 (**CL-130**), ¶ 215; *Cube v. Spain* (*Cube Infra. Fund SICAV et al. v. Spain*, ICSID Case No. ARB/15/20, Decision on Jurisdiction, Liability, and Partial Decision on Quantum of 19 February 2019 (**CL-123**), ¶¶ 275-276); and *SolEs Badajoz v. Spain* (*SolEs Badajoz BhmH v. Kingdom of Spain*, ICSID Case No. ARB/15/38, Award of 31 July 2019 (**CL-131**), ¶¶ 313, 423-426. Cfr. Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 567.

[237] Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 570.

[238] E.g., Enron v. Argentina (Enron Corp. and Ponderosa Assets, L.P. v. Argentine Republic, ICSID Case No. ARB/01/3, Award of 22 May 2007 (**CL-29**), ¶ 265; LG&E v. Argentina (LG&E Energy Corp. et al v. Argentine Republic, ICSID Case No. ARB/02/1, Decision on Liability of 3 October 2006 (**CL-30**), ¶¶ 130-133); and 9REN Holdings S.à.r.l. v. Kingdom of Spain, ICSID Case No. ARB/15/15, Award of 31 May 2019 (**CL-130**), ¶ 295.  Cfr. Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶¶ 571, 573.

Respondent's explicit assurances, the *investment context* gave rise to the same expectations of tariff stability.[239]

413.    The Claimant elaborates in a separate manner on the Respondent's alleged *express representations* and on its alleged *conduct and official policy goals*.

414.    *First*, with regard to the Respondent's alleged *express representations*, the Claimant argues that the assurances of the stability of the feed-in tariffs for existing plants were repeated and explicit. It holds that, from the outset, the royal decrees confirmed the precise tariff rate and the precise time period during which an eligible plant could receive the feed-in tariff on all the electricity the plant produced.[240]

415.    The Claimant refers individually to each of the royal decrees under consideration:

(i)    Concerning RD 661/2007, the Claimant mentions that the tariffs were defined to the fourth decimal point for PV plants. It also mentions that Table 3 of Article 36 of RD 661/2007 confirmed the following: (a) that one rate would be paid on all the electricity an eligible plant could generate during the first 25 years of operation; and (b) that a second, slightly reduced, rate would be paid on all the electricity produced in the operating years following.[241]

(ii)    Concerning RD 1578/2008, the Claimant mentions that the Respondent confirmed the specific tariff a plant would earn for electricity, upon enrolment of the facility into the pre-allocation registry.[242]

416.    The Claimant also states that the Respondent stabilized the legal framework with an explicit provision, confirming that while tariff revisions would be carried out periodically, they would not impact plants already in operation. The Claimant specifically refers to Article 44.3 of RD 661/2007, which it qualifies as a *'stabilization provision'*.[243]

417.    The Claimant adds that there was no provision in RD 661/2007, RD 1578/2008, or any other part of the applicable legal framework, in the following terms: (i) that permitted the Respondent to fail to pay the full, guaranteed value of the tariffs for all the electricity

---

[239]    Claimant's Statement of Claim, ⁋ 388.
[240]    Claimant's Statement of Claim, ⁋ 389.
[241]    Claimant's Statement of Claim, ⁋ 389.
[242]    Claimant's Statement of Claim, ⁋ 390.
[243]    Claimant's Statement of Claim, ⁋ 392.

produced by plants properly enrolled in the regimes; or (ii) that suggested that the Respondent could modify the legal and regulatory framework to reduce the remuneration it had promised. The Claimant holds that, on the contrary, the Respondent expressly committed not to adopt such forms of conduct.[244]

418.  *Secondly*, with regard to the Respondent's alleged *conduct and official policy goals*, the Claimant holds that the Respondent touted the stability and security of the regimes at every opportunity. It contends that Spanish officials repeatedly confirmed to the investment market that changes to the feed-in tariffs would not apply retroactively to existing plants.[245]

419.  The Claimant provides specific examples of what it considers to be assurances from the Spanish government. It refers, for instance, to publications on government websites, declarations of the Spanish Minister of Energy, presentations given by Spain's CNE, and assurances provided by President Zapatero.[246]

420.  In its Reply on the Merits, the Claimant further asserts that those *'explicit statements and assurances by Spanish officials and Government bodies'* were designed to generate expectations among investors.[247]  The Claimant points out that eight arbitral tribunals concluded that this was exactly the Respondent's intent.[248]

421.  The Claimant also considers that the Respondent's *'promises, guarantees, and aggressive promotion'* of RD 661/2007 and RD 1578/2008 were not only designed to generate expectations on the part of equity investors but were also intended to assure Europe's financial community of the stability and security of the legal framework.[249] In this context, in its Reply on the Merits, the Claimant rejects the contention that the Spanish government never took into account the financing costs to set the tariff rates.[250]

---

[244]  Claimant's Statement of Claim, ¶ 393.

[245]  Claimant's Statement of Claim, ¶ 394.

[246]  Claimant's Statement of Claim, ¶ 394.

[247]  Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 605.

[248]  E.g., *9REN Holdings S.à.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/15/15, Award of 31 May 2019 **(CL-130)**, ¶¶ 14(d), 270, 273); *Foresight Lux. Solar 1 S.à.r.l. et al. v. Kingdom of Spain*, SCC Arb. No. 2015/150, Final Award of 14 November 2018 **(CL-110)**, ¶ 89*; Novenergia II – Energy & Env't (SCA), SICAR v. Kingdom of Spain*, SCC Arb/ No. 2015/063, Final Award of 15 February 2018 **(CL-3)**, ¶ 667; and *Antin Infra. Servs. Lux. S.à.r.l. & Antin Energia Termosolar B.V. v. Kingdom of Spain*, ICSID Case No. ARB/13/31, Award of 15 June 2018 **(CL-5)**, ¶¶ 540-545, 548). Cfr. Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶¶ 605-610.

[249]  Claimant's Statement of Claim, ¶ 211.

[250]  Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 611.

422.    The Claimant considers that, in addition to the Respondent's express representations, its conduct and official policy goals also gave rise to the same legitimate expectations. It refers to Spain's advertised policy goal of promoting renewable energy investment, its registration of eligible facilities under the program through RAIPRE registrations, and its promise in Article 44.3 of RD 661/2007 of long-term stability in the regulatory regime.[251]

423.    In its Reply on the Merits, the Claimant asserts that the Respondent offers no convincing response to the wealth of case law that confirms that State conduct, policy goals, official statements, and specific entitlements to investors can all give rise to legitimate expectations. The Claimant argues that the cases on which the Respondent relies do not detract from such a conclusion.[252]

424.    The Claimant additionally argues that the manner in which the regimes operated reinforced the Respondent's commitment of stability.[253] In this regard, the Claimant explains that the design of RD 661/2007 and RD 1578/2008 was particularly critical to the PV sector, where upfront costs of constructing a facility were significant. It submits that both investors and their lenders needed security that those costs would be recovered and that the facility would generate a profit.[254] In this context, the Claimant recalls Mr. Margarit's assertion that the Respondent designed the incentive regimes with all those considerations in mind and after having received extensive input from industry associations and lenders.[255]

(b)    **The Claimant invested in reliance on those expectations**

425.    The Claimant maintains that, if it had not been for the Respondent's *'multifold*

---

[251]    Claimant's Statement of Claim, ¶ 400.

[252]    *AES Summit Gen. Ltd. And AES-Tisza Erömü Kft. v. Republic of Hungary* (ICSID Case No. ARB/07/22, Award of 23 September 2010) **(CL-8)**; *Electrabel S.A. v. Republic of Hungary*, ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability of 30 November 2012 **(CL-33)**, and Award of 25 November 2015 **(CL-99)**; *Plama Consort. Ltd. v. Bulgaria*, ICSID Case. No. ARB/03/24, Award of 27 August 2008 **(CL-56)**); *Charanne B.V. & Constr. Invs. S.à.r.l. v. Kingdom of Spain*, SCC Arb. No. 062/2012, Award of 21 January 2016 **(CL-31)**, and Partial Dissenting Opinion from Prof. Dr. Guido Tawil of 21 December 2015); *Isolux Infra. Netherlands B.V. v. Kingdom of Spain*, SCC Arb. No. 2013/153, Final Award of 12 July 2016 **(CL-102)**; and *Blusun v. Italy* (*Blusun S.A. et al. v. Italian Republic*, ICSID Case No. ARB/14/3, Award of 27 December 2016 **(CL-103)**. *Cfr.* Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶¶ 615-621.

[253]    Claimant's Statement of Claim, ¶ 406.

[254]    Claimant's Statement of Claim, ¶ 408.

[255]    Expert Report of Jaume Margarit dated 11 October 2018 ("**First Margarit Report**"), pp. 26, 60. *Cfr.* Claimant's Statement of Claim, ¶ 408.

*representations'*, it would not have invested in Spain's renewable energy sector.[256]

426.    The Claimant argues that its expectations were informed by the following elements: (i) the explicit terms of the royal decrees; (ii) the *'quid-pro-quo'* required of PV producers for their plants to gain the rights under the royal decrees; (iii) the context in which Spain enacted the royal decrees; (iv) numerous statements of Spanish representatives promoting the stability of the incentives regimes, as well as their representations on the royal decrees; and (v) legal advice from multiple law firms, as well as the fact that international banks were willing to provide non-recourse financing on favourable terms.[257]

427.    With respect to *'the explicit terms'* of the royal decrees, the Claimant asserts that it acquired PV facilities in Spain in reliance on the express provisions, of RD 661/2007 and RD 1578/2008, that those facilities would receive fixed incentive tariffs on all the electricity they produced throughout their operating lives or for 25 years (the latter case, for those plants registered under RD 1578/2008).[258]

428.    In its Reply on the Merits, the Claimant refers to different arguments raised by the Respondent in order to question the Claimant's reliance on its alleged expectations.

429.    The Claimant asserts, for instance, that the Respondent's position that investors would be entitled to rely on a vague and undefined notion of a *'reasonable rate of return'* mentioned in Law 54/1997, but not on the more specific statements of fixed tariff rates included in RD 661/2007 and RD 1578/2008, which implemented the Law, defies reason. The Claimant questions the *'supposed'* guarantee of a reasonable return for two reasons: (i) the rate that the Respondent claims is reasonable today is lower than the rates that apparently informed the incentive levels established in RD 661/2007; and (ii) nothing in RD 661/2007, RD 1578/2008, or the New Regulatory Regime guaranteed a return to investors whose investments performed below Spain's assumed standard.[259]

430.    The Claimant rejects that by virtue of the principle of hierarchy under domestic law it should have looked to Law 54/1997 and not to the implementing royal decrees. In that respect, the Claimant states that laws or acts in Spain establish the overall framework

---

[256]    Claimant's Statement of Claim, ¶ 411.
[257]    Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 582.
[258]    Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 582.
[259]    Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 623.

and principles, which are then implemented and concretized through decrees.[260]

431.    Moreover, the Claimant holds that, before its 2013 amendment, Law 54/1997 did not state that the tariffs must provide a reasonable rate of return and nothing more.[261]

432.    The Claimant also rejects the Respondent's contention that the Claimant did not perform an exhaustive analysis of the legal framework prior to investing. *First*, the Claimant suggests that no specific level of legal due diligence was required. It refers to a statement provided in that sense by the tribunal in *Novenergia v. Spain*.[262] *Secondly*, the Claimant defends that it did conduct extensive and more than adequate due diligence. It, nonetheless, denies that a prudent investor should not rely on due diligence reports prepared for someone else.[263]

433.    Furthermore, the Claimant confronts the Respondent's argument that the previous changes in the regulations should have prevented the Claimant that the regime was subject to change. The Claimant contends, *first*, that RD 661/2007 was *'the most stable regime Spain had enacted, after previous failed attempts'*. *Secondly*, the Claimant refers to guarantees that the regime allegedly contained against retroactive changes.[264]

434.    In addition, the Claimant questions the Respondent's reliance upon its domestic court decisions.[265]

(c)    **The Respondent subsequently failed to honour the expectations it had created**

435.    The Claimant maintains that after the Respondent benefited from the investment, it abruptly altered the legal framework, frustrating the Claimant's legitimate expectations.[266]

436.    The Claimant refers to the following measures implemented by the Respondent:

---

[260]    Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 628.

[261]    Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 630.

[262]    *Novenergia II – Energy & Env't (SCA), SICAR v. Kingdom of Spain*, SCC Arb/ No. 2015/063, Final Award of 15 February 2018 **(CL-3)**, ¶ 673.  Cfr. Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 634.

[263]    Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶¶ 635-636.

[264]    Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 639.

[265]    Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶¶ 642-644.

[266]    Claimant's Statement of Claim, ¶ 412.

(i)    The limitation of the duration that RD 661/2007 plants could receive the fixed tariff to 30 years and the restriction of the operating hours for which all plants could receive the RD 661/2007 and RD 1578/2008 tariffs;[267]

(ii)    The imposition of the 7% tax;[268] and

(iii)    The abolition of RD 661/2007 and RD/2008 and their substitution with the New Regulatory Regime. Under the New Regulatory Regime, the imposition of a different, much lower, rate of return on the Claimant's plants, which was derived using *'arbitrary, ex post formulas'*.[269]

437.    The Claimant concludes that the Respondent's actions violate the FET protection in Article 10(1) of the ECT.[270]

### (ii)    Fundamental Changes to the Incentives Regime

438.    The Claimant argues that the Respondent also breached the FET obligation by abrogating the RD 661/2007 and RD 1578/2008 regimes and *fundamentally* changing the investment framework that formed the basis of the Claimant's investments.[271]

439.    It holds that investment treaty case law confirms that a fundamental change in the incentives regime violates the ECT's FET standard.[272] It contends that the changes the Respondent made with the New Regulatory Regime were fundamental and devastating to renewable energy investors with existing facilities developed under the Original Regulatory Regime.[273]

440.    The Claimant notes six fundamental changes between the original and the new regimes, summarized in the Brattle Regulatory Report in the following way:

---

[267]    Claimant's Statement of Claim, ¶ 413.

[268]    Claimant's Statement of Claim, ¶ 415.

[269]    Claimant's Statement of Claim, ¶ 415.

[270]    Claimant's Statement of Claim, ¶ 417.

[271]    Claimant's Statement of Claim, ¶ 419.

[272]    Eiser Infrastructure Ltd. and Energia Solar Luxembourg S.à.r.l. v. Kingdom of Spain (ICSID Case No. ARB/13/36, Award of 4 May 2017 (**CL-38**), ¶ 382; Novenergia II – Energy & Environment (SCA), SICAR v. Kingdom of Spain (SCC Arbitration 2015/063, Final Award of 15 February 2018 (**CL-3**), ¶ 654; and Antin Infrastructure Services Luxembourg S.à.r.l. & Antin Energia Termosolar B.V. v. The Kingdom of Spain (ICSID Case No. ARB/13/31, Award of 15 June 2018 (**CL-5**), ¶¶ 532, 560). Cfr. Claimant's Statement of Claim, ¶¶ 419-422.

[273]    Claimant's Statement of Claim, ¶ 423.

*i. The "change in tariff structure from a stable incentive-based system per MWh produced, to a new, unprecedented and uncertain "rate base" system with financial incentives per MW installed";*

*ii. The "unilateral reduction of the allowed target return implicit under the Original Regulatory Regime";*

*iii. The "use of hindsight to set new stricter costs targets and appropriate efficiency rewards that existing investors expected to retain for beating the original cost targets implicit in the FITs under the Original Regulatory Regime";*

*iv. The imposition of "retroactive" changes in two different senses: (i) by imposing the changes on existing plants and (ii) by penalizing "existing installations that obtained gains under the Original Regulatory Regime above what Spain now deems reasonable by reducing the future financial support";*

*v. A reallocation of interest rate risk, since "the New Regulatory Regime updates FITs based on the evolution of interest rates exposing investors who have locked in the existing loans to default if interest rates fall";*

*vi. Creation of significantly "greater risk facing investors under the New Regulatory Regime", given that Spain has violated previous commitments and stands ready to alter the regime regularly in the future, when the original regimes were backed by Spain's express guarantee against changes for existing plants.[274]*

441.    The Claimant also recalls some conclusions from the Brattle Regulatory Report's comparison of the two regimes. The Tribunal highlights the following:

*[...] the New Regulatory Regime seizes the benefits of efficient performance that investors legitimately anticipated they would retain when they incurred substantial technical, financial and operating risks.*

*The New Regulatory Regime has inefficiently reduced incentives [originally designed] to maximize production. [...] The New Regulatory Regime now threatens to reduce financial support as interest rates decline, turning the existing credit arrangements into a serious problem. Reduced financial support has threatened many equity investors with insolvency.*

*Spain has increased regulatory risk by violating the expectations of existing investors, and by failing to specify sufficiently the future*

---

[274]    The Brattle Group Expert Report on Changes to the Regulation of Photovoltaic Installations in Spain since December 2012, dated 12 October 2018 ("First Brattle Regulatory Report"), ¶ 17 and Sections V.C., VI.D, VII. C. *Cfr.* Claimant's Statement of Claim, ¶ 423.

> *implementation of the New Regulatory Regime. Regulatory risk reduces*
> *the value of existing assets, and raises the costs of new investment.*[275]

442.    The Claimant additionally notes that four ECT tribunals found the Respondent liable for breaching the FET standard by fundamentally changing its renewable energy incentive framework.[276] It refers to the tribunals in *Eiser v. Spain*,[277] *Novenergia v. Spain*,[278] *Masdar v. Spain*,[279] and *Antin v. Spain*.[280]

**(iii)    The Respondent failed to treat the Claimant's investments transparently and consistently**

443.    The Claimant holds that another key aspect of the FET standard is a State's duty to treat investors and their investments *transparently* and *consistently*.[281]

444.    It states that investment treaty tribunals generally align the duties of transparency and consistency.[282] It also asserts that *'legitimate expectations'* and *'transparency/consistency'* are *'stand alone'* claims of violation of the FET standard.[283] It refers to the decision in *Micula v. Romania* in support for its assertion.[284]

445.    According to the Claimant, *transparency* requires the following: (i) that investors are informed of decisions before they are imposed; (ii) the absence of any ambiguity or

---

[275]    The Brattle Group Expert Report on Changes to the Regulation of Photovoltaic Installations in Spain since December 2012, dated 12 October 2018 ("First Brattle Regulatory Report"), ¶¶ 296-301.  Cfr. Claimant's Statement of Claim, ¶ 424.

[276]    Claimant's Statement of Claim, ¶ 425.

[277]    Eiser Infrastructure Ltd & Energia Solar Luxembourg S.A.R.I. v. The Kingdom of Spain, ICSID Case No. ARB/13/36, Award of 4 May 2017 (**CL-38**).

[278]    Novenergia II – Energy & Environment (SCA), SICAR v. The Kingdom of Spain, SCC Arb. 2015/063, Final Award of 15 Feb 2018 (**CL-3**).

[279]    Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain, ICSID Case No. ARB/14/1, Award of 16 May 2018 (**CL-4**).

[280]    Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V. v. Kingdom of Spain, ICSID Case No. ARB/13/31, Award of 15 June 2018 (**CL-5**).

[281]    Claimant's Statement of Claim, ¶ 434.

[282]    *Enron Corp. and Ponderosa Assets, L.P. v. Argentine Republic* (ICSID Case No. ARB/01/3, Award of 22 May 2007 (**CL-29**), ¶¶ 267-268); *CMS Gas Transmission Co. v. Argentine Republic* (ICSID Case No. ARB/01/08, Award of 12 May 2005 (**CL-40**), ¶ 274; *PSEG Global Inc. and Konya Ilgin Elektrik Üretim ve Ticaret Limited Sirketi v. Republic of Turkey* (ICSID Case No. ARB/02/5, Award of 19 Jan 2007 (**CL-41**), ¶ 250); *Franck Charles Arif v. Republic of Moldova* (ICSID Case No. ARB/11/23, Award of 8 April 2013 (**CL-42**), ¶¶ 538, 557); *Occidental Exploration and Production Co. v. Republic of Ecuador* (UNCITRAL, LCIA Case No. UN 3467, Final Award of 1 July 2004 (**CL-19**), ¶ 185;, and *LG&E Energy Corp., LG&E Capital Corp., and LG&E Int'l, Inc. v. Argentine Republic* (ICSID Case No. ARB/02/1, Decision on Liability of 3 October 2006 (**CL-30**), ¶ 131.  Cfr. Claimant's Statement of Claim, ¶ 435.

[283]    Claimant's Statement of Claim, ¶ 435 and Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 650.

[284]    *Ioan Micula et al. v. Romania*, ICSID Case No. ARB/05/20, Award of 11 December 2013, ¶ 872. Claimant's Statement of Claim, ¶ 435.

opacity in the treatment of investments; and (iii) that the legal framework that will apply to an investment is readily apparent.[285] The Claimant holds that a State also violates the standard if it fails: (i) to correct or clarify uncertainties that develop in a regime; or (ii) to adequately inform investors regarding possible changes to a legal regime.[286]

446.   With respect to *consistency*, the Claimant states that the State has an obligation to act coherently and apply its policies consistently. It holds that the State violates the standard, for instance, if a new government repudiates or alters the commitments or relationships entered into with investors by a previous government.[287]

447.   The Claimant argues that the Respondent repeatedly violated its duty to provide transparent and consistent conditions for the Claimant's investments.[288] The Claimant holds, *inter alia*, the following:

(i)    The measures that modified the RD 661/2007 and RD 1578/2008 tariff regimes were inconsistent with the transparent framework that the Respondent had developed, promoted, and granted to the Claimant's facilities.[289]

(ii)   The decision to abolish the right of the Claimant's RD 661/2007 facilities to receive 80% of the full RD 661/2007 tariff after Year 30 of operation was inconsistent with the clear terms of RD 661/2007, which granted tariffs for the entire operating life of a facility.[290]

(iii)  The imposition of an arbitrary limitation on annual operating hours for PV electricity production eligible for RD 661/2007 and RD 1578/2008 tariffs was inconsistent with the original framework, which expressly granted tariffs all of *'the total or partial sale of the net electricity generated'* by an eligible facility.[291]

(iv)   The arbitrary reduction of the Claimant's incentives by subjecting the entire revenues of its facilities -including incentive income- to a 7% *'tax'* was

---

[285]  Claimant's Statement of Claim, ¶ 436.
[286]  Claimant's Statement of Claim, ¶ 437.
[287]  Claimant's Statement of Claim, ¶ 438.
[288]  Claimant's Statement of Claim, ¶ 439.
[289]  Claimant's Statement of Claim, ¶ 440.
[290]  Claimant's Statement of Claim, ¶ 440.
[291]  Claimant's Statement of Claim, ¶ 440.

inconsistent with the RD 661/2007 and RD 1578/2008 regimes since it directly reduced the remuneration promised in those regimes.[292]

(v)    The modification of the manner in which the tariffs would be adjusted for inflation was inconsistent with the clear terms of the royal decrees, which tied those adjustments to the CPI.[293]

(vi)    The decision to apply the measures to existing facilities was inconsistent with the commitment, of the RD 661/2007 and RD 1578/2008 regimes, that the Respondent would not adopt any retroactive modifications altering the tariffs for existing facilities.[294]

(vii)    The abolition of the RD 661/2007 and RD 1578/2008 regimes, and their replacement with an entirely different regulatory regime, violated the Respondent's duty of transparency and consistency.[295]

448.    The Claimant notes that Mr. Margarit describes *'many ways'* in which the New Regulatory Regime was inconsistent with the incentives regimes under which the Claimant invested.[296] It refers to the following alleged features of the original regime:

(i)    *'[T]he long-term predictability of returns on investment'*. Mr. Margarit explains that the RD 661/2007 regulation was very concerned with the remuneration system enabling predictability of long-term remuneration as a way to reduce uncertainty and to facilitate investments. He explains that, under the New Regulatory Regime, uncertainty regarding remuneration increases because facilities are now remunerated partially at the market price and the main remuneration parameters may be modified every 3 or 6 years. He suggests that in each regulatory period the reasonable rate of return assigned to the projects may vary and, consequently, their remuneration.[297]

(ii)    *"[T]he goals of the regulatory regime"*. Mr. Margarit explains that one of the main goals of RD 661/2007 and RD 1578/2008 was the promotion of renewables in order to achieve the objectives derived from the commitments

---

[292] Claimant's Statement of Claim, ¶ 441.
[293] Claimant's Statement of Claim, ¶ 441.
[294] Claimant's Statement of Claim, ¶ 442.
[295] Claimant's Statement of Claim, ¶ 443.
[296] Claimant's Statement of Claim, ¶ 444.
[297] Claimant's Statement of Claim, ¶ 444.

undertaken by Spain and from the policies established under the European Union framework, but also taking into account the benefits for the Spanish society. He suggests that under the New Regulatory Regime that goal is not a priority at all.[298]

(iii)    *"[P]riority dispatch of electricity from renewable sources"*. Mr. Margarit explains that, under the New Regulatory Regime, the dispatch priority of renewable energies is lost and is now subject to the lowest price. He explains that this goes against the Renewable Energy Directive.[299]

(iv)    *"[T]he original aim of promoting efficiency"*. Mr. Margarit explains that the new remuneration framework removes the original link between the remuneration for the investment and the real production of facilities, as the remuneration depends on the installed power and the hours attributed to the standard facility. He suggests that in the new regulatory framework there will be a loss of efficiency due to the lack of incentives to maximize production.[300]

(v)    *"Spain's long-term planning for the market"*. Mr. Margarit explains that under the former regulatory framework there were important long-term goals that provided an idea of the maintenance of policies supporting renewables and a market horizon for the sector. He suggests that the lack of such long-term objectives under the New Regulatory Regime hinders investors' projections within the sector.[301]

449.    The Claimant further adds that the Respondent replaced the clear and transparent pricing formulas under RD 661/2007 and RD 1578/2008 with remuneration based on the Respondent's notion of a 'reasonable rate of return'. It holds that the latter is to be determined in relation to arbitrary, opaque, and complex formulas, and can be revised and imposed on existing facilities at the Respondent's whim.[302]

450.    The Claimant concludes that the Respondent has made the investment environment entirely uncertain and future remuneration impossible to predict.[303]

---

[298]    Claimant's Statement of Claim, ¶ 445.
[299]    Claimant's Statement of Claim, ¶ 446.
[300]    Claimant's Statement of Claim, ¶ 447.
[301]    Claimant's Statement of Claim, ¶ 448.
[302]    Claimant's Statement of Claim, ¶ 449.
[303]    Claimant's Statement of Claim, ¶ 449.

451. In its Reply on the Merits, the Claimant notes that the Respondent urges the Tribunal to follow the finding in AES Summit v. Hungary, where the tribunal determined that Hungary's price setting did not violate the ECT standards of transparency. The Claimant explains why it considers that the facts of that case are vastly different from those of the present case.[304]

452. The Claimant further maintains that if the Respondent's pleaded case is that it knew that it could or would make fundamental changes to the regime, after it had benefited from the investments, then the Respondent failed to afford the transparency and consistency required by the ECT's FET provision.[305]

### 4.    The Respondent Impaired the Claimant's investments through Unreasonable or Discriminatory Measures

453. The Claimant argues that the Respondent *'unreasonably impaired'* the Claimant's *'management, maintenance, use, and enjoyment'* of its investments in violation of Article 10(1) of the ECT.[306]

454. The Claimant holds that the impairment clause of the ECT sets forth a *'low threshold'* for the requisite impact on an investment. It states that tribunals have held that the term *'impairment'* means *'any negative impact or effect'* and that it includes State acts as well as omissions.[307] It further asserts that because Article 10(1) of the ECT uses the disjunctive *'or'* instead of the conjunctive *'and'*, either unreasonable *or* discriminatory measures will violate the provision.[308]

455. The Claimant notes that tribunals have held that a measure may be *unreasonable* if it is taken without due consideration of the potential negative effects it will have on foreign investors.[309] It also observes that the reasonableness of a measure must be judged from the standpoint of the parties' expectations at the time of the decision to invest, rather than what the State might have subsequently and unilaterally viewed as reasonable from

---

[304] Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶¶ 646-647.

[305] Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶¶ 651, 654.

[306] Claimant's Statement of Claim, ¶ 451.

[307] *Saluka Investments B.V. v. Czech Republic* (UNCITRAL, Partial Award of 17 March 2006 (**CL-16**), ¶¶ 458-459; *CMS Gas Transmission Co. v. Argentine Republic* (ICSID Case No. ARB/01/08, Award of 12 May 2005 (**CL-40**), ¶ 292; and *Azurix Corp. v. Argentine Republic* (ICSID Case No. ARB/01/12, Award of 14 July 2006 (**CL-52**), ¶ 393. Cfr. Claimant's Statement of Claim, ¶ 453.

[308] Claimant's Statement of Claim, ¶ 453.

[309] *LG&E Energy Corp., LG&E Capital Corp., and LG&E Int'l, Inc. v. Argentine Republic*, ICSID Case No. ARB/02/1, Decision on Liability of 3 October 2006, ¶ 158. Cfr. Claimant's Statement of Claim, ¶ 454.

a policy perspective.[310]

456.  The Claimant argues that *all* the Respondent's measures were unreasonable, because they violated the commitments and guarantees in RD 661/2007 and RD 1578/2008, as well as the repeated assurances of Spain's officials, which induced the Claimant to invest.[311]

457.  Moreover, the Claimant maintains that the *individual* measures imposed by the Respondent were also unreasonable when considered on a stand-alone basis.[312] The Claimant refers to the following measures:

(i)    To impose *'operating hour'* limits on plants that cannot be shut down to control costs;[313]

(ii)   To impose a *'tax'* on incentive revenues;[314]

(iii)  To manipulate routine adjustments for inflation based on the Consumer Price Index;[315] and

(iv)   To target the Claimant and other renewable energy investors as the *'cause'* of Spain's tariff deficit and to force them to pay for the *'solution'*.[316]

458.  The Claimant further states that the New Regulatory Regime was unreasonable and irrational in many respects, as described by Mr. Margarit.[317]  The Claimant cites, *inter alia*, the following assertions:

> *[...] the reform includes a new remuneration methodology specific to renewables which is based upon production capacity instead of generation. This reduces the economic signal over the management of these running facilities that, if had been known, would have been designed differently [...]*[318]
>
> *As a consequence of the application of specific remuneration based on power and in connection to the corresponding standard facility, it may be*

---

[310]  *BG Group Plc. v. Argentine Republic*, UNCITRAL, Final Award of 24 December 2007 (**CL-51**), ¶¶ 342, 344).  Cfr. Claimant's Statement of Claim, ¶ 454.

[311]  Claimant's Statement of Claim, ¶ 454.

[312]  Claimant's Statement of Claim, ¶ 455.

[313]  Claimant's Statement of Claim, ¶ 455.

[314]  Claimant's Statement of Claim, ¶ 455.

[315]  Claimant's Statement of Claim, ¶ 455.

[316]  Claimant's Statement of Claim, ¶ 456.

[317]  Expert Report of Jaume Margarit dated 11 October 2018 ("First Margarit Report"). *Cfr.* Claimant's Statement of Claim, ¶ 456.

[318]  Expert Report of Jaume Margarit dated 11 October 2018 ("First Margarit Report"), p. 58.

*the case that the remuneration may be more favorable to bad projects than to good ones for existing facilities at the time the reform entered into force. [...] it turns out that the facilities that produce more than the equivalent hours provided for their standard facility are going to receive a lower price for each generated kWh than those facilities that produce less. [...]*[319]

*Reasonable return is defined as linked to the 10-year State bond's yield. [...] linking the evolution of return on a renewables investment to the evolution of the bond's yield may be very contradictory. As once the investment is made the facility owner's leeway is much reduced, and it would not be appropriate to modify the target return throughout the project's useful life. Yet if regardless of this it is intended that said return be updated with changes that are accruing throughout the project's useful life, it does not make much sense to reference it to the variations of a financial product sensible to stimulus that may have nothing to do with the electricity generation activity. It could be the case that while return expectations within the electricity sector increase, those of the 10-year bond decrease. [...]*[320]

*The new regulatory framework provides for 6-year regulatory periods divided up into 3-year semi-periods as to the validity of the main regulatory parameters. This limits the long-term predictability of investment to be made. The modification of these parameters affects the project's return throughout their useful life once the investment has been made and also the investor's leeway to adapt to new situations is almost non-existent. [...]*[321]

*The reasonable return that is expected from renewables is neither required from other energy generation technologies such as nuclear and large hydro which have been completely recouped by the perception of stranded costs. Given the economic imbalance of the electricity sector that is intended to be corrected with the reform, it is incorrect to not seize the opportunity to rationalize the remuneration of old ordinary regime nuclear plants and large hydro plants that have been recouped by payments allocated to energy consumers, requiring a reasonable return the same way it is done with renewables. [...]*[322]

*The definition of standard facilities and the specification of the remuneration parameters of each of them are not justified. [...] IDAE, during the development phase of the reform, commissioned two consultancy firms with studies in order to collect information on the operating parameters of renewable plants. Nevertheless, one of the studies was not completed and the other was finalized after the enactment of ministerial order IET/1045/2014, which established said parameters for standard facilities. The Secretary of State for Energy has stated that*

---

[319] First Margarit Report, pp. 58-59.
[320] First Margarit Report, p. 59.
[321] First Margarit Report, p. 59.
[322] First Margarit Report, p. 59.

> *only information provided by IDAE has been used without adding any detail [...] Consequently, the procedure used to determine what actually defines the facilities remuneration (the parameters) has not been transparent at all. [...]*[323]

> *In the end, the reform's economic impact is focused on renewables without making an adequate cost-benefit analysis. [...]*[324]

459. The Claimant argues that, from an economic and regulatory perspective, there were better options available to the Spanish Government to address the alleged problems that it cited to justify the measures.[325]

460. The Claimant also considers that it is evident that the Respondent understood the harmful and unreasonable impact of its measures and imposed them anyway.[326]

461. Notwithstanding the previously described elaboration, in its Reply on the Merits the Claimant also holds that the Respondent's measures violate the ECT's impairment clause in at least *three* ways.

462. *First*, the Claimant refers to the alleged lack of legitimate purpose of the disputed measures. It states that, while the measures effectively addressed the tariff deficit, they did so *'in a manner that was unnecessary, arbitrary, that disproportionately impacted renewable energy investors, causing them financial harm'*.[327]

463. *Secondly*, the Claimant asserts that the measures contravened fundamental principles of non-retroactivity and singled out renewable energy investors.[328] In this context, the Claimant rejects the Respondent's argument that the New Regulatory Regime was similar to a reform proposed in 2009 by some members of the renewable energy sector. The Claimant states that the discussions at that time did not involve retroactive changes to the RD 661/2007 or RD 1578/2008 regimes, but instead were designed to address facilities that were developed in the future.[329]

464. The Claimant also rejects the Respondent's statements that most investors accepted the new incentive regime,[330] and that international bodies approved the regulatory

---

323  First Margarit Report, pp. 59-60.
324  First Margarit Report, p. 60.
325  Claimant's Statement of Claim, ¶ 457.
326  Claimant's Statement of Claim, ¶ 458.
327  Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 669.
328  Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 674.
329  Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 675.
330  Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶¶ 676-678.

changes.[331]

465.    The Claimant concludes that the disputed measures were unreasonable and discriminatory, and that the Respondent violated the ECT's impairment clause.[332]

###    5.    The Respondent violated the Umbrella Clause of the ECT

466.    The Claimant argues that the Respondent's conduct also breached Article 10(1) of the ECT in the following provision: 'Each contracting Party shall observe any obligations it has entered into with an Investor or an Investment of an Investor of any other Contracting Party'.[333]

467.    The Claimant states that this provision, known as the *'umbrella clause'*, is specifically intended to expand the reach of the Treaty's protections to obligations that otherwise might not be covered by the other substantive provisions.[334]

468.    The Claimant holds that the wording of the ECT's umbrella clause does not differentiate between contractual obligations and legislative or regulatory undertakings.[335] It observes that ECT tribunals have routinely held that obligations undertaken through law or regulation, in addition to contractual obligations, fall within the scope of the umbrella clause.[336]

469.    Moreover, in its Reply on the Merits, the Claimant asserts that under Article 31 of the VCLT the Tribunal must interpret the umbrella clause in good faith in accordance with the ordinary meaning of its terms. In this regard, the Claimant holds that, had the Contracting Parties to the ECT wanted the umbrella clause to cover only contractual obligations, they would have drafted the provision in that sense.[337]

470.    In said context, the Claimant rejects the Respondent's holding that the phrase *'entered*

---

[331]    Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶¶ 679-680.

[332]    Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 681.

[333]    Claimant's Statement of Claim, ¶ 459.

[334]    Claimant's Statement of Claim, ¶ 459.

[335]    Claimant's Statement of Claim, ¶ 461 and Reply on the Merits and Counter-Memorial on Jurisdiction, ¶¶ 655-656.

[336]    *Mohammad Ammar Al-Bahloul v. Republic of Tajikistan* (SCC Case No. V (064/2008), Partial Award on Jurisdiction and Liability of 2 September 2009 (**CL-24**), ¶ 257;  *Plama Consortium Limited v. Bulgaria* (ICSID Case No. ARB/03/24, Award of 27 August 2008 (**CL-56**), ¶ 186; *Limited Liability Company Amto v. Ukraine* (SCC Case No. 080/2005, Final Award of 26 March 2008 (**CL-61**), ¶ 110; and *Khan Resources Inc., Khan Resources B.V. and Cauc Holding Company Ltd. v. Government of Mongolia and Monatom Co.*, Ltd (PCA Case No. 2011-09, Award on the Merits of 2 March 2015 (**CL-62**), ¶ 366. Cfr. Claimant's Statement of Claim, ¶ 461.

[337]    Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 657.

*into'* in Article 10(1) of the ECT necessarily involves the State's assumption of obligations in the form of a contract.[338] The Claimant also argues that the cases and doctrine cited by the Respondent do not actually support its position.[339]

471. The Claimant maintains that RD 661/2007 and RD 1578/2008 created explicit obligations regarding the tariffs that the Respondent undertook to pay on the electricity produced by qualifying facilities. In the Claimant's thesis, those obligations included the following:

(i) The obligation to pay the compensation provided in the economic regime to the Claimant's facilities *'for the total or partial sale of the net electricity generated'* (Article 17 of RD 661/2007, also applicable to RD 1578/2008);

(ii) The obligation to pay fixed inflation-adjusted tariffs of 44.0381 c€ to four of the Claimant's PV facilities per kWh of electricity produced for the first 25 years of those facilities' operation (Article 36 of RD 661/2007);

(iii) The obligation to pay those tariffs of 35.2305 c€, per kWh of electricity produced for the remaining operating lives of those PV facilities (Article 36 of RD 661/2007);

(iv) The obligation to pay inflation-adjusted tariffs of 29.0857 c€ to Claimant's El Carpio plant per kWh of electricity produced (Article 11 of RD 1578/2008 and resolution of enrollment in the pre-allocation registry);

(v) The obligation to update the value of the RD 661/2007 and RD 1578/2008 tariffs *'on an annual basis using as a reference the increase in the CPI'* (Article 44.1 of RD 661/2007 and Article 12 of RD 1578/2008); and

(vi) The obligation to ensure that *'revisions to the regulated tariff […] shall not affect facilities for which the deed of commissioning shall have been granted*

---

[338] Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 658.

[339] *CMS Gas Transmission Company v. Argentine Republic (*ICSID Case No. ARB/01/08), Decision on Annulment, of 25 September 2007 (**RL-24**); *Société Générale de Surveillance S.A. v. Filipinas* (ICSID Case No. ARB/02/6, Decision on Objections to Jurisdiction, of 29 January 2004 (**RL-21**); *Blusun S.A. et al v. Italian Republic* (ICSID Case No. ARB/14/3, Award of 27 December 2016 (**CL-103**)); *Perenco Ecuador Limited v. Republic of Ecuador* (ICSID Case No. ARB/08/6, Decision on Remaining Issues of Jurisdiction and on Liability of 12 September 2014 (**RL-0060**); and *Plama Consortium Limited v. Bulgaria* (ICSID Case No. ARB/03/24, Award of 27 August 2008 (**CL-56**)). The Claimant also refers to the Respondent's citation of Thomas Wälde, 'The "Umbrella" Clause in Investment Arbitration: A Comment on Original Intentions and Recent Cases', HeinOnline 6 J. World Investment & Trade 183 2005 (**RL-0038**)). *Cfr.* Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 659-665.

*prior to January 1 of the second year following the year in which the revision shall have been performed'* (Article 44.3 of RD 661/2007, also applicable to RD 1578/2008).[340]

472. Moreover, the Claimant contends that the Respondent's incentive tariffs were not of a general nature. It argues that they were individually granted to specific photovoltaic plants that qualified under the terms of the legal regime, obtained a Final Commissioning Certificate, and were individually registered in the RAIPRE.[341]

473. The Claimant argues that the Respondent violated its obligations in the following specific ways, which the Tribunal summarizes:

| Alleged action undertaken by the Respondent | Alleged obligation of the Respondent or right of the Claimant that was violated |
|---|---|
| Cancellation of the right of the Claimant's RD 661/2007 plants to receive fixed tariffs after Year 25 (and then after Year 30) of operation.[342] | Obligation of the Respondent, under Article 36 of RD 661/2007, to pay fixed tariffs to the Claimant's plants for their full operating lives.[343] |
| Imposition of *'operating hours'* limitations on the Claimant's facilities.[344] | Right of the Claimant, under Article 17 of RD 661/2007 (also applicable to RD 1578/2008), to receive fixed tariffs on all of the electricity produced by its plants.[345] |
| Imposition of a 7% reduction in all revenues (disguised as a *'tax'*).[346] | Commitment of the Respondent to pay tariffs at the rates specified in Article 36 of RD 661/2007 and Article 11 of RD 1578/2008 (as well as the resolution issued in respect of El Carpio).[347] |
| Adoption of the inflation-adjustment mechanism.[348] | Terms of Article 44.1 of RD 661/2007 and Article 12 of RD 1578/2008.[349] |

---

[340] Claimant's Statement of Claim, ¶ 465.
[341] Claimant's Statement of Claim, ¶ 466.
[342] Claimant's Statement of Claim, ¶ 469.
[343] Claimant's Statement of Claim, ¶ 469.
[344] Claimant's Statement of Claim, ¶ 469.
[345] Claimant's Statement of Claim, ¶ 469.
[346] Claimant's Statement of Claim, ¶ 470.
[347] Claimant's Statement of Claim, ¶ 470.
[348] Claimant's Statement of Claim, ¶ 470.
[349] Claimant's Statement of Claim, ¶ 470.

| | |
|---|---|
| All measures.[350] | Non-retroactivity obligation under Article 44.3 of RD 661/2007, also applicable to RD 1578/2008.[351] |
| Abrogation of RD 661/2007 and RD 1578/2008, and their replacement with the New Regulatory Regime.[352] | All obligations undertaken by the Respondent toward the Claimant's investments in its legislative and regulatory framework.[353] |

474.     The Claimant concludes that each of the Respondent's measures violates the ECT's umbrella clause.[354]

## 6.     The Respondent cannot invoke the Defence of Necessity under International Law

475.     In its Reply on the Merits, the Claimant refers to the Respondent's argument that the disputed measures were *'necessary macroeconomic control measures'* to stabilize its economy.

476.     The Claimant holds that the Respondent's argument is wrong for at least two reasons.

477.     *First*, the Claimant states that none of the authorities upon which the Respondent relies ever analysed whether the changes in the economic situation amounted to a *'state of necessity'* or whether the measures were necessary to address the changed economic situation as a factual matter.

478.     *Secondly*, the Claimant asserts that, even if the Respondent could establish a factual basis for a need to implement the New Regulatory Regime, it has not and cannot establish the requirements of the *'defence of necessity'* under international law.[355]

479.     The Tribunal summarizes the Claimants arguments below.

### (i)     The Respondent enacted its Electricity Sector Reforms to address the tariff deficit it had ignored since 2000

480.     The Claimant states that the tariff deficit in Spain's electricity system arose in 2000 as a result of the Respondent's failure to establish retail tariffs at a level that covered all

---

[350]   Claimant's Statement of Claim, ¶ 470.
[351]   Claimant's Statement of Claim, ¶ 470.
[352]   Claimant's Statement of Claim, ¶ 471.
[353]   Claimant's Statement of Claim, ¶ 471.
[354]   Claimant's Statement of Claim, ¶ 472.
[355]   Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 683.

the costs of the electricity system.[356]

481.  The Claimant observes that such tariff deficit grew to a level of € 11 billion by the end of 2007, and to a level of € 16 billion by 2008, but the Respondent ignored the problem. The Claimant refers to the implementation of RD 661/2007 and RD 1578/2008 notwithstanding the described situation.[357]

482.  In the Claimant's position, the Respondent took no measure to address the tariff deficit prior to 2009, when it enacted Royal Decree-Law 6/2009.[358]

483.  The Claimant notes that the Respondent makes references to '*ad hoc problems*' that purportedly created imbalances in its electricity system, such as unusual weather that resulted in lower than expected electricity demand and falling market prices. The Claimant argues, however, that the Respondent has not established a causal link between those alleged problems and the unsustainability of the support to renewables. It also argues that the Respondent has not established, or even alleged, that consumers could not cover the costs of the support to renewables.[359]

484.  In the Claimant's view, the alleged retroactive cuts, by way of the New Regulatory Regime, were the result of a conscious political decision to avoid raising electricity costs on end-consumers.[360]

485.  The Claimant holds that none of the disputed measures was necessary to address the tariff deficit. It asserts that the Brattle Regulatory Reports show that the cost of support to PV investors bore little relation to the cost and growth of the tariff deficit.[361]

486.  In addition, the Claimant holds that the Respondent had other methods at its disposal to reign in the tariff deficit, rather than cutting incentives to PV facilities.[362]

---

[356]  Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 684.

[357]  Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 694.

[358]  Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 695.

[359]  Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 686.

[360]  Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 693.

[361]  The Brattle Group Expert Report on Changes to the Regulation of Photovoltaic Installations in Spain since December 2012, dated 12 October 2018 ("First Brattle Regulatory Report") , Section VI.B and ¶ 177; and The Brattle Group Expert Report '*Rebuttal: Changes to the Regulation of Photovoltaic Installations in Spain since November 2010*', dated 17 July 2019 ("Second Brattle Regulatory Report"), Section IV.A.3 and ¶¶ 18, 72-73. Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶¶ 697-699.

[362]  Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶¶ 700-701.

> **(ii)    No authority has independently concluded that a State of Necessity excused the Respondent's changes to RD 661/2007 and RD 1578/2008**

487.    The Claimant holds that none of the authorities on which the Respondent relies takes a position on whether the disputed measures were necessary to address any new or urgent problem.[363]

488.    The Claimant refers to the Respondent's reliance on various opinions of its Constitutional Court. It asserts that international law accords no weight to domestic legal authority when considering the wrongfulness of domestic acts.[364] It additionally contends that, in any event, the decisions of the Constitutional Court on which the Respondent relies do not support its argument.[365]

489.    Similarly, the Claimant considers that the Respondent mischaracterizes a statement by the European Commission.[366] It also holds that the Respondent is wrong in relying on the Commission's refusal to investigate Spain for a potential breach of Directive 2009/28/EC, as support for confirmation of the necessity of the disputed measures.[367]

490.    The Claimant further denies that the reports from the International Monetary Fund and the International Energy Agency take a position on the necessity of the disputed measures.[368]

> **(iii)    The Respondent has not, and cannot, establish a defence of necessity under international law**

491.    The Claimant notes that the Respondent has not explicitly characterized its arguments as a defence of necessity. It, nevertheless, rejects that such a defence could be established.[369]

492.    *First*, the Claimant argues that the international law defence of necessity is not available to Spain. It recalls that Article 25 of the ILC Articles on State Responsibility restricts such defence to breaches of obligations owed to other States or to the international

---

[363]    Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 702.
[364]    Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶¶ 703, 707.
[365]    Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶¶ 704-706.
[366]    Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 708.
[367]    Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 709.
[368]    Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 708.
[369]    Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 714.

community as a whole.[370]

493.   *Secondly*, the Claimant points out that the ECT governs the present dispute as *lex specialis*. In that context, it asserts that the only provision in the ECT that provides exceptions to the Respondent's duty to treat investments and investors in accordance with Article 10 is Article 24. The Claimant observes, then, that none of the circumstances listed in Article 24 exists in the present case.[371]

494.   *Thirdly*, the Claimant states that if the international law defence of necessity were available to the Respondent, the Respondent would still have to meet an extremely high standard, which it cannot meet.[372]

495.   Withal, the Claimant maintains that, even if the Respondent could satisfy the legal standard to prove *'necessity'*, it would not be relieved from its obligation to compensate the Claimant for the harm its measures allegedly caused. The Claimant holds that this is reflected in Article 27 of the ILC Articles on State Responsibility.[373]

496.   The Claimant concludes that any attempt of the Respondent to rely upon the international law defence of necessity would be unavailing.[374]

### C.    The Respondent's Position on Liability

#### 1.    Applicable Law

497.   The Respondent argues that the legal standards that must be applied for the resolution of the present arbitration are established in Article 26(6) of the ECT.[375]

498.   The Respondent further argues that, in parallel to Article 42 of the ICSID Convention,[376] Article 26 of the ECT determines as applicable standards, on the one hand, those of the ECT itself, and on the other, the rules and principles of international law. The Respondent considers that this application must be carried out without

---

[370]   Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 715.

[371]   Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶¶ 718-719.

[372]   Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶¶ 720-723.

[373]   Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 724.

[374]   Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 725.

[375]   Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 884.

[376]   Convention on the Settlement of Investment Disputes between States and Nationals of Other States (ICSID Convention), 1965, Article 42: '*The Tribunal shall decide a dispute in accordance with such rules of law as may be agreed by the parties. In the absence of such agreement, the Tribunal shall apply the law of the Contracting State party to the dispute (including its rules on the conflict of laws) and such rules of international law as may be applicable.*' Respondent's Statement of Defence, ¶ 885.

establishing any kind of distinction or hierarchical order between the ECT and the other rules and principles of international law.[377]

499.    The Respondent argues that EU law falls among those rules and principles of international law to which Article 26(6) refers.[378] It also argues, contrary to the Claimant's position, that EU law is not only a crucial *fact* for the resolution of the present dispute, but is also applicable *law*, both with regard to the jurisdiction of the Tribunal and the merits of the case.[379] The Respondent elaborates on its argumentation.

500.    *First*, it recalls that the CJEU has made clear that EU law is at the same time internal law of the Member States, by virtue of the principle of direct effect, and international law.[380]

501.    The Respondent notes that the application of EU law in its *'dual nature'* has been recognised by numerous arbitration decisions in analogous, if not identical, cases to the present.[381] It refers to the decisions in *Electrabel v. Hungary*,[382] *Blusun v. Italy*,[383] *Wirtgen v. Czech Republic*,[384] and *Isolux v. Spain*.[385] It also observes that other bodies of international law, such as the European Court of Human Rights ("ECHR"), have ruled on the issue.[386]

502.    *Secondly*, the Respondent refers to the applicability *ratione personae* and *ratione materiae* of EU law to the present dispute.

503.    It holds that the applicability *ratione personae* of the rules of EU law to the present

---

[377]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 886.

[378]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 887.

[379]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 890.

[380]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 887.

[381]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 891.

[382]    *Electrabel v. Republic of Hungary*, Award of 5 November 2015 (**RL-0031**), ¶¶ 4122, 4195. Cfr. Respondent's Statement of Defense, ¶ 892.

[383]    *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v. Italian Republic*, ICSID Case No. ARB/14/3, Award of 27 December 2016 (**RL-0059**), ¶ 278. *Cfr.* Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 893.

[384]    *Wirtgen v. Czech Republic*, PCA Case No. 2014-03, Award of 11 October 2017 (**RL-0066**), ¶¶ 175, 177. *Cfr.* Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 894.

[385]    *Isolux Infra. Netherlands B.V. v. Kingdom of Spain*, SCC Arb. No. 2013/153, Final Award of 12 July 2016 (**RL-0056**), ¶ 654. *Cfr.* Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 895.

[386]    The Respondent refers to the Judgment of the European Court of Human Rights related to *Bosphorus v. Ireland*, cited in *Electrabel S.A. v. Republic of Hungary*, ICSID Case No. ARB/07/19, Award of 5 November 2015 (**RL-0031**), ¶ 4102. *Cfr.* Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 896.

dispute does not admit any kind of doubt since it affects a Member State of the Union and a national of another Member State.[387]

504.    It then asserts that the applicability *ratione materiae* of the rules of EU law to the present dispute does not admit any kind of doubt either.[388] The Respondent recalls the two arguments it submitted when it argued in favour of the application of EU law concerning the jurisdiction of the Tribunal:

(i)     The generic matter of the investments affects the fundamental Freedoms of Circulation which are the very basis of EU law. It recalls that this was pointed out by the CJEU in the *Achmea* decision.[389]

(ii)    The application of the rules of EU law on State aid is unquestionable, since what is being claimed by the Claimant is the maintenance of a public subsidy granted by the State in the field of renewable energy.[390]

505.    In its Rejoinder on the Merits, the Respondent refers to the Claimant's questioning of the Respondent's reliance on the European Commission's Decision on State Aid of 10 November 2017. The Claimant contends that the Decision did not assess whether RD 661/2007 and RD 1578/2008 were State aid and, if so, whether they were compatible with EU State aid law. In the Respondent's view, the Claimant misrepresents the content of the Decision.[391]

506.    Moreover, the Respondent argues that the European Commission has stated categorically that the incentives provided by RD 661/2007 and RD 1578/2008 were State aid, and that it has done so on two occasions. The Respondent refers to the European Commission's Response of 29 February 2016 to a request to initiate infringement procedures against Spain as a result of the measures disputed in the present arbitration, and to the Commission's Decision in the case on State Aid SA. 40348.[392]

---

[387]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 897.

[388]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 897.

[389]    *Republic of Slovakia v. Achmea B.V.*, CJEU Case C-284/16, Judgment of the Court of Justice of the European Union of 6 March 2018 **(RL-0005)**, ¶¶ 39-42.  *Cfr.* Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 898.

[390]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 899.

[391]    Respondent's Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶ 1026-1029.

[392]    Decision C(2017) 7384 of the European Commission, rendered on 10 November 2017, regarding the Support for electricity generation from renewable energy sources, cogeneration and waste (S.A. 40348

507. The Respondent argues that the Tribunal can and must apply EU law to the merits of the present dispute, and that its decision cannot be contrary to the rules of EU law on State aid.[393]

508. It further contends that, for the award to be aligned with the law, it must not depart from the pronouncements of the European Commission on matters of its exclusive competence.[394]

509. The Respondent observes that many arbitration precedents on public subsidies for renewable energies have taken into account the rules of EU law and the decisions of the European Commission.[395] It refers to the awards in *Wirtgen v. Czech Republic*[396] and *Blusun v. Italy*.[397]

510. *Thirdly*, the Respondent emphasises that the rules of EU law on State aid constitute rules of public order.[398] It extracts two implications from this. On the one hand, it contends that no procedural regulation that ignores the norms of EU law can render meaningless the jurisdiction of the EU institutions, as interpreted by the CJEU.[399] On the other hand, it suggests that an award that does not respect the rules of EU law, and particularly those that have this public order character, may be subject to annulment, both under the New York Convention of 1958 and the procedural rules of the State in which the annulment is requested.[400]

511. In its Rejoinder on the Merits, the Respondent also contends that the application of EU law to the present dispute is in accordance with Article 38 of the Statute of the ICJ. In the Respondent's view, Article 26(6) of the ECT incorporates the *'iura novit curia'* principle. In said context, the Respondent holds that the Tribunal is called upon to

---

(2015/NN)) **(RL-0003)**. *Cfr.* Respondent's Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶¶ 1022-1024.

[393] Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 902.

[394] Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 904.

[395] Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 905.

[396] *Wirtgen v. Czech Republic*, PCA Case No. 2014-03, Award of 11 October 2017 **(RL-0066)**, ¶¶ 12-13. Cfr. Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 905.

[397] *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v. Italian Republic*, ICSID Case No. ARB/14/3, Award of 27 December 2016 **(RL-0059)**, ¶¶ 63-64. Cfr. Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 906.

[398] Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶¶ 907, 911.

[399] The Respondent refers to the CJEU Judgment, of 11 November 2015, in case C-505/14, on State Aid (*Klausner Holz Niedersachsen GmbH v. Land Nordrhein-Westfalen*) **(RL-0082)**, ¶¶ 44-46. Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 914.

[400] Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 915.

interpret and apply the rules and principles of EU law as international law.[401]

512. Furthermore, the Respondent insists that EU law has a *'triple dimension'* for the resolution of the present dispute, namely: (i) as applicable international law, in accordance with Article 26 of the ECT; (ii) as domestic law of any EU Member State; and (iii) as fundamental fact that should shape the legitimate expectations of any investor.[402]

## 2.    No Violation of the Standards of Protection under the ECT

513. The Respondent argues that, in light of the subject matter and purpose of the ECT and according to established facts, it has not violated the ECT.[403]

514. *First*, it elaborates on the objective and purpose of the ECT. In this context, it asserts that the provision in Article 10(1) of the ECT resorts to the minimum standard of protection guaranteed by international law.[404] It then contends that the maximum aspiration of the ECT is national treatment,[405] as established in Article 10(7).

515. *Secondly*, the Respondent holds that the ECT does not prevent justified macroeconomic control measures from being adopted. In this context, it argues that the measures disputed in the present arbitration were proportional, reasonable and non-discriminatory.

516. The Tribunal summarizes below the arguments submitted by the Respondent.

### (i)    Objective and purpose of the ECT: To grant a foreign investor national or non-discriminatory treatment

517. The Respondent states that the standards of protection of the ECT must be analysed in accordance with their context and in light of the objective and purpose of the ECT.[406]

518. It considers that the objective of the ECT is, according to Article 2 of this Treaty, to establish 'a legal framework in order to promote long-term cooperation in the energy field, based on complementarities and mutual benefits, in accordance with the

---

[401] Respondent's Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶¶ 1004-1009.
[402] Respondent's Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶ 1014.
[403] Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 950.
[404] Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 926.
[405] Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 926.
[406] Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 918.

objectives and principles of the Charter'.[407]

519.    In the Respondent's position, Article 2 of the ECT is substantive law that is applicable according to Article 26(6) of the same Treaty.[408]

520.    The Respondent considers that the Claimant sets out the violations of Article 10(1) of the ECT from a single viewpoint exclusively in favour of the investor. According to the Respondent, the protection of the investor as an absolute value, above the general interest needs of the States, is not admissible and has not been admitted under any precedent that has applied the ECT.[409]

521.    The Respondent argues that the protections for investments must be understood in the context of the ECT.[410] In that regard, it recalls that the European Community promoted the signing of the ECT and that there was an aim to export the market model for energy that existed in the EU to other countries outside it.[411] The Respondent considers that the Claimant has omitted the true objectives and principles that the European Energy Charter establishes for this end, and that they are applicable to the present case by reference to Article 2 of the ECT.[412]

522.    The Respondent refers to the objectives set out in Title I of the ECT and cites the following passage:

> *... to promote the development of an efficient energy market throughout Europe, and a better functioning global market, in both cases based on the principle of non-discrimination and on market-oriented price formation, taking due account of environmental concerns...[413]*

523.    The Respondent considers that the principal objective of the ECT regarding investor protection is to attain the implementation of a free market to be able to perform energy activities without discrimination on the grounds of the investor's nationality.[414] It suggests that the greatest ambition of the ECT is non-discrimination.[415]

---

[407]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 919.
[408]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 919.
[409]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 920.
[410]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 921.
[411]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 922.
[412]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 922.
[413]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 922.
[414]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 924.
[415]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 925 and Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶ 1047.

524. Having argued the previous, the Respondent turns its attention to Article 10(1) of the ECT. It notes that this Article obliges to grant investments already made *'treatment no less favourable than that required by international Law'*. In the Respondent's view, this provision resorts to the minimum standard of protection guaranteed by international law.[416]

525. The Respondent argues, then, that the maximum aspiration of the ECT is national treatment,[417] which is established in Article 10(7).[418]

526. In its Rejoinder on the Merits, the Respondent refers to the Claimant's suggestion that if the principle of discrimination acted in the way postulated by the Respondent, by way of Article 10(1), then there would be no justification for Article 10(7). The Respondent observes, however, that in addition to introducing national treatment, Article 10(7) also introduces the most-favoured nation (MFN) clause.[419]

527. The Respondent notes that the guarantee in Article 10(7) of national treatment and MFN for investments that have already been made, contains a significant exception in the field of subsidies or State aid, in Article 10(8):

> *The modalities of application of paragraph (7) in relation to programmes under which a Contracting Party provides grants or other financial assistance, or enters into contracts, for energy technology research and development, shall be reserved for the supplementary treaty described in paragraph (4). [...]*

528. The Respondent argues that this exception is applicable to the present case. It recalls that, in its view, the Claimant claims the receipt of subsidies or State aid. The Respondent contends that, in this case, the *'supplementary treaty'* under Article 10(8) of the ECT has not yet been signed. In that sense, the Respondent suggests that there is

---

[416] Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 926. Also, in its Rejoinder on the Merits and Reply on Jurisdictional Objections, the Respondent asserts that Professors Wälde and Bamberger, who were involved in drafting the ECT, support this argument. The Respondent cites the following passage: *'The Key Article 10 on "Promotion, Protection and Treatment of Investments" begins, in paragraph (1), with general statements concerning the favourable conditions which Contracting Parties must maintain for investments by investors of other Contracting Parties. These provisions are intended to assure an absolute minimum standard of treatment such as has been established in bilateral investment treaty practice, based to a considerable extent on developments in international law. (...)'* (C. Bamberger, *'An Overview of the ECT'*, in T. W. Wälde (ed), *The Energy Charter Treaty: An East-West Gateway for Investment and Trade* (Kluwer Law International, 1996) (**RL-0096**). Cfr. Respondent's Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶1040

[417] Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 926.

[418] Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 927.

[419] Respondent's Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶ 1059.

still no obligation by the signatory States of the ECT to grant the foreign investor national treatment in the matter of *'programmes'* by which a Contracting Party provides grants or *'other financial assistance'* to the investor.[420]

529.    Moreover, the Respondent refers to Article 9 of the ECT, which regulates state subsidies to promote trade or investment abroad. It notes that Article 9(4) expressly provides the following:

> *Nothing in this Article shall prevent [...] (b) a Contracting Party from taking measures:*
>
> *(i) for prudential reasons, including the protection of Investors, consumers, depositors, policy-holders or persons to whom a fiduciary duty is owed by a financial service supplier; or (ii) to ensure the integrity and stability of its financial system and capital markets.*

530.    The Respondent concludes that the ECT's objective of removing barriers to non-discrimination does not remain unfulfilled as macroeconomic control measures are adopted, as long as they are: *'(1) proportionate, (2) justified on grounds of public interest and (3) applied erga omnes without distinction to national and foreign investors alike.'*[421]

### (ii)    The ECT does not prevent justified Macroeconomic Control Measures from being adopted

531.    The Respondent considers that the Claimant makes a one-sided reading of the ECT, according to which this Treaty would guarantee a right to freeze the general rules in favour of foreign investors, even to the detriment of State Parties and their nationals.[422] The Respondent rejects that this is the objective of the ECT.[423]

532.    In the Respondent's view, in the absence of a specific commitment, an investor cannot have an expectation that a regulatory framework will not be amended.[424] It asserts that this has been stated by the precedents that have applied the ECT.[425] It refers to the

---

[420]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 929 and Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶¶ 1059-1060.

[421]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 932.

[422]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 934.

[423]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 935.

[424]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 935.

[425]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 935.

decisions in Plama Consortium v. Bulgaria,[426] AES v. Hungary,[427] and Electrabel v. Hungary.[428]

533.    The Respondent also notes that in the application of the ECT to the Spanish electricity generation system, two arbitral precedents denied the right claimed by the Claimant, by recognizing the right of States to regulate the economy according to the general interest.[429] It refers to the awards in Charanne v. Spain[430] and Isolux v. Spain.[431]

534.    The Respondent also resorts to the Energy Charter Treaty Guide and cites the following passage:

> *8. Many Governments actions, for example the control of the macroeconomics or the introduction of environmental and safety legislations, can affect investment profits but cannot be subject to absolute rules. In this case, the best defence for a foreign investor is the guarantee that he will be treated at least as well as the national investors, as no Government will want to destroy its own industry.[432]*

535.    In this context, the Respondent holds that the ECT neither limits nor impedes the possibility for States Parties to adopt macroeconomic control measures on grounds of general interest that affect the profits of an investment.[433]

536.    The Respondent denies that the States Parties to the ECT are required to maintain a predictable regulatory framework during the whole life of the investments of all foreign investors. It notes that Article 10(1) alludes to *'stable conditions'* and not to a

---

[426]    *Plama Consortium Limited v. Bulgaria*, ICSID Case No. ARB/03/24, Award of 27 August 2008 **(RL-0006)**, ¶ 219. *Cfr.* Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 935.

[427]    *AES Summit Generation Limited and AES-Tisza Erömü Kft v. Republic of Hungary*, ICSID Case No. ARB/07/22, Award of 23 September 2010 **(RL-0026)**, ¶ 9.3.25, confirmed by Decision on the Application for Annulment of 29 June 2012 **(RL-0028)**, ¶ 95. *Cfr.* Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 935.

[428]    *Electrabel S.A. v. Republic of Hungary*, ICSID Case No. ARB/07/19, Award of 25 November 2015 **(RL-0031)**, ¶¶ 165-166. *Cfr.* Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 935.

[429]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 936.

[430]    *SP Charanne B.V. & Constr. Invs. S.à.r.l. v. Kingdom of Spain*, SCC Arb. No. 062/2012, Final Award of 21 January 2016 and private vote **(RL-0033)**, ¶¶ 493, 510. *Cfr.* Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 937.

[431]    *Isolux Infra. Netherlands B.V. v. Kingdom of Spain*, SCC Arb. No. 2013/153, Award of 12 July 2016 **(RL-0008)**, ¶ 788. *Cfr.* Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 938.

[432]    Energy Charter Treaty, 17 December 1991, Spanish consolidated text **(RL-0010)**, p. 8. *Cfr.* Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 940.

[433]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 942.

'regulatory framework'.[434]

537. The Respondent also cites Professor Wälde, according to whom the *'primary'* obligations of the Contracting Parties of the ECT are tempered by the miscellaneous provisions of Part IV, with reference to sovereignty.[435]

538. The Tribunal notes that the position delivered by the Respondent in this point is twofold. On the one hand, it holds that the ECT does not set out any limits on the regulatory power of the States, other than the minimum standards of international law, with a principal objective of non-discrimination compared with national investors. On the other hand, the Respondent adds that the ECT does not set out requirements for Contracting States in matters of subsidies or State aid.[436]

539. With regard to the present case, the Respondent argues that the disputed measures were adopted on several reasonable grounds. It notes the following:

> *(1) The legal obligation to ensure that the economic regime is always consistent with the principle of reasonable return for investors, thereby preventing over-remuneration which is contrary to the sustainability of the SES.*
>
> *(2) The existence of public interest by the sustainability of the SES, in a context of a severe international crisis and with a sharp reduction in energy demand, affecting the RE Sector, which decreased the revenue of the SES and economically destabilised the SES, along with increased RE costs; and*
>
> *(3) The impossibility of passing the whole economic imbalance onto consumers, consumers who have seen how the price of electricity has increased significantly for both domestic consumers and industrial consumers. The aforementioned increase has placed the electricity price in Spain among the most expensive in the European Union. It should be taken into account that a great effort has been made by Spanish consumers in a scenario of a deep economic crisis.[437]*

540. The Respondent further holds that a set of macroeconomic control measures were

---

[434] Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 943.

[435] Thomas Wälde, 'Arbitration in the Oil, Gas and Energy Field: Emerging ECT Practice', 1 Transnational Dispute Management 2 2004 **(RL-0037)**. *Cfr.* Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 943.

[436] Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 945. A similar position is described in the Respondent's Rejoinder on Merits and Reply on Jurisdictional Objections, ¶ 1075.

[437] Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 946 and Rejoinder on Merits and Reply on Jurisdictional Objections, ¶ 1076.

adopted in compliance with international commitments that were binding on Spain. It refers, for instance, to the European Council's Recommendations of March 2012[438] and the Memorandum of Understanding signed with the European Union on 20 July 2012.[439] The Respondent states that, under both documents, Spain undertook to adopt macroeconomic measures to deal with the electricity tariff deficit in a comprehensive way.[440]

541.    In addition, the Respondent considers that the disputed measures continue to provide national and foreign investors with a guaranteed reasonable rate of return within the framework of a sustainable SES.[441]

542.    The Respondent concludes that the measures adopted were proportional, reasonable and non-discriminatory.[442]

### 3.    The Respondent respected the Standard of FET under Article 10(1) of the ECT

543.    The Respondent recalls that the Claimant alleges a violation of the obligation to accord FET, in relation to (1) the Claimant's legitimate expectations and (2) the Respondent's duty to grant transparent and consistent conditions for the Claimant's investments.[443] The Respondent notes that the Claimant also cites, as a standard of violation of FET, that the Respondent made *'fundamental changes'* to the subsidy regime applicable under RD 661/2007 and 1578/2008. The Respondent denies that Article 10(1) of the ECT provides for this standard of violation.[444] It also asserts that the Claimant has not proven that the arbitration doctrine has consolidated such a standard.[445]

544.    The Respondent maintains that it scrupulously complied with its obligation to create stable conditions for investors. It denies that it in any way substantially modified the

---

[438]    The Council of the European Union, Council Recommendation, of 10 July 2012, on the National Reform Programme 2012 of Spain and delivering a Council opinion on the Stability Programme for Spain for 2012-2015 **(R-0007)**. *Cfr.* Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 948.

[439]    Memorandum of Understanding on Financial-Sector Policy Conditionality subscribed with the European Union on 20 July 2012 **(RL-0046)**. *Cfr.* Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 948.

[440]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 948.

[441]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 949.

[442]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 949.

[443]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 951.

[444]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 952.

[445]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 953.

subsidy regime under which the Claimant invested.[446]

545. The Respondent notes that the burden of proof in relation to the violation of the FET standard rests with the Claimant.[447] It holds that the following has been accredited:

> (i) Relevant Spanish laws omitted by the Claimant, (i.e. RD-Act 7/2006, RD-Act 6/2009)
>
> (ii) Judgments of the Supreme Court since 2005 that were not revealed to the Arbitral Tribunal in the Memorial on the Merits,
>
> (iii) Parts of CNE Reports or statements concealed by the Claimant, [and]
>
> (iv) Statements by the RE sector (APPA, AEE, ANPIER [National Association of Photovoltaic Energy Producers], ASIF, Protermosolar, APECYL) omitted by the Claimant.[448]

546. It then maintains that the facts proven by it determine that it has not infringed the FET standard contained in the ECT, as this standard has been interpreted by arbitral tribunals that have applied the ECT.[449]

547. In the Respondent's view, the Claimant avoids quoting and analysing precedents that have applied the ECT standard. It refers, for instance, to (i) the *AES Summit* award,[450] (ii) the award of the annulment committee of the *AES Summit* case,[451] (iii) the final award of *Electrabel*,[452] (iv) the *Charanne* award,[453] and (v) the *Isolux* award.[454] The Respondent considers that the Claimant rather invokes less important precedents, which (i) were ordered on the basis of breaches of contracts or administrative concessions in

---

[446] Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 954.

[447] Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 956.

[448] Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 958.

[449] Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 959.

[450] *AES Summit Generation Limited and AES-Tisza Erömü Kft v. Republic of Hungary*, ICSID Case No. ARB/07/22, Award of 23 September 2010 **(RL-0026)**. *Cfr.* Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 960.

[451] *AES Summit Generation Limited and AES-Tisza Erömü Kft v. Republic of Hungary*, ICSID Case No. ARB/07/22, Decision on the Application for Annulment of 29 June 2012 **(RL-0028)**. *Cfr.* Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 960.

[452] *Electrabel S.A. v. Republic of Hungary*, ICSID Case No. ARB/07/19, Award of 25 November 2015 **(RL-0031)**. *Cfr.* Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 960.

[453] *SP Charanne and Construction Investments v. Kingdom of Spain*, SCC Case No. V 062/2012, Final Award of 21 January 2016 **(RL-0033)**. *Cfr.* Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 960.

[454] *Isolux Netherlands, BV v. the Kingdom of Spain*, SCC Case V2013/153, Award of 12 July 2016 **(RL-0008)**. *Cfr.* Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 960.

States such as Mexico, Ecuador, Chile or Argentina;[455] and which (ii) apply BITs that are unrelated to the purpose, context and objectives of the ECT, and to the facts under examination in the present arbitration.[456]

548.    The Respondent refers to each group of allegations submitted by the Claimant in relation to the alleged violation of the FET standard under the ECT. The Tribunal summarizes below the arguments presented by the Respondent.

(i)    **The Respondent has not breached the Legitimate Expectations of the Claimant**

(a)    **Lack of evidence of an exhaustive analysis of the legal framework by the Claimant**

549.    The Respondent asserts that legitimate expectations must be reasonable and objective as regards the existing general regulatory framework. It argues that the Tribunal must analyse the knowledge of the investor about the general regulatory framework at the time of the investment, or rather the aspects that its knowledge should have covered.[457]

550.    In said context, the Respondent submits that, at the time when an investment is made, the investor must know and understand the following: (i) the regulatory framework, (ii) how it is applied, and (iii) how it affects its investment. It notes that an investor must be aware of the risks assumed when the investment is made.[458]

551.    The Respondent refers to the decisions in *Electrabel v. Hungary*,[459] *Charanne v. Spain*[460] and *Isolux v. Spain*,[461] in support of its statement regarding the diligent analysis of the legal framework that an investor should conduct at the time of making the investment.

552.    In the Respondent's view, the Claimant generically refers to the fact that it carried out

---

[455]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 960.

[456]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 961.

[457]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 964.

[458]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 965.

[459]    *Electrabel S.A. v. Republic of Hungary*, ICSID Case No. ARB/07/19, Award of 25 November 2015 **(RL-0031)**, ¶ 7.78. Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 966.

[460]    *SP Charanne B.V. & Constr. Invs. S.à.r.l. v. Kingdom of Spain*, SCC Arb. No. 062/2012, Final Award of 21 January 2016 **(RL-0033)**, ¶¶ 495, 505, 507. *Cfr.* Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 967.

[461]    *Isolux Netherlands, BV v. the Kingdom of Spain*, SCC Case V2013/153, Award of 12 July 2016 **(RL-0008)**, ¶¶ 793-794. *Cfr.* Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 968.

its investment trusting in the fact that RD 661/2007 and RD 1578/2008 would not be modified. The Respondent considers that it is appropriate for the Tribunal to question whether the Claimant's knowledge of the SES corresponded to that of a diligent entrepreneur.[462]

(1)    **Opinions not linked to any of the Claimant's investments**

553.    The Respondent takes issue with the Claimant's statement that its consultants reviewed RD 661/2007 and were satisfied with its literal wording. In the Respondent's view, this would imply not requiring any legal reports that analyse in a minimum amount of detail the possibility of the modification of the renewable energy subsidy regime according to the Spanish regulatory framework as a whole.[463]

554.    The Respondent comments on the documents cited by the Claimant in support of its statement. The Respondent describes them as (i) an opinion issued by Cuatrecasas Gonçalves Pereira LLP for another company, and (ii) a generic presentation by J&A Garrigues SLP ("**Garrigues**"). It holds that said documents were neither commissioned by the Claimant nor intended to analyse the specific investments in the present arbitration.[464]

555.    In addition, the Respondent states that none of the referred documents was intended to analyse the possibility of modifying the subsidy regime.[465] It contends that they merely transferred the content of Article 44(3) of RD 661/2007, without a minimal analysis that could lead to confirmation of the 'freezing' invoked by the Claimant.[466]

556.    Moreover, the Respondent asserts that there is no evidence that the Claimant was aware of these documents at the time of its investments. In that regard, the Respondent rejects that the documents support the expectations of the Claimant.[467]

557.    The Respondent refers to the assessment regarding each of the Claimant's investments.

(i)    The investment in GSI

558.    The Respondent states that the Claimant does not provide any *'due diligence'* report in

---

[462]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 970.
[463]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 971.
[464]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 972.
[465]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 973.
[466]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 974.
[467]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 975.

connection with the investment in GSI. It points to the Claimant's reference to the evaluation of the project by Triodos Bank Spain[468] and notes that no report commissioned by such institution was provided.[469]

559.    The Respondent concludes that the assertions made in an internal investment proposal, in which only individuals from the Triodos Group are involved, cannot support an informed and diligent expectation that the remuneration of the plants could not be updated.[470]

(ii)    The investment in Lucentum

560.    With regard to the investment in Lucentum, the Respondent refers to the *'due diligence'* report provided by the Claimant.[471] It notes that such report was drawn up by Garrigues in January 2009 and commissioned by the company developing the project before Triodos acquired it.[472]

561.    The Respondent observes, *inter alia*, the following: (i) the Garrigues report is not a regulatory report; (ii) contrary to the Claimant's assertion that registration in the RAIPRE involves a specific commitment to immutability of the remuneration, the report points out that such registration is a requirement of a formal nature; (iii) the report emphasises that registration is an administrative act subject to review or appeal; and (iv) the report was neither commissioned by the Claimant to assess the risks of its investment nor was it intended to analyse the possibility of revising the tariff.[473]

562.    The Respondent also observes that the Lucentum investment proposal, of October 2009, set as a requirement for final approval an *'updated legal DD'*. The Respondent notes that no such due diligence has been provided.[474]

563.    In addition, the Respondent notes that, in the SPA agreement relating to the Lucentum project of October 2009, Triodos expressly accepted that the tariffs under RD 661/2007 could be modified.[475]

---

[468]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 976.
[469]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 977.
[470]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 977.
[471]    Garrigues Legal Due Diligence Report, dated 12 January 2009 **(C-212)**.
[472]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 978.
[473]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶¶ 979-980.
[474]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 981.
[475]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 982.

564.    The Respondent concludes that the Claimant has not provided any evidence of its informed expectation that the legal framework under which it made the Lucentum investment could not be changed.[476]

(iii)    The investments in Aznalcóllar and Los Cabezos

565.    The Respondent notes that the Claimant jointly analysed the investments in Aznalcóllar and Los Cabezos. It observes that, as a basis for the *'due diligence'* of the investments, reference was made to reports prepared in 2008 for Rabobank and BBVA, which financed the construction of the plants before they were acquired by both Ampere Equity Fund B.V. (in 2009) and Triodos (in December 2009 and April 2010).[477]

566.    With respect to Aznalcollar, the Respondent observes that Rabobank requested reports from Uría Menéndez and Garrigues.[478] The Respondent notes the following: (a) the report by Uría Menéndez does not analyse the regulatory framework; it also does not mention RD 2007, the tariffs, or the possible guarantee regarding its modification; (b) the Garrigues report is a technical due diligence; it lists the tariff but does not analyse the possibility of it being revised.[479]

567.    The Respondent also notes that the date of both reports is prior to RD 1578/2008, which was already in force when Triodos invested.[480]

568.    With respect to Los Cabezos, the Respondent observes that the Claimant alleges that BBVA requested reports from Gómez-Acebo & Pombo. The Respondent states that neither of the two reports provided analyse the remuneration framework or the regulatory risk.[481]

569.    The Respondent concludes that none of the documents cited by the Claimant with respect to Aznalcollar and Los Cabezos can justify an informed expectation that the tariff of the plants would remain unchanged.[482]

---

[476]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 983.

[477]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 984.

[478]    Uría Menéndez Due Diligence Report of Aznalcollar Project, dated 28 April 2008 **(C-218)**; and Garrigues Due Diligence Report of Aznalcollar Project, dated 30 April 2008 **(C-222)**.

[479]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 985.

[480]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 985.

[481]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 986.

[482]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 987.

(iv)     The investment in El Carpio

570.     With regard to the investment in El Carpio, the Respondent observes that the Claimant cites Gómez-Acebo & Pombo's *'due diligence'* report as the basis for its expectation.[483]

571.     The Respondent considers that the report by Gómez-Acebo & Pombo only deals with the regulatory framework in Section V, which describes the new developments under RD 1578/2008, without analysing the risk of possible modifications.[484]

572.     In the Respondent's view, it is admitted by the Claimant that, at the time of this investment, it was aware of the foreseeable regulatory changes that took place in 2010. The Respondent holds that this led the Claimant to mitigate the risks in the EPC Agreement.[485]

573.     Generally, the Respondent concludes that the lack of due diligence means that the expectations invoked by the Claimant cannot be deemed to be real and objective.[486]

**(b)     Even if a Due Diligence process had been performed, the disputed measures do not violate the objective legitimate expectations of the Claimant**

574.     As summarized in the previous section, the Respondent argues that the Claimant did not conduct a due diligence process which could support its alleged legitimate expectations. Nonetheless, the Respondent also argues that, even if the contrary had been the case, the disputed measures do not violate the objective legitimate expectations of the Claimant.

575.     The Respondent states that the ECT is not a kind of insurance policy in favour of the investor against the risk of changes in the regulatory framework.[487] It holds that, therefore:

(a)     It is necessary to have specific commitments made to an investor that the regulation in force is going to remain immutable. The Respondent recalls that

---

[483]  Gómez-Acebo & Pombo Due Diligence Report, dated 31 May 2010 (**C-229**). *Cfr.* Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 988.  Cfr. Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 988.

[484]  Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 988.

[485]  Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 990.

[486]  Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 991.

[487]  Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 992.

this was declared in *Plama v. Bulgaria*[488] and ratified by other precedents of the ECT.[489]

(b)  The investor's expectations must be reasonable and justified in relation to any changes in the laws of the host country. This requires an assessment of the background of information that the investor knew and should reasonably have known at the time of the investment and of the conduct of the host State.[490]

576.  The Respondent argues the following: (a) there was no specific commitment of the Respondent in favour of the Claimant, and (b) the (alleged and unproven) expectations of the Claimant would not be reasonable or justified in light of the information that it knew or should have known at the time of its investment.[491]

(1)  **Non-existence of specific commitments in the Spanish regulatory framework on the future immutability of the remuneration regime in favour of renewable energy facilities**

577.  The Respondent asserts that neither RD 436/2004, RD-Act 7/2006, RD 661/2007 nor RD 1578/2008 contain any guarantee or promise to freeze their framework in favour of the Claimant or its investments. It also denies that they contain any guarantee or commitment that the successive measures will improve or maintain the framework.[492]

578.  In the Respondent's view, the renewable energy sector was fully aware of the regulatory framework. In this context, the Respondent recalls that its Supreme Court declared that *'there was no "unalterable right" for the economic regime to remain unchanged'*, and expressly recognised a *'relatively wide margin of the Administration's "ius variandi" in a regulated sector where general interests are involved'*. The Respondent further observes that such *'ius variandi'* was allowed with one limitation: *'that the requirements of the Electricity Sector Act are respected regarding the reasonable rate*

---

[488]  *Plama Consortium Limited v. Bulgaria*, ICSID Case No. ARB/03/24, Award of 27 August 2008 **(RL-0006)**, ¶ 219. *Cfr.* Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 992.

[489]  *Charanne B.V. & Constr. Invs. S.à.r.l. v. Kingdom of Spain*, SCC Arb. No. 062/2012, Award of 21 January 2016 **(RL-0033)**; *EDF (Services) Limited v. Romania*, ICSID Case No. ARB/05/13, Award of 8 October 2009 **(RL-0025)**; and *AES Summit Generation Limited and AES-Tisza Erömü Kft. v. Republic of Hungary*, ICSID Case No. ARB/07/22, Award of 23 September 2010 **(RL-0026)**. *Cfr.* Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 992.

[490]  Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 992.

[491]  Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 993.

[492]  Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 994.

*of return on the investments'.*[493]

579.    The Respondent additionally refers to arbitral awards that, in its view, corroborated the non-existence of a commitment regarding the previous legal framework for the electricity sector. It considers that these awards corroborated that RD 661/2007 and RD 1578/2008 did not contain promises or guarantees to freeze their framework in favour of the Claimant or its investment.[494]

580.    In its Rejoinder on the Merits, the Respondent states that the ECT does not seek to: (i) protect unsustainable situations in electricity markets; or (ii) protect expectations of setting in stone over-remuneration indefinitely, to the detriment of market-price formation, by being a public subsidy.[495]

581.    The Respondent further argues that a regulatory modification that respects the reasonable profitability of investments cannot be described as an arbitrary or a discretionary decision, but as mere regulatory power implemented within the parameters set by Act 54/1997.[496]

(2)    **The Claimant's expectations would not be reasonable and justified in relation to the disputed measures**

582.    The Respondent argues that the Claimant's alleged expectations would not be reasonable either with respect to the regulatory framework existing at the time of its investment or with respect to other alleged sources of expectations.[497]

---

[493]    The Respondent refers to the pleadings of the Spanish Wind Energy Association ("AEE" by its Spanish acronym) before the National Energy Commission ("CNE" by its Spanish acronym) during the hearing process **(R-0099)**, p. 6 . *Cfr.* Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 999.

[494]    Charanne B.V. & Constr. Invs. S.à.r.l. v. Kingdom of Spain, SCC Arb. No. 062/2012, Award of 21 January 2016 **(RL-0033)**, ¶¶ 499-511; and Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v. Italian Republic (ICSID Case No. ARB/14/3, Award of 27 December 2016 **(RL-0059)**). Cfr. Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 995-996. The Respondent also refers to Isolux v. Kingdom of Spain (Isolux Netherlands, BV v. Kingdom of Spain, SCC Case V2013/153, Final Award (12 July 2016) **(RL-0008)**), which, according to the Respondent, denied the existence of freezing expectations for certain tariffs for facilities in operation; and to the majority decision in RREEF Infrastructure (G.P.) Limited and other v. Kingdom of Spain (ICSID Case No. ARB/13/30, Decision on Responsibility and on the Principles of Quantum of 30 November 2018 **(RL-0092)**, ¶¶ 318-321), which, according to the Respondent, denied that RD 661/2007, in its Article 44(3), contains a commitment to the immutability of the investment conditions. Cfr. Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1001-1005.

[495]    Respondent's Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶ 1088.

[496]    Respondent's Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶ 1093.

[497]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1006.

583.    The Tribunal summarizes below the arguments submitted by the Respondent.

(i)    The Claimant's expectations would not be reasonable in light of the evolution of the regulatory framework

584.    In the Respondent's view, any investor who had done a reasonable analysis of the legal framework applicable to the sector, knew or should have known that this regulatory framework had the following 'essential principles':

*(1) The regulatory system governed by the principle of regulatory hierarchy and the result of legally stipulated regulation creation procedures.*

*(2) The regulatory framework is not limited to RD 661/2007 and RD 1578/2008 as claimed by the Claimant. It is configured based on Act 54/1997 and any regulatory standards that have implemented it, as interpreted by Case-law.*

*(3) The fundamental principle that RE subsidies are a cost of the SES, secondary to the principle of economic sustainability of the same.*

*(4) Right to priority of access and dispatch of electricity production.*

*(5) That the remuneration of the RE consists of a subsidy which, once added to the market price, provides RE plants with reasonable rate of return, in the context of its useful life, according to capital markets, which has a dynamic and balanced nature within the SES. This return was linked to the cost made in the construction and operation of the plants.*

*(6) That the subsidies were determined according to the evolution of the demand and other basic economic data, expressed in the Renewable Energy Plans on the investment and operation costs of standard facilities, with a view to ensuring that these facilities are able to reach reasonable rate of return during their useful lives.*

*(7) That the regulatory changes in the remuneration regime of the RE have been motivated since 2006 (i) to correct situations of over-remuneration, or (ii) by the strong variation in the economic data that served as the basis for the estimation of subsidies.*[498]

585.    The Respondent considers that these principles constitute the objective legitimate expectations of a diligent investor.[499] It also observes that this interpretation, regarding what a diligent investor could expect, was accepted by the arbitral tribunal of *Blusun v.*

---

[498]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1008.
[499]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1009.

*Italy*.[500] The Respondent also refers to the decision in *RREEF v. Spain* and considers that it emphasises the same idea.[501]

586.  The Respondent states that there were successive regulatory changes in the regulatory framework under which the Claimant made its investment, in order to maintain the principle of reasonable rate of return within the framework of a sustainable SES.[502] It asserts that such adjustments were made to guarantee the sustainability of the system and avoid situations of over-remuneration.[503]

587.  In the Respondent's alleged understanding, the Claimant was aware of the possibility of regulatory changes.[504] It refers, in this regard, to the SPA agreement for the acquisition of 50% of Lucentum, dated 30 October 2009. The Respondent observes that said agreement expressly recognised that the registration of the plant did not guarantee that the tariff under RD 661/2007 would not change.[505] The Respondent also notes that this was despite the definitive registration in the RAIPRE.[506]

588.  In this context, the Respondent argues that, in October 2009, at the time of the investment in Lucentum and prior to the investments in Aznalcóllar, Los Cabezos and El Carpio, the Claimant knew and accepted in a contract that registration under the RD 661/2007 regime did not guarantee the immutability of the tariff.[507]

589.  Furthermore, the Respondent contends that the Claimant admitted that it was aware that RD 1578/2008 was also subject to reforms.[508] The Respondent refers, *first*, to the Claimant's Memorial on the Merits, in which it indicates that since April 2010 there

---

[500]  *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v. Italian Republic*, ICSID Case No. ARB/14/3, Award of 27 December 2016 (**RL-0059**), ¶ 319.  Cfr. Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1010.

[501]  *RREEF Infrastructure (G.P.) Limited and other v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Responsibility and on the Principles of Quantum of 30 November 2018 (**RL-0092**), ¶ 386. Cfr. Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1011.

[502]  Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1012.

[503]  Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1013.

[504]  Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1015.

[505]  The Respondent refers to the Deed of the Share Purchase Agreement of the Shares of Piraenergy Solar I, S.L., 30 October 2009 (**C-215**), p. 60. *Cfr.* Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1016.

[506]  The Respondent refers to the Deed of the Share Purchase Agreement of the Shares of Piraenergy Solar I, S.L., 30 October 2009 (**C-215**), p. 67. *Cfr.* Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1017.

[507]  Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1018.

[508]  Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1019.

were rumours regarding the reduction in tariffs for plants already registered.[509] The Respondent refers, *secondly*, to the EPC agreement regarding El Carpio, where certain guarantees were included *'to neutralise the risk of a reduction in tariffs or any other regulatory reform that would negatively impact the plants' remuneration before 31 December 2010'*.[510]

> (ii)    The Claimant's expectations regarding an alleged active campaign to attract foreign investors or other alleged sources of expectations are also unreasonable

590.    The Respondent denies that there was an enthusiastic or aggressive campaign to attract foreign investors. It also rejects the enactment of regulations specifically aimed at foreign investors and that granted them specific guarantees.[511]

591.    It refers to the presentations by CNE employees[512] and by IDAE and *'Invest in Spain'*.[513] It holds that no rational investor could claim to maintain a remuneration regime based on *generic statements* and omit the evolution of the applicable regulations and its case-law.[514]

592.    The Respondent also observes that the Claimant has not proven or stated that it knew these presentations or statements. In that regard, the Respondent considers that they cannot be taken into account as constitutive elements of the Claimant's legitimate expectations.[515]

593.    Nevertheless, the Respondent submits that even if the Claimant could prove that it was aware of the presentations, they could not reasonably create a real and objective expectation that the framework would remain unchanged.[516] The Respondent refers to various arbitral decisions in support of its statement.

594.    It refers, *first*, to *ECE Projektmanagement v. Czech Republic*. According to the

---

[509]    The Respondent refers to paragraph 269 of the Claimant's Memorial on the Merits. Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1020.

[510]    The Respondent refers to Clauses 22 and 27.1 of the EPC Agreement Between BP Solar and Carpio Fotovoltaica, S.L, 4 June 2010 **(C-230)**. *Cfr.* Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1021-1024.

[511]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1029.

[512]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1030.

[513]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1031.

[514]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1032.

[515]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1033.

[516]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1034.

Respondent, the award in this case declared that legitimate expectations could hardly be generated as a result of statements made by subjects who lack the capacity or competence to grant or comply with the commitment undertaken.[517] *Secondly*, the Respondent refers to *Charanne v. Spain*, where the tribunal dismissed the possibility that the information contained in *'advertising leaflets'* could generate a real and objective expectation on a diligent investor.[518] Thirdly, the Respondent recalls the tribunal's reasoning in *Blusun v. Italy*, in the sense that for a State to be bound to an investor, the obligation must be a legal obligation and not just any statement.[519] In addition, the Respondent refers to *RREEF v. Spain*. According to the Respondent, in this latter case the majority of the tribunal rejected that the same presentations cited by the Claimant in the present arbitration were a source of legitimate expectations.[520]

(iii)    Additional observations submitted by the Respondent

595.    In its Rejoinder on the Merits and Reply on Jurisdictional Objections, the Respondent holds that, when assessing certain expectations, the following must be analysed: (i) objective expectations, that is, those that any investor would have; (ii) the content of the regulatory framework applicable at the time of the investment; (iii) subjective expectations, that is, those defined by the specific case of this investor; and (iv) the conduct of the State in regard its having been able to provide some specific guarantee.[521]

596.    With regard to the *first two items*, the Respondent states that the evolution of the Spanish electricity regulatory framework makes it untenable to maintain that an investor could reasonably expect a freezing of the applicable regulatory framework.[522]

597.    In this point, the Respondent holds that the importance of domestic law is totally

---

[517]    *ECE Projektmanagement v. The Czech Republic*, UNCITRAL, PCA Case No. 2010-5, Award of 19 September 2013 **(RL-0029)**, ¶ 4771.  *Cfr.* Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1035.

[518]    *Charanne B.V. & Constr. Invs. S.à.r.l. v. Kingdom of Spain*, SCC Arb. No. 062/2012, Award of 21 January 2016 **(RL-0033)**, ¶¶ 496, 497. *Cfr.* Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1036.

[519]    *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v. Italian Republic*, ICSID Case No. ARB/14/3, Award of 27 December 2016 **(RL-0059)**. Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1038.

[520]    *RREEF Infrastructure (G.P.) Limited and other v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Responsibility and on the Principles of Quantum of 30 November 2018 **(RL-0092)**, ¶ 396. *Cfr.* Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1039.

[521]    Respondent's Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶ 1100.

[522]    Respondent's Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶ 1101.

ignored by the Claimant. It asserts that in accordance with domestic law, RD 661/2007 or RD 1578/2008 were subject to Act 54/1997 and its idea of reasonable rate of return. It further contends that the Spanish Supreme Court's case-law highlighted the mutability of the regulations prior to the Claimant's investment. The Respondent also suggests that Professor Vaquer's Report is very clear on this.[523]

598.    Furthermore, the Respondent maintains that the Claimant restricts its analysis of the regulatory framework to *'two phrases'* in RD 661/2007 and RD 1578/2008. It holds that this overlooks the following relevant facts, which the Tribunal transcribes below:

> *a) The Spanish regulatory framework is governed by the principle of regulatory hierarchy and the result of the legally stipulated procedures for drafting regulations.*
>
> *b) The applicable regulatory framework is not limited to RD 661/1997 and RD 1578/2008, but is established on the basis of Act 54/1997, the regulations for which were implemented through various Royal Decrees that over time have served to adapt the principles of the Act to changing macroeconomic circumstances (RD 2818/1998, RD 436/2004, RD-Act 6/2009, RD 1565/2010, RD 1614/2010 and RD-Act 14/2010), and the urgent Royal Decrees-Act adopted to guarantee the sustainability of the SES and the Renewable Energy Plans, as the basis for the objectives and remuneration regimes.*
>
> *c) The fundamental principle is that Special Regime subsidies are an SES cost subordinate to the principle of its economic sustainability.*
>
> *d) The Special Regime remuneration has always consisted of the market price for the energy produced plus a subsidy, with the aim of providing RE generation facilities with a reasonable return, according to the capitals market.*
>
> *e) That same principle of reasonable return makes the RE remuneration system a dynamic, balanced system. This dates back to the LSE in 1997 and was confirmed in Supreme Court case law prior to, during and subsequent to the Claimant making its investment.*
>
> *f) The determination of the premiums was established based on the evolution of demand and other basic economic data, as set down in the Renewable Energy Plans.*
>
> *g) The motivation behind the regulatory changes to the remuneration regime for the special regime, including those that occurred prior to the Claimant's successive investments, was either: (i) to correct situations of*

---

[523]    Respondent's Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶ 1104.

*over-remuneration; or (ii) due to major changes to the economic data that served as a basis for the initial calculation of the premiums.*

*h) That subsidies for the production of energy from renewable sources are considered as State Aid in accordance with EU Law, it befalling the European Commission to declare its compatibility or incompatibility and without any right existing to receive State aid.[524]*

599.   Moreover, the Respondent refers to the Claimant's assertions that (i) the applicable standard does not require any type of due diligence, and (ii) that, in any case, the Claimant was sufficiently advised. The Respondent contends that the first assertion has no legal basis and that to admit it would be to allow that international law rewards entirely negligent and irresponsible business conducts. As to the second assertion, the Respondent states, on the one hand, that none of the Claimant's advisers assured that RD 661/2007 guaranteed immutable remuneration for 35 years, and on the other hand, that the Claimant assumed at least the possibility of some regulatory change.[525]

600.   With regard to the *third item*, the Respondent states that it has come to be identified by arbitral jurisprudence largely with the due diligence standard, that is, with the specific knowledge that an investor had of the regulatory framework in which it was to invest.[526] In this point, the Tribunal notes the Respondent's argumentation which was submitted in its Reply on the Merits.[527]

601.   Finally, with regard to the *fourth item*, the Respondent maintains that this refers to whether the State has generated a specific expectation in the investor through a guarantee of immutability. The Respondent rejects that any article of the Royal Decrees cited by the Claimant contained some guarantee of freezing.[528] In this point, the Tribunal notes the Respondent's argumentation which was also submitted in its Reply on the Merits.[529]

602.   The Respondent also makes a distinction between, on the one hand, a royal decree setting specific rates and specific times ranges, and, on the other hand, that such rates remain frozen under that royal decree. The Respondent maintains that, in Spanish law, the latter is impossible. The Respondent also states that international law cannot

---

[524]   Respondent's Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶ 1114.
[525]   Respondent's Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶¶ 1126-1127.
[526]   Respondent's Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶ 1105.
[527]   *See* ¶ 529.
[528]   Respondent's Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶ 1110.
[529]   *See* ¶ 535.

attribute the character of commitment or guarantee to a declaration that could never be of such type.[530]

603.    Moreover, the Respondent insists that Power Point presentations, press releases and declarations of authorities do not have the value or content that the Claimant wishes to attribute to them. The Respondent states, however, that what is more relevant is that the Claimant was not the recipient of any of those declarations.[531]

604.    In addition, the Respondent rejects the Claimant's argument that its original expectations were confirmed with subsequent acts of the Respondent. The Respondent holds that such a new concept of *'evolutionary or continued expectations'* must be rejected completely.[532]

(c)    **The Respondent has respected the duty to create Stable Conditions set forth in the ECT**

605.    The Respondent refers to the Claimant's argument that the Respondent failed to provide a stable regulatory framework. The Respondent maintains that such invoked standard must be examined within the framework of the FET standard, pursuant to the objective and purpose of the ECT.[533]

606.    In the Respondent's understanding, an interpretation that requires the immutability of the regulatory framework, irrespective of any ensuing economic circumstances, would violate the FET standard of the ECT.[534]

607.    The Respondent maintains that, according to a consolidated arbitral case-law on the ECT,[535] the *'stable conditions'* referred to by the ECT clearly admit the adoption of reasonable and proportionate macroeconomic control measures, provided that they are

---

[530]    Respondent's Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶¶ 1130, 1132.

[531]    Respondent's Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶ 1136.

[532]    Respondent's Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶ 1137.

[533]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1041.

[534]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1042.

[535]    E.g., Plama Consortium Limited v. Bulgaria, ICSID Case No. ARB/03/24, Award of 27 August 2008 **(RL-0006)**, ¶¶ 173, 219; AES v. Republic of Hungary (AES Summit Generation Limited and AES-Tisza Erömü Kft. v. Republic of Hungary, ICSID Case No. ARB/07/22, Award of 23 September 2010 **(RL-0026)**, ¶¶ 9.3.29-9.3.30; Mamidoil v. Albania (Mamidoil Jetoil Greek Petroleum Products Societe S.A. v. Republic of Albania, ICSID Case No. ARB/11/24, Award of 30 March 2015 **(RL-0030)**, ¶¶ 617-618; Charanne v. Kingdom of Spain (Charanne B.V. & Constr. Invs. S.à.r.l. v. Kingdom of Spain, SCC Arb. No. 062/2012, Award of 21 January 2016 **(RL-0033)**, ¶ 499; and Blusun v. Italy (Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v. Italian Republic, ICSID Case No. ARB/14/3, Award of 27 December 2016 **(RL-0059)**.

motivated by a reasonable cause.[536]

608.    In that context, the Respondent argues, *first*, that the disputed measures were based on the need to ensure the sustainability and balance of the SES and, *secondly*, that the principle of granting a reasonable rate of return was observed.[537]

609.    The Respondent argues that it granted stable conditions to the Claimant according to the ECT standard. In its view, the disputed measures maintained *'the essential nature of the Regulatory Framework'*. It explains that, after the 2013 measures, the Respondent kept the subsidies and the priority of dispatch, which enabled a diligent, well-managed company to recover the investment costs and obtain a reasonable rate of return in accordance with the cost of money on the capital market.[538]

610.    The Respondent also rejects a violation of the stable conditions by arguing that since RD-ACT 9/2013 the return to which renewable energy producers can aspire has been determined by Law.[539]

611.    Moreover, in its Rejoinder on the Merits and Reply on Jurisdictional Objections, the Respondent maintains that the *'stability standard'* would only be considered violated if there is *'a total and absolute subversion of the regulatory framework'*, which it denies to be the case.[540]

612.    The Respondent finally argues that, according to international[541] and national[542] case-

---

[536]  Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1043.

[537]  Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1047.

[538]  Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1049.

[539]  Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1050.

[540]  Respondent's Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶ 1152.

[541]  *Nations Energy Corporation, Electric Machinery Enteprises Inc., and Jaime Jurado v. The Republic of Panama*, ICSID Case No. ARB/06/19, Award of 24 November 2010 (**RL-0027**), ¶¶ 642, 644, 646), where it was distinguished between the principle of non-retroactivity and the immediate effect of a new law for the future. The Respondent holds that this award expresses the established principle in international law of 'Acquired Rights'. Cfr. Respondent's Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶¶ 957-958. The Respondent also refers to the decision in *Charanne v. Kingdom of Spain* (*Charanne B.V. & Constr. Invs. S.à.r.l. v. Kingdom of Spain*, SCC Arb. No. 062/2012, Award of 21 January 2016 and individual vote (**RL-0033**), ¶¶ 546, 548) and considers that it confirms the reasoning in *Nations Energy v. Panama*. Cfr. Respondent's Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶ 963.

[542]  The Respondent refers to decisions from the Spanish Supreme Court (Judgment from the Third Chamber of the Supreme Court, of 9 December 2009 (App. 152/2007)(**R-0084**)) and Council of State (Ruling from the Permanent Committee of the Council of State number 937/2013, of 12 September 2013 (**R-0064**)). In the Respondent's view, these decisions ratified the legality of the legislative changes since they did not affect acquired rights. *Cfr.* Respondent's Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶ 968. The Respondent also refers to a judgment of the Spanish Constitutional Court (Judgment of the Constitutional Court of 17 December 2015 (App. Uncons. 5852/2013) (**R-0095**)) which, in its understanding, examined the measures adopted based on RD-Act 9/2013 and ruled that they were not retroactive. *Cfr.* Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶¶ 1056-1064.

law, the disputed measures were not retroactive. It holds that the Claimant never had an *'acquired right'* to a remuneration in the future, not subject to possible macroeconomic control adjustments or reforms of the SES.[543]

### (ii)    The conduct of the Respondent was transparent

613. The Respondent rejects that it has breached its obligation to promote transparent conditions, pursuant to Article 10(1) of the ECT.[544]

614. It maintains that the ECT does not guarantee the predictability of the regulatory framework unless there is a specific commitment. It holds that this was corroborated by the tribunal in *AES v. Hungary*, which applied the ECT and interpreted this condition of transparency established in the ECT.[545]

615. The Respondent asserts that it has established the following:

(i)    The Respondent never made any commitment to the Claimant to maintain its regulatory framework or the regime established in RD 661/2007 and RD 1578/2008; also, the regulations passed are *erga omnes*, without discrimination between nationals and foreigners;

(ii)    Since 2004, the Respondent has implemented successive regulatory reforms, which have sought to maintain a balance between granting a reasonable rate of return and avoiding situations of over-remuneration and the imbalance of the System;

(iii)    The renewable energy Associations themselves proposed reviewing the sector in 2009, 2010 and 2011, and even proposed the text for a new Act on renewable energy in 2009; in addition, the Government had been announcing a new Electricity Sector Act continuously since December 2011;

(iv)    The Respondent followed the procedures established by the law in all the measures adopted since 2006, without incurring in undue delays and guaranteeing the participation of the legitimate stakeholders; and

---

[543]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1055 and Respondent's Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶ 1162.

[544]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1072.

[545]    *AES Summit Generation Limited and AES-Tisza Erömü Kft. v. Republic of Hungary*, ICSID Case No. ARB/07/22, Award of 23 September 2010 **(R-0026)**, ¶ 9.3.73. *Cfr.* Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1068.

(v) The Respondent passed a predictable and dynamic regulatory system that continues to guarantee reasonable rate of return for the renewable energy projects and the economic equilibrium of the investment.[546]

616. In addition, the Respondent refers to the decision in *REEFF v. Spain*. It considers that it rejects the notion that the same conduct of the Respondent which is the subject matter of the present arbitration has breached the transparency requirement under the ECT.[547]

617. Moreover, in its Rejoinder on the Merits, the Respondent denies that the standard of transparency in international law requires that the investor be a partner in the procedure of elaboration of the norms, or that it has access to absolutely all the information managed by the State when preparing its regulations.[548]

618. Nevertheless, the Respondent argues the following: (i) from 2006, it warned the Energy Sector Operators that it would take action in situations of over-compensation or unsustainability of the SES; and (ii) from 2008, it alerted about the need for introducing modifications to eliminate the tariff deficit.[549]

619. Furthermore, the Respondent refers to the draft reports of Boston Consulting Group and Roland Berger mentioned by the Claimant.[550] The Respondent considers that these draft reports make *'insinuations of the utmost gravity'* which lack justification.[551] The Respondent also states that no final report was made available before the publication and entry into force of the disputed measures.[552]

     **(iii)** **The measures taken by the Respondent were reasonable and proportionate and they do not constitute any impairment for the Claimant's investments**

620. The Respondent argues that the disputed measures are (i) rational, (ii) proportionate, and (iii) do not cause impairment to the Claimant's investments.

---

[546] Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1070.

[547] *RREEFF Infrastructure (G.P.) Limited and other v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Responsibility and on the Principles of Quantum of 30 November 2018 (**RL-0092**), ¶ 416. *Cfr.* Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1071.

[548] Respondent's Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶ 1168.

[549] Respondent's Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶ 1176.

[550] Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 512, footnote 693 (the Tribunal notes that the Respondent mistakenly cites Claimant's Statement of Claim, ¶ 512, footnote 693. *Cfr.* Respondent's Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶¶ 1186-1193).

[551] Respondent's Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶ 1186-1193.

[552] Respondent's Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶ 1192.

(a) **Relevant facts that substantiate the reasonableness, proportionality and non-discriminatory nature of the disputed measures**

621. The Respondent states that, as relevant facts to assess the reasonableness and proportionality of the measures adopted, it has accredited the following:

*(1) The principle of sustainability of the SES;*

*(2) The regulatory framework in place since 1997 and the case-law that has interpreted it since 2005;*

*(3) The successive amendments since 2006 (i) for reasons of sustainability and over-remuneration, and which (ii) have affected the future of registered, installed plants;*

*(4) The non-existence of specific commitments regarding future immutability in RD 661/2007 and RD 1578/2008;*

*(5) The awareness by the RE Sector about the regulatory framework, case-law and the State's 'ius variandi' powers, within the limit of ensuring a reasonable rate of return.*

*(6) The worsening of the international crisis from 2009 to 2012, with an exceptional decrease in electricity demand. […]*

*(7) The international commitments undertaken by the Kingdom of Spain in July 2012 in relation to the bailout of the Spanish financial sector.*

*(8) The adoptions of macroeconomic control measures to ensure the sustainability of the SES and to avoid placing an excessive burden on consumers.*[553]

622. The Respondent refers to the decisions in *AES Summit,*[554] *Charanne v. Spain,*[555] *solux*[556]

---

[553] Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1074.

[554] The Respondent recalls that the approval of regulatory adjustments on the grounds of general interest was allowed in this award. *Cfr. AES Summit Generation Limited and AES-Tisza Erömü Kft v. Republic of Hungary*, ICSID Case No. ARB/07/22, Award of 23 September 2010 **(RL-0026)**. *Cfr.* Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1075.

[555] In the Respondent's view, this award confirms the Respondent's theory, by recognizing, *inter alia*, the capacity of States to regulate the economy according to the public interest, in the absence of a specific commitment toward stability. *Charanne B.V. & Constr. Invs. S.à.r.l. v. Kingdom of Spain*, SCC Arb. No. 062/2012, Award of 21 January 2016 **(RL-0033)**, ¶¶ 493, 510. *Cfr.* Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1076.

[556] The Respondent notes, *inter alia*, that the tribunal in this decision considered that, even if there were other measures available for the Kingdom of Spain, which would have been preferable and more favourable to the Claimant, that would not be sufficient to conclude that the measures adopted were exorbitant or unreasonable under the terms of the ECT. *Cfr. Isolux Netherlands, BV v. Kingdom of Spain*, SCC Case V2013/153, Award of 12 July 2016 **(RL-0008)**, ¶¶ 823, 825. *Cfr.* Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1077.

and *RREEF v. Spain*[557] in support of its argument in favour of the legitimacy of the State's regulatory adjustments on the grounds of general interest.[558] It also considers that it corresponds to the Claimant to prove the breach in the irrational and disproportionate measures' standard under Article 10(1) of the ECT.[559]

623. The Respondent, however, provides alleged reasons to prove that the disputed measures were reasonable and proportionate.

624. The Respondent notes, *first*, the *'unsustainable economic circumstances'* of the SES in 2012. It refers to the following: (i) the international financial crisis that prompted a drop in the electricity demand, (ii) the rise in consumer tariffs, (iii) the over-remuneration in the renewable energy sector, and (iv) the increasing tariff deficit forecasts due to the costs of renewable energy.[560] The Respondent refers then to its commitments with the European Union to adopt macroeconomic control measures in the SES.[561]

625. *Secondly*, the Respondent maintains that the disputed measures were proposed by the renewable energy Sector in 2009. It specifically recalls that the remuneration method for renewable energy chosen in 2009 was expressly proposed by the renewable energy Sector's main association, the APPA.[562] The Respondent then contends that the remuneration system set forth in 2013, under RD-Act 9/2013, is similar to that proposed in 2009 as the best system.[563]

626. *Thirdly*, the Respondent defends that there was acceptance of the disputed measures by most domestic and foreign investors. It refers, for instance, to the fact that in 2015 the regime attracted more than EUR 5 billion in investments in renewable energy in Spain.[564] It additionally notes the positive assessments of the measures received from the European Commission, the International Monetary Fund, and the International

---

[557] The Respondent asserts that, when analysing the reasonableness and proportionality of the disputed measures taken by the Kingdom of Spain, this award states that two clear premises must firstly be taken as a basis. On the one hand, respect for the State's margin of appreciation and, on the other, the denial of an immutable framework applicable to the Claimant. *Cfr. RREEF Infrastructure (G.P.) Limited and other v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Responsibility and on the Principles of Quantum, of 30 November 2018 **(RL-0092)**, ¶ 468. *Cfr.* Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1078.

[558] Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶¶ 1075-1078.

[559] Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1079.

[560] Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶¶ 1080-1081.

[561] Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1081.

[562] Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1085.

[563] Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶¶ 1086-1087.

[564] Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1088.

Energy Agency, in 2015 and 2016.[565]

## (b)    The Respondent has passed the tests referring to the Objectives of the ECT

627.    The Respondent recalls its previous argument that the ECT's main objective is the non-discrimination against foreign investors and that, in that vein, Article 10(1) also established a specific FET standard.[566]

628.    In that context, the Respondent states that international arbitral tribunals apply a series of tests to assess whether the measures adopted by a State are irrational or discriminatory according to the ECT's objectives and standards. It refers to the tests applied by the tribunals in *EDF v. Romania*[567] and *AES Summit v. Hungary*.[568] The Respondent argues that the disputed measures in the present arbitration comply with those tests.[569]

629.    The Respondent concludes that the disputed measures are rational and proportionate to the legitimate and public interest that justified their adoption, and fully respect both the FET and the non-impairment standards.[570]

630.    In addition, in its Rejoinder on the Merits, the Respondent understands that Article 10(1) of the ECT does not require assessing whether the host State could or should have taken other measures, but the proportionality and rationality of the measures already approved.[571]

631.    The Respondent insists that the disputed measures were rational because they were carried out to solve a tariff deficit that jeopardized the sustainability of the Spanish electricity system. It holds that the measures were proportional because they were taken in relation to all the agents of the electrical system, both on the income side and on the

---

[565]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1089.

[566]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1091.

[567]    *EDF (Services) Limited v. Romania*, ICSID Case No. ARB/05/13, Award of 8 October 2009 **(RL-0025)**, ¶ 303. *Cfr.* Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1094.

[568]    *AES Summit Generation Limited and AES-Tisza Erömü Kft v. Republic of Hungary*, ICSID Case No. ARB/07/22, Award of 23 September 2010 **(RL-0026)**, ¶¶ 10.3.7-10.3.9. *Cfr.* Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1097.

[569]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶¶ 1092-1116.

[570]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1117.

[571]    Respondent's Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶ 1195.

expense side. It asserts that for that reason they were not discriminatory.[572]

### 4. The Respondent did not Impair the Claimant's investment through Unreasonable or Discriminatory Measures

632. The Tribunal notes that the Respondent does not refer to the non-impairment of an investor's investment as an independent standard of protection under the ECT, but rather addresses it when it refers to the reasonableness, proportionality and non-discriminatory character of the disputed measures, under the analysis of the FET standard.

### 5. The Respondent has not breached any obligations undertaken regarding the Claimant's investment (Umbrella Clause)

#### (i) The interpretation made by the Claimant contradicts the literal sense of Article 10(1) of the ECT and the interpretation thereof by doctrine and arbitral precedents

633. The Respondent maintains that the Claimant makes an erroneous interpretation of the content and purpose of the last sentence of Article 10(1) of the ECT, which leads to the application of the *'umbrella clause'* beyond reasonable interpretation.[573] It alludes to the Claimant's interpretation that the expression *'any'* would allow any type of obligation to be included in the concept of guaranteed obligation.[574]

634. The Respondent argues that there are three essential elements or requirements of the umbrella clause under the ECT. *First*, it notes that the last sentence of Article 10(1) of the ECT uses the term *'entered into'*. In the Respondent's view, this involves the State's assumption of specific obligations regarding a certain investor or a certain investment.[575] *Secondly*, the Respondent contends that the obligation under the umbrella clause must exist in accordance with the domestic law of the State.[576] *Thirdly*, the Respondent asserts that the obligation must have been *contracted* with the foreign investor. That is, the investor must be a *'creditor'*.[577]

635. The Respondent cites certain arbitral precedents in support of its position. As to the alleged first element or requirement of the umbrella clause, the Respondent refers to

---

[572] Respondent's Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶ 1198.
[573] Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1120.
[574] Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1120.
[575] Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1121.
[576] Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1124.
[577] Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1125.

the awards issued in *Noble Ventures v. Romania*,[578] *SGS v. The Philippines*[579] and *Blusun v. Italy*.[580] As to the alleged second and third requirements of the umbrella clause, the Respondent recalls the decision of the annulment committee in *CMS v. Argentina*.[581]

636.    The Respondent additionally refers to the decisions in *AES Summit Generation Limited v. Hungary*[582] and *RREEF v. Spain*,[583] when it rejects the inclusion within the scope of the umbrella clause of a state regulation, regardless of whether there is a specific consensual relationship between the State and the investor or investment.[584] The Respondent also notes that the tribunal in *RREEF v. Spain* concluded that RD 661/2007 and RD 1614/2010 were not covered under the ECT umbrella clause.

637.    In its Rejoinder on the Merits, the Respondent also refers to the award in *Isolux v. Spain*, and considers that in that case the Claimant defended the same interpretation of the ECT umbrella clause that it maintains in the present case. The Respondent recalls that the Isolux tribunal noted, with regard to the last phrase of Article 10(1) of the ECT, the importance of the existence of an obligation to investors or towards investments of investors.[585]

638.    The Respondent additionally resorts to the *ECT Reader's Guide*, prepared by the ECT Secretariat. It observes that, with respect to the last sentence of Article 10(1), the Guide

---

[578]    *Noble Ventures, Inc v. Romania*, ICSID Case No. ARB/01/11, Award of 12 October 2005 **(RL-0022)**, ¶ 51. *Cfr.* Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1121.

[579]    *Société Général de Surveillance S.A. v. Republic of the Philippines*, ICSID Case No. ARB/02/6, Decision on Objections to Jurisdiction, of 29 January 2004 **(RL-0021)**, ¶ 166. *Cfr.* Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1122.

[580]    *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v. Italian Republic*, ICSID Case No. ARB/14/3, Award of 27 December 2016 **(RL-0059)**. *Cfr.* Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1123.

[581]    *CMS Gas Transmission Company v. Argentine Republic*, ICSID Case No. ARB/01/8, Decision on the application for annulment, of 25 September 2007 **(RL-0024)**. *Cfr.* Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶¶ 1124-1125.

[582]    *AES Summit Generation Limited and AES-Tisza Erömü Kft v. Republic of Hungary*, ICSID Case No. ARB/07/22, Award of 23 September 2010 **(RL-0026)**. *Cfr.* Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1129.

[583]    *RREEF Infrastructure (G.P.) Limited and other v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Responsibility and on the Principles of Quantum, of 30 November 2018 **(RL-0092)**, ¶ 284. *Cfr.* Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1130.

[584]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1128.

[585]    *Isolux v. Spain*, SCC Arbitration V2013/153, Award of 12 July 2016 **(RL-0008)**, ¶¶ 767-771. *Cfr.* Respondent's Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶ 1251.

emphasises that the basis is the international principle of *pacta sunt servanda*.[586]

639.    In a similar vein, the Respondent recalls Professor Wälde's interpretation that the umbrella clause under the ECT targets *'an abuse of the state when situated in its dual role as both contract party and regulator'*.[587]

640.    The Respondent also considers that the arbitral decisions cited by the Claimant do not support the Claimant's *'generic and lax'* interpretation of the umbrella clause. The Respondent specifically notes the following: (i) the award in *Al-Bahloul v. Tajikistan* concludes that the obligation under the umbrella clause must have been entered into with an investor or an investment of an investor, and that the provision does not refer to general obligations of the State arising as a matter of law;[588] (ii) the award in *Plama v. Bulgaria* concludes that the obligations worthy of protection must have been undertaken directly, *'vis à vis'*, with a specific investor;[589] (iii) the Claimant's interpretation is not shared by the tribunal in *AMTO v. Ukraine*, since the only thing in question in that case was the extension of the umbrella clause to a subsidiary company;[590] and (iv) the award in *Khan v. Mongolia* only applies one consequence arising from a previous arbitral decision, without including any reasoning as to the extent to which the protection of the umbrella clause is to be interpreted.[591]

641.    The Respondent concludes that the scope of the ECT umbrella clause covers contractual obligations or specific commitments undertaken by the State within the framework of a contract or a similar bilateral instrument, such as an administrative contract, a concession or a licence.[592] In its Rejoinder on the Merits, the Respondent elaborates

---

[586] *'The ECT: A Reader's Guide'*, June 2002 **(RL-0036)**, p. 26. *Cfr.* Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1127.

[587] Thomas Wälde, 'The "Umbrella" Clause in Investment Arbitration: A Comment on Original Intentions and Recent Cases', HeinOnline 6 J. World Investment & Trade 183 2005 **(RL-0038)**, p. 226. *Cfr.* Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1128.

[588] *Mohammad Ammar Al-Bahloul v. Republic of Tajikistan*, SCC Case No. V (064/2008), Partial Award on Jurisdiction and Liability, of 2 September 2009 **(CL-26)**, ¶ 257. *Cfr.* Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶¶ 1135-1136.

[589] *Plama Consortium Limited v. Bulgaria*, ICSID Case No. ARB/03/24, Award of 27 August 2008 **(RL-0006)**, ¶ 186. *Cfr.* Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1137.

[590] *Limited Liability Company Amto v. Ukraine*, SCC Case No. 080/2005, Final Award of 26 March 2008 **(CL-59)**, ¶ 110. *Cfr.* Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1138.

[591] *Khan Resources Inc., Khan Resources B.V. and Cauc Holding Company Ltd. v. Government of Mongolia and Monatom Co., Ltd*, PCA Case No. 2011-09, Award on the Merits, of 2 March 2015 **(CL-60)**, ¶ 366. *Cfr.* Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1139.

[592] Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1133.

further on this point and suggests that a state can only *'enter into'* obligations with an investor or an investment either (i) through a bilateral relationship, or (ii) through a unilateral act specifically directed at that investor or investment.[593]

642.    In said context, the Respondent holds that the Spanish regulatory framework, including RD 661/2007 and RD 1578/2008, which is of *erga omnes nature*, is not subject to the umbrella clause.[594] In its Rejoinder on the Merits, the Respondent asserts that Royal Decrees and Royal Decree Acts are regulations issued by the government and validated by parliament (in some cases) that are applicable to all producers of electrical energy.[595]

643.    The Respondent further contends that, even if it was accepted that the Respondent assumed some kind of commitment with the Claimant or its investments, that commitment would be limited to applying the legal regime in force in its entirety, and not to the application of RD 661/2007 and RD 1578/2008.[596]

644.    In the aforementioned scenario, the Respondent states that the regulatory framework for the electricity sector, as established by Act 54/1997, enshrined two basic guarantees for renewable energy producers: (a) the right of priority of access and dispatch, and (b) the right to obtain a premium that, added to the market price, allows to obtain a reasonable rate of return according to the cost of money in the capital market.[597] The Respondent asserts that, under the new measures, these characteristics are preserved.[598]

645.    The Respondent concludes that the protection clause of Article 10(1) of the ECT, if applicable to the present case, would have been fully respected.[599]

### 6.    The Respondent has not invoked the Defence of Necessity under International Law

646.    The Respondent denies having invoked a defence of necessity under international law.[600]

647.    It states that it merely exposed the micro and macroeconomic situation in which the

---

[593]    Respondent's Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶ 1250.
[594]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1133.
[595]    Respondent's Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶ 1262.
[596]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1148.
[597]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1149.
[598]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1154.
[599]    Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶ 1160.
[600]    Respondent's Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶ 1239.

disputed measures were taken.[601] It argues that the measures have been recognized as necessary, stabilizing and reasonable macroeconomic control measures.[602]

648.    In the Respondent's position, the measures prevented the collapse of the Electricity System, thereby pursuing and achieving an object of clear public interest.[603]

### D.    The Tribunal's Analysis

649.    The Arbitral Tribunal will first address the scope of the Applicable Law.  It will then consider the issues concerning each of the allegations of breach of the ECT.

#### 1.    The Applicable Law

650.    The Commission has addressed the Tribunal to indicate that, as held in the 2017 EC Decision, the Claimant has no legitimate expectations under EU law.  The Commission, however, does not have jurisdiction to adjudicate disputes under ECT Article 26. Measures taken by the Commission, such as its 2017 Decision, do not displace the jurisdiction of the Arbitral Tribunal to hear and adjudicate the dispute before it.

651.    The Commission and the Respondent raise the question whether EU law controls the outcome of the dispute.  The Commission submits that it does, by virtue of EU law forming part of the body of international law which the Arbitral Tribunal is mandated to apply under ECT Article 26(6).  The Commission argues that the interrelation of the sources, rules, and principles of international law require EU law to prevail, as between EU Member States and their nationals, over the rules and obligations that would otherwise apply under Part III of the ECT. Spain supports the Commission's view.

652.    The Claimant opposes the Commission's submission.  The Claimant argues, *inter alia*, that EU law is not relevant to the dispute because the dispute concerns a breach by Spain of its obligations under the ECT.  The Claimant submits that EU law does not address those obligations and, even if it did, ECT Article 16 requires that more favourable treatment under the ECT must prevail over any standard prescribed by EU law.

653.    The Arbitral Tribunal holds that neither EU law in general, nor the 2017 EC Decision in particular, determine the outcome of the dispute in this case.  In the first place, under

---

[601]    Respondent's Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶ 1240.
[602]    Respondent's Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶ 1241.
[603]    Respondent's Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶ 1243.

ECT Article 16 EU law in general and the 2017 EC Decision in particular would control the outcome only if they were more favourable to the investor and the investment, a point that has not been demonstrated.

654.    Second, the 2017 Decision, on its terms, does not provide a rule of decision in this case. The 2017 EC Decision only determines the compatibility of Spain's New Regulatory Framework with EU rules on State Aid.  That decision does not conclude that the support schemes under which the Claimant invested in Spain, and under which it operated during several years, amounted to illegal State Aid under EU law.  The evidence before the Arbitral Tribunal does not show that such a proposition has ever been the subject of a complaint to or an inquiry by the Commission.  It is common ground that any alleged incompatibility of prior support schemes with EU State Aid rules was not the motivation for Spain's Disputed Measures.

655.    The terms and circumstances of the 2017 EC Decision also support the conclusion that the general rules of EU law are also not determinative of the dispute.  Those rules provide that State Aid is allowable for environmental purposes, which were the direct motivation for the support schemes adopted by the Respondent under which the Claimant invested in Spain.  The support scheme under RD 661/2007, for example, was designed to promote investment to achieve the mandatory renewable energy targets which the EU had imposed on Spain.  The circumstances indicate that the Respondent assumed that such a scheme was permitted by EU State Aid rules.

656.    Spain argues that EU law in general does not protect the Claimant's expectation that it would receive the FiT during the operative life of its facilities.  For the reasons stated, however, EU law does not exhaust the potentially applicable standard under ECT Article 10(1).  ECT Article 16 is clear in providing that, as between the ECT standards and those of other treaties among two or more ECT Contacting Parties concerning the subject matter of Part III or V of the ECT, the provisions that are more favourable to the investor and the investment must prevail.

657.    The Tribunal will therefore proceed to analyse the dispute and the Parties' arguments in accordance with the ECT and "*applicable rules and principles of international law*," as provided by ECT Article 26(6).  Among the most relevant rules and principles of international law are those of the 1969 Vienna Convention on the Law of Treaties, including its rules on the interpretation of treaties.

## 2.    Fair and Equitable Treatment

658.    The Parties have debated whether the FET standard provides for treatment beyond the applicable minimum standard of treatment under general international law.  The Parties did not seem to attach specific consequences to this debate, however, except for the relevance of EU law.  As stated above, the Tribunal considers that EU law does not dictate the legal standards to be applied for the resolution of this dispute.  Accordingly, EU law does not displace or curtail the FET standard under ECT Article 10(1).  In addition, the text of ECT Article 10(1) refers separately to the FET standard and to treatment "*required by international law*".  Moreover, Spain itself has made arguments on the basis of the common elements of the FET standard as developed by arbitral tribunals applying the terms of various investment treaties interpreted in accordance with international law.  Consistently with the decisions of other tribunals, this Arbitral Tribunal shall apply the FET standard as set forth in the ECT as understood in accordance with the international law rules on the interpretation of treaties.  The Arbitral Tribunal does not consider that it is required to rule on whether the FET standard set out in the ECT is more demanding than the minimum standard of treatment under customary international law.

659.    ECT Article 10(1) provides, in part:

> "*Each Contracting Party shall, in accordance with the provisions of this Treaty, encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area.  Such conditions shall include a commitment to accord to all times to Investments of Investors of other Contracting Parties fair and equitable treatment. [...]*"

660.    The Tribunal considers that the fair and equitable treatment standard required by ECT Article 10(1) must be applied in light of all the circumstances of the case.[604]  The relevant circumstances will include the elements that correspond to the specific wording of the FET provision and other fact patterns, such as legitimate expectations, which have been identified through a combination of State practice, jurisprudence, and

---

[604] See, e.g., Rudolf Dolzer, *Fair and Equitable Treatment: Today's Contours*, Santa Clara Journal of International Law (2014), Vol. 12, Issue 1, Article 2 (**CL-25**), at p. 26; and C. Schreuer, "*Fair and Equitable Treatment in Arbitral Practice*", Journal of World Investment & Trade, 2005 (**RL-39**), at p. 364; citing, inter alia, *Mondev International Ltd. v. United States of America* (ICSID Case No. ARB(AF)/99/2), Award dated 11 October 2022, at ¶ 118 ("*A judgment of what is fair and equitable cannot be reached in the abstract; it must depend on the facts of the particular case*").

commentary as being relevant considerations for the application of the FET standard.[605] In this section, the Tribunal will analyse, in particular, whether the disputed measures frustrated the Claimant's legitimate expectations and whether they breached the requirements of stability and transparency expressly referred to in ECT Article 10(1).[606]

661.    The Parties do not dispute that the duty of fair and equitable treatment under ECT Article 10(1) includes the duty to respect the legitimate expectations relied upon by an investor when making a qualifying investment under the ECT.  Respect for legitimate expectations as a component of fair and equitable treatment has been recognized in a long line of arbitration awards made under investment treaties.[607] This recognition reflects a widespread understanding that, when a state takes actions that give rise to objectively reasonable expectations of an investor regarding future treatment, expectations on which the investor relies, and then the state takes further action that frustrates those expectations, such pattern of conduct is generally not consistent with the ordinary meaning of "fair and equitable treatment."

---

[605]    Rudolf Dolzer, *Fair and Equitable Treatment: Today's Contours*, Santa Clara Journal of International Law (2014), Vol. 12, Issue 1, Article 2 (**CL-25**), at p. 16 ("The point here is to emphasize the evolution of the jurisprudence in general of the FET standard by way of developing operationally distinct subcategories of conduct meant to detail the meaning of the standard. … As pointed out earlier, these components do not cover the entire scope of the rule's application."); C. Schreuer, "*Fair and Equitable Treatment in Arbitral Practice*", Journal of World Investment & Trade, 2005 (**RL-39**), at p. 365 ("it is possible to identify typical fact situations in which tribunals have employed the principle of fair and equitable treatment"); and United Nations Conference on Trade and Development, *FAIR AND EQUITABLE TREATMENT*, UNCTAD Series on Issues in International Investment Agreements II, *A sequel* (2012) (**CL-160**), pp. 61-88.

[606]    Arbitrator Garibaldi reaffirms his detailed analysis of the FET standard under the ECT, as stated in his Partial Dissent in *Eurus Energy Holdings Corporation v. Kingdom of Spain* (ICSID Case No. ARB/16/4), 17 March 2021, at ¶ 49 *et seq.*, which he considers to be consistent with the Tribunal's analysis in the present case. Arbitrator Garibaldi accepts using the common expression "legitimate expectations" only in the understanding that this expression refers to objectively reasonable expectations.

[607]    *See*, e.g., *Técnicas Medioambientales Tecmed, S.A. v. The United Mexican* States, ICSID Case No. ARB (AF)/00/2, Award, 29 May 2003 (**CL-17**), at ¶ 154 (Referring to the provision on fair and equitable treatment of the bilateral investment treaty applicable to the case, the tribunal held that "*this provision of the Agreement, in light of the good faith principle established by international law, requires the Contracting Parties to provide to international investments treatment that does not affect the basic expectations that were taken into account by the foreign investor to make the investment.*"); *Waste Management, Inc. v. United Mexican States ("Number 2")*, ICSID Case No. ARB (AF)/00/3, Award, 30 April 2004 (**CL-18**), ¶ 98 ("*In applying* [the fair and equitable treatment] *standard it is relevant that the treatment is in breach of representations made by the host State which were reasonably relied on by the claimant.*"); *Occidental Exploration and Production Company v. The Republic of Ecuador*, LCIA Case No. UN3467, Final Award, 1 July 2004 (**CL-19**), ¶ 183 ("*The stability of the legal and business framework is thus an essential element of fair and equitable treatment.*"); *CMS Gas Transmission Company v. The Republic of Argentina*, ICSID Case No. ARB/01/8, Award, 12 May 2005 (**CL-40**), at ¶ 274 ("*There can be no doubt, therefore, that a stable legal and business environment is an essential element of fair and equitable treatment.*"); and *Saluka Investments B.V. v. The Czech Republic*, UNCITRAL, Partial Award, 17 March 2006 (**CL-16**), ¶ 302 ("*The standard of 'fair and equitable treatment' is therefore closely tied to the notion of legitimate expectations which is the dominant element of that standard.*").

662.   The first question before the Tribunal is whether, in the context of Spain's duty of fair and equitable treatment under ECT Article 10(1), the Claimant had a legitimate expectation that its three investments made under RD 661/2007 and its investment made under RD 1578/2008 would enjoy the prescribed FiT under those instruments for the 25-year (or amended 30-year) period prescribed in each of them, and whether the Claimant relied on such expectation.

663.   The second question the Tribunal must decide is whether Spain's disputed measures, including its repeal of RD 661/2007 and RD 1578/2008 in 2013, frustrated the legitimate expectation, if any, of the Claimant in respect of each of the Claimant's investments, and therefore whether Spain's disputed measures were contrary to its duty of fair and equitable treatment under ECT Article 10(1).

664.   As recounted above, both Parties have brought to the attention of the Arbitral Tribunal the decisions of arbitration tribunals that have addressed claims made under the ECT or other investment treaties arising out of the same disputed measures at issue in this case, or have addressed similar claims arising in the wind and solar power industries. While the Arbitral Tribunal has been aided by its consideration of those non-binding authorities, it has considered and arrived at its own conclusions based on the evidence and the Parties' arguments thereon.  The discussion below refers to certain decisions which support and confirm the Tribunal's reasoning.

**The First Question: Did the Claimant have a legitimate expectation that its investments would receive the prescribed FiT over the prescribed period?**

665.   The Claimant made three investments in plants under RD 661/2007 and one investment in a plant under RD 1578/2008.[608]  The Tribunal must decide whether the Claimant derived a legitimate expectation pursuant to RD 661/2007, and whether the Claimant derived a legitimate expectation pursuant to RD 1578/2008.

666.   The Parties are generally in agreement that, under general rules of international law, a legitimate expectation arises if the host State makes a sufficiently specific commitment to the investor, on which the investor relies at the time of making the investment, and if that reliance is objectively reasonable in the light of the circumstances, including the investor's subjective situation and the State's conduct.  The following paragraphs consider each of these elements in turn.

---

608   *See*, above, Section III.C.

667.    Did Spain make a specific commitment to the Claimant that its investments would receive the prescribed FiT over a 25-year period?  For the reasons that follow, the Tribunal finds that Spain did make such a specific commitment to the Claimant.

668.    Spain issued RD 661/2007 in furtherance of its attempt to meet its renewable energy targets under EU Directives as reflected in Spain's domestic renewable energy plans. Spain's prior measures had not been successful in this respect.  The purpose of RD 661/2007 was therefore to attract the necessary investment to achieve Spain's renewable energy targets.

669.    The preamble of RD 661/2007 explains this incentive as follows:

> *"The economic framework established in the present RD develops the principles provided in LSE, guaranteeing the owners of facilities under the special regime a reasonable return on their investments, and the consumers of electricity an assignment of the costs attributable to the electricity system which is also reasonable."[609]*

670.    At the time of Spain's drafting and preparation of RD 661/2007, the Spanish Government issued a press statement indicating that the purpose of the draft was a tariff system that would "*guarantee*" investors an "*attractive*" return to power production under the special regime.[610]

671.    RD 661/2007, as supplemented by the Resolution of the Ministry of Industry, Tourism and Commerce dated 27 September 2007,[611] provided that its regime would lapse 12 months from the date on which the target generating capacity was reached.  RD 1578/2008 extended this regime, with certain modifications, for an additional period.[612]

672.    The central feature of the regime under RD 661/2007, as well as that under RD 1578/2008, was that a registered facility would receive the prescribed FiT over a 25-year period.  This was a specific commitment on the part of the Spanish regulator.  The Claimant relies on the above features to argue that it had a legitimate expectation of

---

[609]    **C-92**, p. 2.

[610]    **C-88**, p. 1: "El establecimiento de un sistema estable de ayudas que garanticen una atractiva rentabilidad a la actividad de producción de energía eléctrica en régimen especial, es el objetivo del borrador preparado por el Ministerio de Industria, Turismo y Comercio para regular en los próximos años el régimen jurídico y económico de las instalaciones generadoras de energía eléctrica de cogeneración y aquellas que utilicen como materia prima energías renovables y residuos." Cf. DG-53, p.1: "Las revisiones que se realicen en el futuro de las tarifas no afectarán a las instalaciones ya puestas en marcha. Esta garantía aporta seguridad jurídica para el productor, proporcionando estabilidad al sector y fomentando su desarrollo."

[611]    **C-151**.

[612]    **C-46 / R-47**, Article 2.

receiving the FiT for 25 years.

673.    Spain argues that for a legitimate expectation to arise with respect to the FiT there must be a specific stabilization commitment. Relying on the award in *Charanne*, Spain argues that the Claimants did not receive any commitment that the regulatory regime would remain immutable.[613] As confirmed by the *Isolux* award, however, also cited by Spain, the issue is not the immutability of the regulatory regime in its entirety but rather whether Spain committed to a stable and predictable FiT over an extended period.[614] Likewise, in *Cube Infrastructure* the tribunal did not require a promise of immutability, only that a commitment to maintain for a certain period a set of specific regulatory principles be "*sufficiently clear and unequivocal.*"[615]

674.    The Tribunal is satisfied that RD 661/2007 prescribed in specific terms that registered facilities were to receive a certain FiT for a 25-year period. Through RD 661/2007 and its surrounding circumstances Spain did offer a commitment of a stable and predictable FiT over the prescribed period. RD 661/2007 required investors to identify and register each plant in the RAIPE by a specific cut-off date. RD 661/2007 set out specific benefits for each group of PV plants. In this sense, RD 661/2007 is considerably more specific than the provision of Law 54/2007 directing the Government to set the remuneration of special energy producers with the goal of providing them with a reasonable rate of return.[616]

675.    The Tribunal does not ignore that the texts of RD 661/2007 and RD 1578/2008 differ in important respect. Article 44.3 of RD 661/2007 provided, generally, that the future revisions to the regulated tariff that it contemplates would not affect facilities

---

[613]  Respondent's Counter-Memorial on the Merits and Memorial on Jurisdictional Objections, ¶¶ 615-616.

[614]  **RL-8 / RL-56 / CL-102**, ¶ 774.

[615]  Cf. *Cube Infrastructure Fund SICAV and others v. Kingdom of Spain* (ICSID Case No. ARB/15/20), Decision on Jurisdiction, Liability and Partial Decision on Quantum, 19 February 2019 (**CL-209**), ¶ 388: "The Tribunal does not consider it necessary that a specific commitment be made to each individual claimant in order for a legitimate expectation to arise. At least in the case of a highly-regulated industry, and provided that the representations are sufficiently clear and unequivocal, it is enough that a regulatory regime be established with the overt aim of attracting investments by holding out to potential investors the prospect that the investments will be subject to a set of specific regulatory principles that will, as a matter of deliberate policy, be maintained in force for a finite length of time. Such regimes are plainly intended to create expectations upon which investors will rely …"

[616]  Cf. *Cube Infrastructure Fund SICAV and others v. Kingdom of Spain* (ICSID Case No. ARB/15/20), Decision on Jurisdiction, Liability and Partial Decision on Quantum, 19 February 2019 (**CL-209**), ¶ 310: "In these circumstances, the Tribunal finds that the representations concerning the Special Regime expressed in RD 661/2007, referring in particular to tariffs and premiums and the non-retrospective character of the provisions for their review, were, at the time of its adoption, representations on which the Claimants were intended and entitled to rely."

commissioned earlier.[617] By contrast, the Fifth Additional Provision of RD 1578/2008 provided that during 2012 it would be possible to modify the remuneration of solar power plants in light of the technological evolution of the sector and the market and the functioning of the remuneration regime.[618]  The question arises whether this latter provision applies, or was meant to apply, to plants already commissioned under RD 1578/2008.  The general structure of RD 1578/2008 as a continuation of RD 661/2007 suggests that the provision excluding existing plants from changes in remuneration was intended to carry over to the regime of RD 1578/2008, as Spain's CNE interpreted it.[619] That interpretation by an organ of the Respondent, whether authoritative or not, does indicate that, at most, there is an ambiguity in the Fifth Additional Provision of RD 1578/2008 and the continued applicability of Article 44.3 of RD 661/2007 to the regime of RD 1578/2008.  Any such ambiguity should be resolved against the Respondent, which under ECT Article 10(1) was expressly required to create transparent conditions for the making of investments.  The Tribunal therefore concludes that also under RD 1578/2008 the Respondent made a commitment to provide a stable remuneration for a prescribed period.

676. The Tribunal examines further below the relevance of the regulatory framework for that commitment, whether the Claimant relied on the commitment, and whether any such reliance was reasonable.

677. *Did the Claimant rely on Spain's specific commitment at the time of its investment?* The Tribunal finds that the Claimant did rely on the Respondent's commitment described above.  The provisions of RD 661/2007 and RD 1578/2008 were in force and applicable at the time.  The Claimant has provided evidence that it relied on this FiT regime.[620]

---

[617]  RD 661/2007, Art. 44.3, (**BRR-5**, p. 19) ("*Durante el año 2010 (...) se procederá a la revisión de las tarifas, primas, complementos y límites inferior y superior definidos en este real decreto (...) Cada cuatro años, a partir de entonces, se realizará una nueva revisión manteniendo los criterios anteriores. Las revisiones a las que se refiere este apartado de la tarifa regulada y de los límites superior e inferior no afectarán a las instalaciones cuya acta de puesta en servicio se hubiera otorgado antes del 1 de enero del segundo año posterior al año en que se haya efectuado la revisión.*").

[618]  RD 1578/2008, Fifth Additional Provision (**BRR-6**, p. 6) ("*Durante el año 2012, a la vista de la evolución tecnológica del sector y del mercado, y del funcionamiento del régimen retributivo, se podrá modificar la retribución de la actividad de producción de energía eléctrica mediante tecnología solar fotovoltaica.*").

[619]  CNE Report on the interpretation of the Fifth Additional Provision of RD 1578/2008 (*Consulta de un Particular sobre la Disposición Adicional Quinta del Real Decreto 1578/2008*), 22 October 2009, p. 2, (**C-261**).

[620]  See, Statement of Claim, ¶¶ 235-271, and the evidence cited therein.

678.    Was it reasonable for the Claimant to rely on Spain's commitment as expressed in RD 661/2007 and RD 1578/2008?

679.    Spain argues that neither RD 661/2007 nor RD 1578/2008 could give rise to a legitimate expectation, because they are regulatory instruments that are subject to amendment and repeal by the Government at any time, and there was therefore no objective and reasonable basis on which the Claimant could rely on these regulatory instruments. Spain argues that the Claimant could derive legitimate expectations only from the promise of a "*reasonable rate of return*" under Law 54/2007.

680.    The Tribunal does not share Spain's view that investors could not reasonably rely on the FiT commitments in RD 661/2007 or RD 1578/2008 and that these instruments are therefore incapable of giving rise to legitimate expectations.

681.    It is true that regulatory instruments such as RD 661/2007 are subject to amendment and repeal by the Spanish executive. Spain cites numerous Spanish Supreme Court judgments which have denied claims based on amendments to the Spanish renewable energy framework. These judgments indeed hold that there is no acquired right to a particular retribution framework regulated by an executive instrument such as a Royal Decree. Spain argues that no investor could therefore reasonably expect such a retribution framework to remain unchanged.

682.    The judgments of the Spanish Supreme Court alluded to by Spain are not on point. It is not in doubt that the Spanish executive branch retains the power to amend or repeal Royal Decrees. The Spanish Supreme Court distinguishes this issue, however, from the question of whether an amendment to a Royal Decree is consistent with the principle of legitimate expectations under Spanish law. It has ruled, for example, that legitimate expectations (*confianza legítima*) under Spanish law does not protect FiTs in perpetuity, beyond the 30-year limit established by Law 2/2011.[621] Even in the case of Spanish law, however, the regulatory expert proposed by the Respondent confirms that the Spanish principle of legitimate expectations may (and indeed is meant to) operate separately from the executive's power to amend regulations.[622]    In any event, this

---

[621]    Judgment dated 12 November 2012, **C-279**.

[622]    Tr. Eng., Day Four, 13:21-14:1 (Prof. Vaquer Caballería): "… the government has discretionary power to regulate – within the limitations established by the law – to regulate the incentives. And this is to be taken into consideration when talking about the principle of legitimate expectations."; 73:18-74:1 (Prof. Vaquer Caballería): "… they are two different principles. They're concurrent, and they don't contradict each other but rather they're complementary. They are limitations to what the constitutional powers can do. So in the

Tribunal's task is not to apply the principle of legitimate expectations as it may exist in Spanish or EU law. This Tribunal's task is to apply the protection of legitimate expectations, as a component of the FET standard, under the ECT.[623]

683. The arbitral awards invoked by Spain make a comparable distinction when examining Spanish jurisprudence. The *Isolux* tribunal held that it was not bound by Spanish case law but could consider, as a fact to assess the existence of a legitimate expectation for the purpose of ECT obligations, whether there was any obstacle under Spanish law to the amendment of the remuneration framework for existing facilities.[624] The *Isolux* tribunal, as the *Charanne* tribunal, found that the overall evolution of the Spanish special retribution regime did not support a legitimate expectation that the remuneration scheme would remain without modification, but only that investors would receive a reasonable return.[625] In contrast, however, the *Novenergia II* tribunal found this conclusion to be too general and undetermined and had to be qualified by an assessment of the specific representations and measures in question, but not retroactively.[626]

684. This Arbitral Tribunal agrees with the approach of the *Novenergia II* tribunal. The Tribunal must assess the significance of Spain's representation that it would grant investors the specific benefit of a certain FiT over a 25-year period separately from the subordinate or even transient character of the regulatory instruments employed. The starting point for the Tribunal's assessment is that Spain implemented the PV remuneration framework, including the fixed FiT provisions, through legally appropriate instruments. The Tribunal further notes that those instruments enjoyed a presumption of legality, and that no evidence has been produced that any of them was found to be illegal at any time prior to repeal. As a matter of Spanish law, Spain was also legally bound to comply with its own Royal Decrees as long as they were in force. Further, Spain's representations made in, or in connection with, such legal instruments could impact on Spain's obligations under international law, including ECT Article

---

exercise of their public powers, authorities must, on the one hand, respect normative hierarchy, so a regulation could never overturn or challenge a law; and according to the Constitution the principle of legitimate expectation must also be upheld."

[623] Cf. *Cube Infrastructure Fund SICAV and others v. Kingdom of Spain* (ICSID Case No. ARB/15/20), Decision on Jurisdiction, Liability and Partial Decision on Quantum, 19 February 2019 (**CL-209**), ¶ 401: "… the significance of the Respondent's representations as to the stability of RD 661/2007 is ultimately not a matter of Spanish law but of international law, operating in the context of Article 10(1) ECT."

[624] **RL-8 / RL-56 / CL-102**, para. 793.

[625] **RL-8 / RL-56 / CL-102**, paras. 788-798; *Charanne v. Spain*, (**RL-32 / CL-31**), para. 506.

[626] **CL-3 / RL-74**, paras. 673-674.

10(1).[627]

685.    The Arbitral Tribunal considers three factors to be of relevance: (i) the purpose of Spain's representation to PV investors in RD 661/2007 and RD 1578/2008; (ii) Spain's conduct with respect to existing facilities under prior remuneration regimes; and (iii) Spain's position with respect to future facilities not covered by its representations in RD 661/2007 and in RD 1578/2008. The following paragraphs discuss each of these factors in turn.

686.    The purpose of RD 661/2007 was to achieve a certain generating capacity within a target period. The means for achieving that purpose was to present an opportunity to investors in defined terms, including a cut-off date. RD 661/2007 in effect invited PV investors to identify and register each PV plant in the RAIPE by a specific cut-off date, as a condition for enjoying specific benefits such as a fixed FiT for 25 years. This regulation had the avowed aim of inducing investors to invest in PV generation in Spain, with the purpose of reaching a specified renewable generation capacity.[628]

687.    In RD 661/2007, Spain provided an option, through a transitional provision, for the preservation of benefits that had been granted under prior regulatory regimes when it amended those regimes through subsequent regulation.[629] This transitional provision did not apply to photovoltaic energy producers subject to the special regime, to whom the RD 661/2007 applied automatically.[630] By being excluded from the transition provision, PV generators could no longer aspire to a higher premium under the previous remuneration regime, but such a premium was not fixed.[631] These provisions created a grandfathering option for existing producers in general, but replaced the remuneration regime for PV generators with a new mechanism that was promoted as predictable and transparent. Indeed, Spain's press release regarding RD 661/2007 speaks of the

---

[627]    Cf. *Cube Infrastructure Fund SICAV and others v. Kingdom of Spain* (ICSID Case No. ARB/15/20), Decision on Jurisdiction, Liability and Partial Decision on Quantum, 19 February 2019 (**CL-209**), ¶ 397: "We emphasise that no investor is entitled to assume that the regulatory regime in place at the time that its investment is made will continue to remain in force. States have the sovereign right to amend their legislation. But States also have the right, and the legal power, to make representations as to the future treatment of investments in such a manner as to create expectations that cannot be defeated without violating a duty of Fair and Equitable Treatment."
[628]    See Novenergia II v. Kingdom of Spain (**CL-3 / RL-74**), para. 667.
[629]    RD 661/2007, First Transitional Provision, paragraph 1, **BRR-5**, page 23.
[630]    RD 661/2007, First Transitional Provision, paragraph 4, **BRR-5**, page 23.
[631]    RD 436/2004, Articles 18(c), 22(1)(a) and 23(3), **BRR-3**, pages 7-8.

"*guarantee*" of an "*attractive*" return.[632]

688.    RD 1578/2008 maintained, for a further period, the features of RD 661/2007 for PV facilities that were not registered by the deadline for enrolment under RD 661/2007, except that it reduced the FiTs available to PV facilities that would register under RD 1578/2008.  RD 1578/2008 did not affect the incentives offered to those PV facilities already registered under RD 661/2007.  Under Spain's position, it would have been possible under Spanish law for RD 1578/2008 to amend the FiT applicable to facilities registered under RD 661/2007, but RD 1578/2008 did not do so.  Instead of changing the remuneration regime for plants registered under RD 661/2007, RD 1578/2008 extended the period within which investors could invest in the special regime, albeit at a reduced FiT.

689.    Beyond the specific representation made to registered facilities under RD 661/2007, it remained within Spain's power to withhold the benefits of RD 661/2007 for *future* PV investments.  Spain could have, prospectively and consistently with its specific representation to registered facilities, lowered the target threshold that would trigger the 12-month phase out of the RD 661/2007 benefits.  Spain could have, prospectively, shortened that phase-out period for future investments without affecting its representations to registered facilities.  It did not do so.  The Claimant could not have known this at the time it invested under RD 661/2007.

690.    The same features are present in RD 1578/2008, except that Spain introduced periodic reviews of the FiT that would apply prospectively to discrete registration and investment windows (called "*convocatorias*").  This framework gave Spain closer control over the tariffs that it offered investors in successive windows.  As before, Spain had no obligation to maintain this remuneration scheme available for new investments indefinitely.  It did so through 2012, and continued to offer fixed FiTs.  During this time Spain fixed the level of FiTs through administrative measures.  In 2011, however, Spain adopted legislation (Law 2/2011) to determine the *duration* of the PV FiTs.

691.    The Respondent has argued that the Claimant failed to perform adequate due diligence.  The record shows that the Claimant did perform due diligence.  The Respondent argues that the Claimant should have examined Spanish jurisprudence on the prior evolution of the special regime.  The Arbitral Tribunal has found that the terms and circumstances

---

[632]    **C-88**.

of RD 661/2007 are more relevant in this case than the preceding jurisprudence concerning the special regime for the remuneration of renewable energy. It would not be appropriate for this reason to require a high degree of due diligence on the part of the Claimant. The *Isolux* tribunal accepted that an investor cannot be required to conduct extensive legal research. What is relevant is what all investors should know about the legal framework and whether the investor's personal information allows it to foresee an unfavourable evolution of the regulatory framework.[633] The Tribunal finds that the Claimant was sufficiently informed about the legal framework before investing.

692.  The Tribunal acknowledges that, from the perspective of Spanish law, the undertakings made in RD 661/2007 could *in theory* be repealed by a later norm of equal or higher rank or even superseded by an earlier norm of higher rank in cases of conflict. These theoretical observations do not detract, however, from the fact that (i) RD 661/2007 enjoyed a presumption of validity under Spanish law and it was never found to be in conflict with Law 54/2007 or any other norm of higher rank until it was repealed, and (ii) from the perspective of the ECT standards, Spain both on the face of RD 661/2007 and in its related communications expressly committed not to alter the tariff regime for qualifying investments for a period of 25 years. Accordingly, it was reasonable for the Claimant to rely upon the guarantees as set out on the face of the scheme itself. The Claimant cannot reasonably have been expected to second-guess the express representations of Spain itself and assume that when it promulgated RD 661/2007 Spain was expecting all potential investors to understand that "*fixed period of 25 years*" in fact meant that it was subject to change at the State's sole discretion at any time.

693.  The Respondent has pointed to documents showing that the Claimant was aware of regulatory and legal risks. This evidence, however, does not show that the Claimant was alerted of a risk that Spain would withdraw the FiT scheme from existing facilities. The language of RD 1578/2008 is illustrative of its purpose to provide continuity and expectations to the investments fostered under RD 661/2007.[634] With this aim, RD 1578/2008 provided for a pre-assignation registry so that promoters would have the "necessary legal security" at the time the installation began to operate.[635] The installation registered in the pre-assignation registry enjoyed "the right to the retribution

---

[633]  **RL-8 / RL-56 / CL-102**, para. 781.
[634]  **BRR-6**, Preamble, page 1.
[635]  **BRR-6**, Preamble, pages 1-2.

that is fixed" for the associated period of the "*convocatoria*". [636] The fixed tariff was to remain in force for a maximum of 25 years from the later date of the start of operations or of the pre-assignation registration and in no event could apply to generation preceding the pre-assignation registration.[637]

694.    The Tribunal finds that both RD 661/2007 and RD 1578/2008 provided an objective and reasonable basis for the Claimant to expect that it would receive the prescribed FiT, under RD 661/2007 and RD 1578/2008 respectively, over a period of 25 years.

695.    There remains a question as to whether the Claimant's legitimate expectations extended to other aspects of RD 661/2007 or RD 1578/2008, such as receiving a reduced FiT for the remaining operative life of the facility or a guarantee against the imposition of eligibility conditions to receive the FiT.  The Tribunal discusses this question below when addressing certain of the disputed measures.

**The Second Question: Did Spain's disputed measures frustrate the Claimant's legitimate expectations?**

696.    The Tribunal examines below each of Spain's disputed measures against the Claimant's legitimate expectations derived from its investments under RD 661/2007 and RD 1578/2008.  The Tribunal reiterates its view that the Respondent's representation of stability of the remuneration regime under RD 661/2007 does not imply the immutability, petrification, or freezing of that regime.[638]  Respect for legitimate expectations does require, by contrast, that the State not defeat the basic expectations it has created to induce the making of investments.[639]

697.    The Tribunal reiterates that Spain does not dispute that this is an appropriate understanding of the content of the FET obligation.  Spain has instead chosen to argue

---

[636]   RD 1578/2008, Article 4(3).

[637]   RD 1578/2008, Article 11(5); see also First Brattle Regulatory Report, ¶¶ 65, 119, pages 31, 59.

[638]   *Antin Infrastructure Services Luxembourg S.a.r.l. et al., v. Kingdom of Spain* (ICSID Case No. ARB/13/31) Award, 15 June 2018 (**CL-5 / RL-85**), ¶ 555 ("The requirement of stability under the [ECT] does not equate to the immutability of the legal framework."); *Cube Infrastructure Fund SICAV and others v. Kingdom of Spain* (ICSID Case No. ARB/15/20), Decision on Jurisdiction, Liability and Partial Decision on Quantum, 19 February 2019 (**CL-209**), ¶ 408 ("Stability is not the same as petrification."); and *Saluka Investments B.V. v. Czech Republic*, Award, 17 March 2006 (**RL-0084**), ¶ 305.

[639]   *Antin Infrastructure Services Luxembourg S.a.r.l. et al., v. Kingdom of Spain* (ICSID Case No. ARB/13/31) Award, 15 June 2018 (**CL-5 / RL-85**), ¶ 556 ("… such expectations may be defeated if the host State eliminates the essential features of the regulatory framework relied upon by the investor in making a long-term investment."); *Cube Infrastructure Fund SICAV and others v. Kingdom of Spain* (ICSID Case No. ARB/15/20), Decision on Jurisdiction, Liability and Partial Decision on Quantum, 19 February 2019 (CL-209), ¶¶ 410, 412; and *Charanne v. Kingdom of Spain*, Final Award, 21 January 2006 (**CL-31 / RL-32**), ¶¶ 513-514, 517.

that the Claimant's expectations in this regard were not reasonable, because, as a matter of domestic law, the constitutionally established hierarchy of norms prevented Spain's express guarantees to investors from having any binding effect on the State. For the reasons stated above, the Tribunal does not accept Spain's arguments in that regard.

*19 November 2010: Elimination of the reduced FiT that would have applied after the initial FiT period*

698.    RD 1565/2010 limited the entire FiT support scheme under RD 661/2007 and RD 1578/2008 to 25 years.[640]  It eliminated the reduced FiT for registered facilities applicable after the first 25 years for the remaining operative life of the facilities.  It thus deleted those residual FiTs from Table 3 at Article 36 of RD 661/2007.

699.    RDL 14/2010 addressed the impact of this limitation by extending the FiTs under RD 661/2007 to 28 years.[641]  The preamble of RDL 14/2010 explains that this was to ensure a reasonable return to the facilities.  Law 2/2011 further extended this period to 30 years.[642]

700.    The Tribunal must consider whether the Claimant had a legitimate expectation that it would receive a fixed, but reduced, FiT for the remainder of the operative life of each facility, after the initial FiT period.  The Tribunal concludes that, in respect of plants commissioned under the regime of RD 661/2007, the Claimant did have a legitimate expectation that, after the first 25 years of operation, the reduced FiT would be in effect indefinitely for the remainder of the useful life of the plant, if it continued to be operated until then.  The Tribunal also concludes, however, that as the remaining useful life of each plant is undetermined and may vary, the 30-year cut-off established by Law 2/2011 did not breach the requirement of stability under ECT Article 10(1) and, in light of all the circumstances, it did not breach the FET standard of the ECT.  The Tribunal further concludes that, in respect of the single plant commissioned under RD 1578/2008, the Claimant did not have a legitimate expectation to any FiT tariff beyond the first 25 years of operation.  The reasons for these conclusions are set forth in the following paragraphs.

701.    Under the regime of RD 661/2007, after the first 25 years of operation of the plant, the

---

[640]   **C-143 / R-49**.
[641]   **C-102 / R-35**.
[642]   **C-109 / R-21**, 44th final provision, section two.

Claimant was entitled to a reduced FiT for an indefinite period thereafter, that is, for the remainder of the useful life of the facility.[643]  Accordingly, the Claimant had a legitimate expectation that such a reduced FiT tariff would apply, for the same reasons that it had a legitimate expectation to the FiT tariff to be paid in the first 25 years and to the remuneration scheme of RD 661/2007 as a whole, as discussed in the previous section.

702.    This question is different from the question whether the changes to the length of that remuneration scheme which were introduced by RD 1565/2010, RDL 14/2010, and Law 2/2011 were of such magnitude as to breach the stability of investment conditions that is required by ECT Article 10(1) of the ECT.  On the latter question, the Tribunal considers that the limitation at 30 years of what was previously an uncertain period determined by the useful life of the plant does not amount to a breach of the stability requirement.[644]  Taking into consideration that legitimate expectations and stability are separate elements or *consideranda* of  the FET standard which should be considered together in an integrated analysis, the Tribunal is of the view that, even though the Claimant reasonably expected that a reduced FiT would be paid after the 25th year for an uncertain period, the limitation of that period to 30 years does not amount to a breach of the FET standard.

703.    This conclusion is consistent with the sequence of changes that Spain effected through RD 1565/2010, RDL 14/2010, and Law 2/2011.  The general reaction to RD 1565/2010 was contentious.  It was an impactful modification of the FiT regime enjoyed by facilities registered under RD 661/2007.  Spain almost immediately issued RDL 14/2010, which extended the full FiT from 25 to 28 years in the context of other specific amendments to the FiT regime.  RDL 14/2010 extended the FiT period "*for the sake of assuring the reasonableness of the retribution*".[645]  Spain issued RDL 14/2010 with the force of law in accordance with Article 86 of the Spanish Constitution.  Spain further extended the full FiT period, to 30 years, by Law 2/2011 of 4 March 2011,[646] in the

---

[643]    **BRR-5**, Article 36, Table 3.

[644]    Cf. *Cube Infrastructure Fund SICAV and others v. Kingdom of Spain* (ICSID Case No. ARB/15/20), Decision on Jurisdiction, Liability and Partial Decision on Quantum, 19 February 2019 (**CL-209**), ¶ 419: "The Tribunal regards [RD 1565/2010] as an adjustment, rather than a repudiation, of the economic basis on which the investment was made and does not consider it to be a violation of Article 10 ECT."

[645]    **C-102 / R-35**, preamble.

[646]    **C-109 / R-21**, preamble.

context of more comprehensive adjustments to achieve a "*sustainable energy model*".

704.    These considerations do not apply to the Claimant's legitimate expectations in respect of its investment in the El Carpio plant, the single facility commissioned under RD 1578/2008. Article 11.5 of RD 1578/2008 provided, expressly, that the regulated tariff to be applied to a facility thereunder was to be maintained for a maximum period of 25 years counted from the later of the date of entry into operation or the date of inscription in the registry of pre-assignment of remuneration.[647] The Claimant invested in El Carpio in contemplation of this provision, assuming "a project lifetime of 25 years".[648] The fact that the El Carpio plant was registered in the RAIPRE in the days following the entry into force of Law 2/2011 was accidental.[649] In light of the reference in RD 1578/2008 to a "maximum period of 25 years," it cannot be concluded that the Claimant had a legitimate expectation to any FiT after the end of that period.

705.    The Tribunal therefore concludes that the reduction to 30 years of the duration of the FiT scheme under RD 661/2007, as ultimately provided by Law 2/2011, did not breach the FET standard of the ECT. The Tribunal further concludes that, under the regime of RD 1578/2008, the Claimant was not entitled to any FiT after the initial 25-year period nor did it have any legitimate expectation to any such remuneration.

*23 December 2010: Cap on annual operating hours and access toll*

706.    RDL 14/2010 imposed caps on the number of operating hours for which various facilities, depending on their geographical location, were eligible to receive the FiT. RDL 14/2010 also imposed an access toll for the sale of power to the grid.[650]

707.    The Tribunal must consider whether the Claimant had a legitimate expectation that it would receive the full FiT for each facility, without any subsequent restrictions or conditions such as the cap on operating hours or a toll to access the grid. The Tribunal observes that neither RD 661/2007 nor any other instrument contains a representation by Spain that access to the FiT support scheme by registered facilities would not be subject to such restrictions or conditions. In these circumstances, it is questionable

---

[647] **C-46**, Article 11.5: "The applicable regulated tariff to a facility, in accordance with this royal decree, shall be maintained for a maximum duration of twenty-five years, as from the latest of the two following dates: the date of commissioning, or the date of the registration of the facility in the Compensation Pre-Allocation Registry. Such compensation shall never be applicable prior to the date of such registration."

[648] Claimant's Memorial, ¶ 267; citing Investment Proposal for El Carpio, March 18, 2010, pp. 3, 10 (**C-227**).

[649] Claimant's Memorial, ¶ 271.

[650] **C-102 / R-35**.

whether the overall tariff scheme of RD 661/2007 implies a commitment on the part of the state not to impose restrictions on the operating hours or a toll access to the grid. Put differently, it is questionable whether the Claimant had a sufficient basis in a state commitment to form a legitimate expectation that such changes would not be imposed later. In any event, the Tribunal is of the view that the changes effected by RDL 14/2010 were not of such magnitude as to breach the requirement of stability imposed by ECT Art. 10(1).[651]  On an integral analysis of the FET standard of the ECT, the Tribunal concludes that the changes introduced by RDL 14/2010 did not breach that standard. The same reasoning and conclusions apply to the Claimant's investment in the El Carpio photovoltaic energy facilities, which took place through March 2011, after RDL 14/2010 was enacted.

708.   The Tribunal therefore concludes that the cap on operating hours and the access toll imposed by RD 14/2010 did not breach the Respondent's duty to provide fair and equitable treatment.

   *2013: The repeal of RD 661/2007 and RD 1578/2008*

709.   The Tribunal has addressed the changes introduced by RDL 14/2010, and Law 2/2011 in respect of the length of the period in which the Claimant and other investors similarly situated were entitled to receive the FiT. It remains to consider whether these adjustments to the support scheme diminished the Claimant's legitimate expectation that it would continue to receive the fixed FiT over the minimum prescribed period, as the Claimant made a portion of its investment after those adjustments were made. For the following reasons, the Tribunal concludes that neither RDL 14/2010 nor Law 2/2011 diminish or dissolve the Claimant's legitimate expectation to receive the fixed FiT for a 25-year period.

710.   RDL 14/2010 was a legislative measure taken in accordance with specific powers accorded to the Spanish government by Article 86 of the Spanish Constitution. Its first additional provision introduced a cap to the eligible hours for the FiT according to one of three basic facility designs and five geographical locations. This legislative measure justified the cap as a proportional contribution by generators to address the deficit gap.

---

[651]   Cf. *Cube Infrastructure Fund SICAV and others v. Kingdom of Spain* (ICSID Case No. ARB/15/20), Decision on Jurisdiction, Liability and Partial Decision on Quantum, 19 February 2019 (**CL-209**), ¶ 420: "… the Tribunal considers [RDL 14/2010] to be a measure within the range of adjustments that a reasonable investor must be prepared to accept and accommodate."

Its operative provision acknowledged, in doing so, that PV facilities "*shall have the right, as the case may be, to receive each year the premium economic support regime which they have been recognized*," up to the new cap.[652]  RDL 14/2010 therefore confirmed Spain's promise of a fixed FiT over a minimum period, which this measure extended to 28 years.

711.  Law 2/2011 introduced additional measures to address the deficit gap and the economic crisis more generally, which included "*the sustainability of the energy model*".[653]  Its specific objectives were aimed at achieving 2020 targets of energy conservation and efficiency, including taking steps "*to increase the participation of renewable energies, to reinforce the foreseeability and efficiency of decisions of energy policy and especially of the incentive framework ...*"[654]  Its Article 78.1 established "*a minimum national objective of participation of renewable energies in the gross final energy consumption of 20 per cent for 2020.*"  Article 78.3 provided that these and other objectives "*should guide the design and approval of public policies and, in particular, public incentives for the development of various energy sources and the adoption of energy efficiency measures.*"  Article 79.4 provided that legislation shall order the necessary public incentives to meet planning objectives, in accordance with certain principles.  Among these principles was the "[g]*uarantee of an adequate return of investments in the technologies of the special regime, that will incentivize a volume of installation compatible with the objectives in the energy plans.*"

712.  At the same time, Law 2/2011 extended the period of full fixed FiT, under RD 661/2007 and RD 1578/2008, to 30 years.  The combined effect of RDL 14/2010 and Law 2/2011 was thus to reaffirm the full FiT support scheme for the registered facilities.  The Claimant therefore retained its legitimate expectation that the facilities registered in accordance with RD 661/2007 would enjoy the FiT for the initial prescribed period.  In addition, the Claimant was entitled to rely on the explicit provisions of Law 2/2011, in combination with RD 1578/2008, to expect that its additional PV plant would enjoy the allotted FiT for the initial prescribed period.

713.  By contrast, RDL 9/2013 abolished the support regime under RD 661/2007 and RD

---

[652]  **C-102 / R-35**, preamble, para. 4.
[653]  **C-109 / R-21**, preamble, Section I.
[654]  **C-109 / R-21**, preamble, Section V.

1578/2008.[655]   Spain established a new regime by virtue of Law 24/2013,[656] RD 413/2014 and MO 1045.  These measures therefore eliminated the FiT for all facilities which are the subject of the Claimant's claims in this proceeding.  Law 24/2013, RD 413/2014 and MO 1045 did not restore the FiT support scheme.

714.   RDL 9/2013 and its successor enactments abolished the FiT support scheme for the facilities commissioned under RD 661/2007 and RD 1578/2008.  By so doing, those enactments frustrated the Claimant's legitimate expectations and radically altered the previous FiT regimes, in violation of the requirement of stability of the ECT.  Therefore, those measures breached Spain's obligation to afford fair and equitable treatment under ECT Article 10(1).

715.   The Tribunal addresses as a final point the surrounding regulatory and economic circumstances invoked by the Respondent in support of the reasonableness of its revocation of RD 661/2007 and RD 1578/2008.

716.   The Respondent asserts that this dispute arises from

> *Respondent's legitimate exercise of its regulatory power between 2010 and 2014 to adjust the subsidies paid to those renewable plants, which were receiving windfall profits, in the context of a global financial crisis, that was putting pressure on the sustainability of the SES, due to the fact that the system accumulated a tariff deficit of more than 30 billion euros by 2012.[657]*

717.   The Claimant rejects this argument, indicating that the Respondent implemented its legislation by choosing an *ex ante* method in which specific tariff rates would be paid for a specific duration and in which existing, registered plants would not be affected by future revisions. [658]   The Claimant adds that this choice brought tangible benefits by reducing regulatory risk, there is no contention that the fixed tariffs were set too high, and the Respondent did not conduct any systematic analysis of alleged overcompensation or unreasonable returns at the time of the Disputed Measures.[659]

718.   The Respondent elaborates its position throughout its pleadings by reference to the

---

[655]   **C-91 / R-40**.
[656]   **C-180 / R-23**.
[657]   Respondent's Post-Hearing Brief, ¶ 107.
[658]   Claimant's Post-Hearing Brief, ¶ 65.
[659]   Claimant's Post-Hearing Brief, ¶ 67.

mounting tariff deficit which the Disputed Measures were designed to address.[660]  The Claimant counters the Respondent's allegations by pointing out that the tariff deficit was of the Respondent's own making, arose several years before the Claimant's investments and was not attributable to the tariffs offered to those investments.[661]

719.  The Tribunal notes that the Respondent invokes the "*legitimate exercise of its regulatory power*" as a circumstance to support the conclusion that it has not breached a duty of FET under ECT Article 10(1) in connection with the Claimant's investments. The Respondent does not invoke such regulatory power as a circumstance that would exclude the wrongfulness of conduct that is otherwise contrary to its ECT obligations.

720.  The Respondent's arguments concerning the alleged windfall profits, the tariff deficit, and the surrounding economic conditions may be considered to be among the circumstances to be taken into account in analysing whether the disputed measures complied with the Respondent's FET obligations.

721.  The Tribunal finds it unnecessary to determine the particular form in which these considerations would enter the FET analysis and how they ought to be weighed against other considerations, because the Tribunal finds that the Respondent has not established the factual premises of its argument.  In the first place, the Respondent has not established that the fixed tariff remuneration under RD 661/2007 and RD 1578/2008 was the cause of the tariff deficit.  In the second place, the Respondent has not established that the fixed tariffs referred to have led to "windfall profits" in any sense not anticipated at the time the Respondent's officials and agencies set the tariffs.

722.  This last observation is applicable to the indexation of the fixed tariffs to the CPI.  The annual updates based on the CPI were a decision deliberately taken by the Spanish regulator as an objective criterion to achieve the price stability required by investors in order to invest.  The Tribunal finds that the CPI indexation was an inherent part of the tariff regime.

723.  In conclusion, the Arbitral Tribunal does not find that the circumstances invoked by the Respondent lead it to depart from its holding that the Respondent's abrogation of the fixed tariff remuneration system was contrary to the Respondent's FET obligations

---

[660]  See, e.g., Respondent's Rejoinder on the Merits, ¶¶ 1208-1209, 1243.
[661]  See, e.g., Claimant's Memorial, ¶¶ 357-359; Claimant's Reply, ¶¶ 32-33, 671, 684; Claimant's Post-Hearing Brief, ¶ 70-72.

under ECT Article 10(1).

### 3.    Impairment through Unreasonable or Discriminatory Measures

724.    The Tribunal has found that Spain breached its duty to afford fair and equitable treatment to the Claimant by withdrawing, through RDL 9/2013 and Law 24/2013,  the FiT scheme provided by RD 661/2007 and RD 1578/2008.  Accordingly, the Tribunal need not consider whether those measures were in addition unreasonable or discriminatory.  In addition, and as noted above, the Claimant's argument with respect to discriminatory measures is limited to the Tax Measure, over which this Tribunal has no jurisdiction.

725.    On the other hand, the Tribunal has found that the Respondent did not breach the FET standard by (i) reducing to 30 years the period in which the Claimant was entitled to FiT under RD 661/2007; (ii) imposing a cap on the number of hours of production subject to the FiT; and (iii) imposing a toll for access to the grid.  The Tribunal must then address whether these measures were unreasonable or discriminatory, impairing the management, maintenance, use, enjoyment, or disposal of the investment, in violation of ECT Article 10(1).

726.    *First*, the Tribunal must consider whether it was unreasonable for RD 1565/2010 to eliminate the reduced FiT to which the Claimant was entitled under RD 661/2007 after the initial 25-year period.  The Tribunal observes that this measure was never implemented in its original form.  In December 2010, through RDL 14/2010, Spain extended the initial FiT period to 28 years, stating that it did so to ensure a reasonable rate of return.  In March 2011, Spain enacted Law 2/2011 to extend the initial FiT period to 30 years.  Spain thus replaced an undefined residual period of reduced FiT by an additional five-year period of the full FiT for registered facilities, with the stated purpose of ensuring a reasonable rate of return within the overall FiT scheme.  Spain took these measures after the remuneration provisions of RD 1578/2008, which provided for a fix tariff for a 25-year period only, had been in force for several years and had attracted additional PV investment, including investment in an additional facility by the Claimant.

727.    The Claimant relies on the dictum in the *BG v Argentina* award to the effect that reasonableness, like FET, "should be measured against the expectations of the parties

to the … treaty."[662]  If this articulation of the standard embraces the expectations of a reasonable investor, the Tribunal has noted above that those expectations did not prevent the Claimant from continuing to invest after Spain enacted, through RD 1578/2008, remuneration provisions that were more restrictive.  To the extent the standard requires the Tribunal to look at the expectations of the ECT Contracting Parties, the Tribunal must rely on the precepts of the Vienna Convention.  The text and context of ECT Article 10(1) provide guidance in this respect.  The opening sentence of this provision requires each Contracting Party to "create stable, equitable, favourable and transparent conditions for" investor to make investments in its territory.  The Tribunal has concluded that the changes introduced by RD 1565/2010 were not of such magnitude as to breach the stability requirement of ECT Article 10(1).  Therefore, the Tribunal concludes that such changes were not contrary to the Contracting Parties' expectations and hence cannot be considered unreasonable.

728.  The Tribunal finds that, taken together, the above three measures were not unreasonable or discriminatory and did not impair the Claimant's investments.

729.  *Second*, the Tribunal must consider whether it was unreasonable, under the terms of ECT Article 10(1), for Spain to impose caps on the qualifying annual hours of operation of the facilities for the purpose of earning the FiT, or to impose an access toll.  The Tribunal recalls that Spain took these measures through DFL 14/2010, which is a legislative instrument, and confirmed them in Law 2/2011.  These measures purported to impose a proportional reduction in the FiT as a "*contribution*" to the reduction of the tariff deficit.  At the same time, however, these legislative measures acknowledged and confirmed the FiT support scheme.

730.  As noted above, the Claimant made an additional investment in El Carpio on the basis of these regulatory measures.  The same legal considerations therefore apply to this second set of disputed measures.

731.  Therefore, the Tribunal finds that these measures were not unreasonable or discriminatory and did not impair the Claimant's investments.

### 4.    The Umbrella Clause

732.  The Claimant argues that, by virtue of the steps required for the facilities to qualify for

---

[662]    **CL-51**, para. 342; Claimant's Statement of Claim, ¶ 454.

the FiTs, Spain has entered into an obligation with each of the direct owners of the facilities (which it says qualify as the Claimant's Investments) to provide the FiTs in the terms of RD 661/2007 and RD 1578/2008, as applicable, and has failed to observe that obligation. Spain argues that it has not entered into any such obligation with the Claimant or its Investments.

733. Given that the Tribunal has found that the repeal of the FiT under RD 661/2007 and RD 1578/2008 was contrary to the duty of fair and equitable treatment, and that violations of other ECT protections by those same measures does not affect the amount of damages, there is no need for the Tribunal to address the Claimant's arguments based on the last sentence of ECT Article 10(1).

### 5.    Necessity as a Circumstance Excluding Wrongfulness

734. Spain argues that its repeal of the FiT has been recognized by various entities as "necessary" measures of macroeconomic control, and therefore cannot be characterized as having been irrational or disproportionate. Spain highlights these circumstances to emphasize that its disputed measures were in conformity with Part III of the ECT.[663]

735. The Claimant rejects the Respondent's contentions, noting that the Respondent stops short of invoking necessity as a circumstance that precludes wrongfulness under international law.[664]

736. To the extent the Respondent intended to invoke a legal defence based on a state of necessity, a defence that the Respondent has ultimately disclaimed, the Tribunal is unable to accept Spain's argument. Spain has neither argued nor made out the circumstances that would justify a state of necessity under international law.

## VI.    THE BASES AND THE QUANTUM OF DAMAGES

737. The Parties do not dispute the principle of compensation or its articulation as a rule of international law.[665] The Parties' differences concern the methods for the calculation of loss and the manner in which the Tribunal should apply them.

---

[663] Respondent's Rejoinder on the Merits and Reply on Jurisdictional Objections, ¶¶ 1240-1243.

[664] Claimant's Reply on the Merits and Counter Memorial on Jurisdiction, ¶ 682 *et seq.*, in particular ¶¶ 713-725.

[665] Claimant's Memorial, ¶¶ 247-255; Respondent's Counter-Memorial, ¶¶ 1156-1162; Claimant's Reply, ¶ 580; Respondent's Rejoinder, ¶¶ 1351-1353.

### A.    The Claimant's Position

738.    The following paragraphs summarize the Claimant's position on the quantum of damages set out in the Claimant's Memorial, the Claimant's Reply on the Merits, and the Claimant's Post-Hearing Brief.

### 1.    The Principles and Appropriate Method of Valuation

739.    The Claimant invokes the customary international law principle of full compensation[666] with respect to each of the alleged breaches by Spain of the ECT.  The Claimant contends that the Tribunal enjoys a "large margin of appreciation" for assessing damages.[667]

740.    The Claimant points out that the ECT contains specific rules only on the quantum of compensation for lawful expropriation.  It invokes arbitral decisions holding that, in these circumstances, arbitral tribunals have discretion to determine the approach to damages that would eliminate the consequences of the unlawful actions.[668]

### 2.    DCF Method

741.    The Claimant "seeks as damages the diminution in the fair market value of its investment, calculated according to the discounted cash flow (DCF) method, caused by Spain's violations of the ECT."[669]

742.    The Claimant advances expert evidence by The Brattle Group ("**Brattle**").  Brattle applies the DCF method as part of a multi-step process to calculate the quantum of compensation based on the difference between a "But For Scenario" (in which Spain does not breach its obligations under ECT) and the "Actual Scenario" (*i.e.* what has actually transpired, including breaches of the ECT).  In each of these scenarios Brattle values "Claimant's equity interest and shareholder loans in five PV plants in Spain."[670]

### 3.    The Appropriate Date of Valuation

743.    The Claimant argues that an *ex post* valuation of damages would be particularly appropriate in this case "because the New Regulatory Regime continues to evolve in several ways, causing increasing harm to Claimant's investments that was not apparent

---

[666]    Claimant's Memorial, ¶¶ 474-482.
[667]    Claimant's Memorial, ¶ 483.
[668]    Claimant's Memorial, ¶¶ 477-480.
[669]    Claimant's Memorial, ¶ 485.
[670]    Claimant's Memorial, ¶ 487; Brattle First Quantum Report, ¶¶ 6, 19.

when Spain introduced the regime in 2013-2014."[671]

744.    In its Reply, the Claimant rejects Spain's contention that it is not appropriate to apply an *ex post* valuation, as of the date of the award, to calculate damages for unlawful actions.  The Claimant argues that there is no reason to accept Spain's limitation, pointing to several awards that have calculated damages on an *ex post* basis.[672]

745.    In its first Report, Brattle proposes a Valuate Date as of 31 December 2017.  In its second Report, Brattle adopts a Valuation date for the Los Cabezos and Aznacolar plants of November 2018 (as they were sold on that date) and a Valuation date of June 2019 for the remaining plants.[673]

### 4.    Alternative Methods

746.    The Claimant rejects the "Regulated Asset Base", or RAB, valuation method advanced by BDO and the Respondent.  The Claimant states that the RAB valuation expressly assumes that the plants were entitled only to a reasonable return rather than to the "the guarantee of fixed tariff rates in RD 661/2007 and RD 1578/2008," and therefore does not respond to, but ignores, the Claimant's case and Brattle's quantum analysis.[674]  The Claimant contests the reasons advanced by Spain against the DCF method, stating that nearly every arbitration award dealing with investment treaty claims in the renewables sector applied the DCF method.[675]

747.    The Claimant states that the implementation of the RAB method by BDO is equally flawed, as it assigns enterprise value on the basis of a multiple of the RAB value but applies the same multiple in the But For scenario as in the Actual scenario.  The resulting value, being the same in both scenarios, leads BDO to conclude that there are no damages due.[676]  The Claimant cites two awards, one by majority, that rejected this calculation.[677]

748.    The Claimant rejects BDO's and Spain's position that the reasonable rate of return may fluctuate according to interest rate variations.  The Claimant argues that the reasonable

---

[671]    Claimant's Memorial, ¶ 484.
[672]    Claimant's Reply, ¶¶ 756-762.
[673]    Second Brattle Quantum Report, ¶ 6.
[674]    Claimant's Reply, ¶¶ 727, 732.
[675]    Claimant's Reply, ¶¶ 750-754.
[676]    Claimant's Reply, ¶¶ 733-735.
[677]    Claimant's Reply, ¶ 736.

rate of return for its plants "should be the rate of return that Spain deemed reasonable at the time the plants were built" as Spain has not identified "any principled reason" to conclude that the fixed rate was not deemed reasonable.[678]

749.   The Claimant adds that Spain determined the fixed rates as reasonable to provide transparent and predictable incentives for investment. "Because the mechanics of how Spain implemented the reasonable return principle are an integral part of the principle itself, the reasonable return framework ultimately is indistinguishable from the specific tariff rates that Spain guaranteed in RD 661/2007 and RD 1578/2008."[679] The Claimant adds that, if the return target is changed from fixed to variable, or applied as a cap, this would perpetuate the breach of ECT obligations.[680]

750.   The Claimant argues that even if a reasonable return on assets method were applied, it would need to apply at least a 7% rate of return on an after-tax, all-equity, holding basis, remain fixed, and allow plants to exceed the fixed rate by surpassing the efficiency targets underpinning the tariff (which is acknowledged by the New Regulatory Regime). Changing any of these premises would violate the ECT.[681]

751.   On this hypothetical basis, Brattle calculates total damages at Euros 17.3 million.[682] Brattle rejects the adjustments proposed by BDO to this calculation, noting among other things that the 7% rate of return identified by Spain in 2007 did not assume the realization of tax benefits through shareholder loans.[683]

### 5.    The Calculation of Quantum

752.   The Claimant summarizes Brattle's three-step procedure for the calculation of damages as follows:

> *First, to calculate damages from the historical effects of Spain's measures (prior to the Valuation Date), Brattle calculates the amount of additional cash flows that the investment would have generated in the But For scenario based on actual historical operating data.  Brattle then "rolls forward" that amount to the Valuation Date at the rate of pre-award interest ... Second, to calculate damages from the future effects of Spain's measures, Brattle calculates the difference in the fair market value of*

---

[678]   Claimant's Reply, ¶¶ 728,737-746.
[679]   Claimant's Post-Hearing Brief, ¶ 95.
[680]   Claimant's Post-Hearing Brief, ¶ 98.
[681]   Claimant's Reply, ¶ 749.
[682]   Claimant's Reply, ¶ 747.
[683]   Claimant's Post-Hearing Brief, ¶ 104.

> *Claimant's investment in the Actual and But For scenarios as of the valuation date [sic], using the discounted cash flow (DCF) method. Third, Brattle will "roll forward" the loss from the Valuation Date to the date of award at the rate of pre-judgment interest.* [684] *(footnotes omitted)*

753.   Brattle's calculation under the first step described above renders a reduction of operating income of Euros 5.7 million.[685]

754.   Under the second step, "Brattle uses the DCF method to calculate the future impact of the disputed measures on the present value of Claimant's investment." [686]   Brattle concludes in its first report that Spain's disputed measures reduce the aggregate value of the PV plants by Euros 39.1 million. [687]   Brattle then computes the portion of this sum that represents the impact of the disputed measures on Claimant's equity interests in the PV plants ("as opposed to the enterprise value of the project companies themselves"). [688]   Brattle concludes that "Spain's measures reduced the fair market value of Claimant's investment on the Valuation Date by €16.8 million." [689]   The sum of historical loss (Euros 5.7 million) and future loss (Euros 16.8 million) renders damages calculation of Euros 22.5 million as of the Valuation Date.[690]

755.   The Second Brattle Quantum Report provides an update to the Claimant's damages valuation "in response to observations of BDO or errors it discovered in its model."[691]   The adjusted calculation consists in: (i) higher historical damages of Euros 7.5 million; (ii) lower future damages of Euros 13.2 million; (iii) rendering a total of Euros 20.7 million as of the Valuation Date.[692]

756.   The Claimant rejects BDO's alternative DCF calculation, relying on a rebuttal report prepared by Brattle.   Among other things, the Claimant contends that the Euro 3.8 million discount in BDO's DCF calculation for regulatory risk in the But For scenario is "speculative and illogical." [693]   The Claimant, relying on Brattle, contends that the regulatory risk "is in fact materially higher in the Actual scenario" than in the But For

---

[684]   Claimant's Memorial, ¶ 489 and Figure 1.
[685]   Claimant's Memorial, ¶ 490 and Table 4.
[686]   Claimant's Memorial, ¶ 491.
[687]   Claimant's Memorial, ¶ 498 and Table 8.
[688]   Claimant's Memorial, ¶ 499.
[689]   Claimant's Memorial, ¶ 500.
[690]   Brattle Quantum Report, Table 8.
[691]   Claimant's Reply, ¶ 766; Second Brattle Quantum Report, ¶¶ 237-245.
[692]   Second Brattle Quantum Report, Table 1: Updated Damages.
[693]   Claimant's Reply, ¶ 766; Second Brattle Quantum Report, ¶¶ 327-45.

scenario, given that the Respondent has breached its obligations towards the Claimant.[694] The Claimant cites several arbitral awards it says have accepted this proposition in connection with the disputed measures.[695] The Claimant adds that the Respondent has not discharged its burden of proof on this question, a requirement it highlights in certain arbitral award.[696]

757. The Claimant provided an updated spreadsheet showing the amounts attributable to each of the disputed measures, to allow the Tribunal to calculate damages if it concludes that any individual disputes measure is either outside its jurisdiction or not a breach of the ECT. The Claimant argues, however, that even if the Tribunal were to reach such a conclusion, the Tribunal should only exclude the impact of the non-offending measures until the date on which Spain dismantled the remuneration regime under which the Claimant invested.[697]

### 6.    Interest

758. The Claimant seeks pre- and post-award compound interest at international commercial rates.[698] Brattle applies pre-award interest at the rate of Spain's cost of borrowing.[699]

## B.    The Respondent's Position

759. The following paragraphs summarize the Respondent's position on the quantum of damages set out in the Respondent's Counter-Memorial, the Respondent's Rejoinder on the Merits and the Respondent's Post-Hearing Brief.

### 1.    The Principles and Appropriate Method of Valuation

760. The Respondent does not dispute the principle of reparation under international law. It emphasizes that its position on quantum "is submitted in the alternative" to its argument on jurisdiction and merits.[700]

761. The Respondent relies on the principle of reparation to argue that, where a claimant has not suffered any loss or injury, then it is not entitled to an award of payment of damages

---

694    Claimant's Reply, ¶ 767.
695    Claimant's Reply, ¶¶ 768-771.
696    Claimant's Reply, ¶¶ 772-776.
697    Claimant's Post-Hearing Brief, ¶¶ 115-119.
698    Claimant's Memorial, ¶¶ 501-508.
699    Claimant's Memorial, ¶ 509.
700    Respondent's Counter-Memorial, ¶ 1166.

even if the arbitral tribunal has found liability.[701]

762.   The Respondent argues that the damages claimed by the Claimant "are completely and absolutely speculative" due to the overly long time-horizon over which they are calculated "together with the fact that nothing guarantees that the remuneration shall remain frozen in the current form (always ensuring reasonable rate of return)."[702]   The Respondent cites jurisprudence to argue that the claims for compensation in this case should be rejected for being "too uncertain or speculative or otherwise unproven."[703]

## 2.    DCF Method

763.   The Respondent argues that the DCF method is not appropriate in the circumstances as it would result in a speculative calculation.

764.   The Respondent cites opinions pointing to divergent DCF calculations as revealing a risk of overvaluation of assets by claimants; [704] investments consisting entirely of tangible infrastructure;[705] the high dependency of cash flows on external, unpredictable elements; [706] and the long-term nature of the forecasts.[707]

765.   The Respondent invokes the decision in *RREEF v. Spain* holding that the DCF method was speculative in the light of a scarce track record, [708] and therefore: *the Claimants cannot claim full compensation for the total decrease in their profits as a result of the adoption of the new regime by the Respondent; they can only get compensation to the extent that such decrease is below the threshold of a reasonable return.[709]*

766.   The Respondent argues that it "is for this reason that the RREEF Tribunal considers that the DCF valuation method is neither valid nor reliable since the use of a return system (based on the costs of assets) or IRR (Internal Rate of Return) is more appropriate."[710]

---

[701]   Respondent's Counter-Memorial, ¶ 1164; Respondent's Rejoinder on the Merits and Reply on Jurisdiction, ¶ 1306.
[702]   Respondent's Counter-Memorial, ¶¶ 1169, 1175.
[703]   Respondent's Rejoinder, ¶ 1275, citing *Gemplus v Mexico*, **RL-0062**.
[704]   Respondent's Counter-Memorial, ¶ 1183.
[705]   Respondent's Counter-Memorial, ¶ 1184(a).
[706]   Respondent's Counter-Memorial, ¶ 1184(b).
[707]   Respondent's Counter-Memorial, ¶ 1184(c).
[708]   Respondent's Counter-Memorial,¶ 1186.
[709]   Respondent's Counter-Memorial,¶ 1187; **RL-0082**, ¶ 523.
[710]   Respondent's Counter-Memorial,¶ 1189.

767.  The Respondent invokes further jurisprudence noting that small adjustments to a DCF calculation can yield significant divergencies in the results[711] and rejecting the DCF method where a plant had been in operation for only 42 months prior to an expropriation decree and whose prospects were made uncertain due to general economic conditions.[712]

### 3.    Alternative Methods

768.  The Respondent cites several commentators to propose a valuation method "based on the cost of assets, examining whether they are recovered and if reasonable rate of return is obtained from them."[713]

769.  The Respondent relies on expert reports by BDO to argue that the Claimant's plants achieved a return of 7.9%, which is greater than the target return of 7.398% established by the disputed measures.[714]  This target return is in line with or above that of other countries such as Germany.[715]

770.  The Respondent adds that the target return is one approved by the EC which "leaves no margin for appreciation". [716]  The Respondent counters the Claimant's criticisms by stating that BDO does not "base its calculations on the legal approach of the Kingdom of Spain. BDO calculations are based on the objective operation of the Spanish Electricity System."[717]

771.  The Respondent notes that the differences between BDO and Brattle as regards their respective estimated rates of return on the plants lie mainly in the post-tax rates of return.  The Respondent states that BDO makes a reasonable calculation of estimated effective tax rate.  The Respondent concludes that the plants have made a reasonable rate of return which is "higher than both the weighted average cost of financing (WACC) and that of other alternative investments that may be made in Spain or in general in the Euro zone at that time and with a similar level of risk."[718]

---

[711]  *Rusoro v Venezuela*, **RL-0109**; Respondent's Rejoinder, ¶ 1298.

[712]  *Tenaris v Venezuela*, **RL-0115**; Respondent's Rejoinder, ¶ 1299.

[713]  Respondent's Counter-Memorial, ¶¶ 1190-1195.

[714]  Respondent's Counter-Memorial, ¶¶ 1197-98; First BDO Expert Report, para. 290, section VI and table 40.

[715]  Respondent's Counter-Memorial, ¶ 1204; First BDO Expert Report, para. 126.

[716]  Respondent's Counter-Memorial, ¶¶ 1202-03.

[717]  Respondent's Rejoinder, ¶ 1279; Second BBDO Expert Report, paras. 21-25.

[718]  Respondent's Rejoinder, ¶¶ 1281-1289.

### 4.    The Appropriate Date of Valuation

772.    The Respondent puts forward several arguments to insist that valuation of damages must be performed *ex ante* and not *ex post*.

773.    The Respondent argues that only a valuation *ex ante* is compatible with the principle of causality required by the international law rule on reparation.  "Therefore, the case-law is virtually unanimous in applying an ex ante date." [719]  The Respondent adds that the only valuation date provided in the ECT, at Article 13, is an *ex ante* date.  Because there is no reason to believe that such a valuation date would not fully compensate damage caused, it would be "arbitrary and unlawful" to apply an *ex post* date of valuation.  The Respondent argues in addition that applying an *ex post* date poses logical and insurmountable obstacles since the date of the award is "unrelated to the material dispute itself", the investment may lose its value due to other events and "the value of an asset fluctuates constantly over time."

### 5.    The Calculation of Quantum

774.    Subject to its main argument that the Claimant has not incurred any loss that requires compensation, the Respondent put forward an alternative DCF calculation made by BDO.

775.    The Respondent argues that Brattle has applied an inappropriately high risk premium in the Actual scenario and an inappropriately low risk premium in the But For scenario.  The Respondent argues that the risk premium in the But For scenario should be higher than in the Actual scenario due to the "financial stress and imbalance situation that existed in the Spanish Electricity Sector until 2014 and which would not have been corrected if the measures under analysis had not been implemented."[720]

776.    The Respondent counters the Claimant's criticism of this approach by noting that the disputed measures addressed "the sustainability problem of the Spanish electricity system" and therefore decreased regulatory risk in three main respects: (i) an uncontrolled increase in the tariff deficit in the But For scenario would have higher risk than in the Actual scenario in which the system has been financially rebalanced; (ii)

---

[719] Respondent's Counter-Memorial, ¶ 1210.  The Respondent's Rejoinder states that its preference for an *ex ante* date "is shared by the vast majority of arbitration doctrine in practice." Respondent's Rejoinder, ¶ 1308.

[720] Respondent's Counter-Memorial, ¶¶ 1226-1232.

this does not imply attributing the European sovereign debt crisis to the But For scenario; and (iii) liquidity of the investments has increased due as illustrated by an increase in plant transactions in Spain.[721]  The Respondent notes that this position has been accepted by arbitral tribunals hearing claims arising out of the disputed measures.[722]

777.  Respondent's experts BDO, in addition to accounting for regulatory risk, make several other adjustments to Brattle's DCF calculation and arrive at an alternative damages figure of Euros 2.9 million.

778.  The Respondent and BDO reject the Claimant's and Brattle's contention that the similarity in the cash flow projections between BDO's and Brattle's respective DCF calculations imply the predictability of those cash flows.  Instead, they contend that the differing results after certain adjustments, based on the same assumptions and resulting cash flow projections, render the DCF method speculative.[723]

779.  The Respondent makes the point that an earlier Valuation Date of June 2014, instead of 31 December 2017, would decrease the amount of damages by Euros 7.2 million or 35%.[724]  The Respondent, in addition, contests the Claimant's argument that non-offending measure should not be deducted from the calculation of future damages.  The Respondent argues that the BDO calculations are the correct ones in this respect.[725]

### 6.    Interest

780.  The Respondent and its experts BDO agree that, hypothetically, the use of the Spanish bond is appropriate for the calculation of interest, but the bonds in questions should be ones with shorter maturity.[726]

781.  The Respondent rejects the Claimant's request for post-award interest at the highest lawful rate, invoking jurisprudence that declines to account for the risk of default in post-award interest[727] and the general principle that compensation should not have a

---

[721]  Respondent's Rejoinder, ¶¶ 1316-1322; Second BDO Expert Report, paras. 50-56.

[722]  Respondent's Rejoinder, ¶¶ 1323-24; citing RREEF v Spain (**RL-0092**); and 9REN v Spain (**RL-0123**).

[723]  Respondent's Rejoinder, ¶ 1315; Second BDO Expert Report, paras. 224-230.

[724]  Respondent's Post-Hearing Brief, ¶ 170.

[725]  Respondent's Post-Hearing Brief, ¶¶ 172-175.

[726]  Respondent's Counter-Memorial on the Merits and Memorial on Jurisdiction Objections, ¶¶ 1239-1242; Respondent's Rejoinder, ¶¶ 1328-29.

[727]  Respondent's Rejoinder, ¶¶ 1332-34; Vestey v. Venezuela (**RL-0105**); National Grid v. Argentina (**RL-0113**); Micula v Romania (**RL-0108**).

punitive character.[728]

### C.    The Tribunal's Analysis

782.    The following paragraphs contain the Tribunal's analysis and determination of the quantum of damages resulting from the Respondent's breaches of the ECT.

#### 1.    The Principles and Appropriate Method of Valuation

783.    The Parties do not dispute the legal basis for compensation at international law according to which reparation must as far as possible eliminate the consequences of the unlawful act, and that the requested form of reparation in this case is compensation reflecting the injury caused by the Respondent's breach of its ECT obligations towards the Claimant, including interest.  The Parties also agree that the Tribunal enjoys a significant degree of discretion in determining the amount and form of compensation.

784.    The Parties dispute (i) whether the Claimant suffered any injury that requires compensation as a result of the Respondent's ECT breaches; (ii) the method for calculating the extent of the injury; (iii) the relevant components of that calculation, including the Valuation Date; (iv) and the appropriate rate of interest.

785.    These points of disagreement are interrelated.  The Tribunal has considered them together in an integral manner.  The order in which the Tribunal sets out its analysis below is for expository purposes only and does not imply any prejudgment of particular issues.

#### 2.    DCF Method

786.    The Claimant seeks damages based upon the decrease in the fair market value of its investment in PV plants in Spain, calculating that decrease in value applying the DCF method.  The Respondent contends that the DCF method is too speculative and uncertain, as minor variations in assumptions may lead to broad divergencies in quantum and extend those assumption over a long time horizon. The Respondent argues, in addition, that the DCF methos is incompatible with Spain's reformed renewable energy remuneration system.

787.    The Tribunal considers that the application of the DCF method is a reasonable approach

---

[728]    Respondent's Rejoinder, ¶¶ 1335-36; ILC Articles (**RL-0064**), Commentary (4) to Article 36 ("*Compensation corresponds to the financially assessable damage suffered by the injured State or its nationals. It is not concerned to punish the responsible State, nor does compensation have an expressive or exemplary character*").

to the calculation of damages in this matter. The projected cash flow from the operation of the PV plants is a key factor in calculating their value as of a given date. That projected cash flow was central to the investment incentive proffered by Spain by means of a fixed tariff over a minimum period, which in turn served as a basis for the Claimant's legitimate expectations. The projected cash flow based on the fixed tariffs, coupled with Spain's repeal and replacement of the remuneration system, were therefore central aspects of the wrongful action that an award of damages is meant to repair. It is therefore reasonable to assess damages based on the diminution of fair market value of the Claimant's investment in the PV plants applying the DCF method.

788. The Tribunal finds that the PV plants had a sufficient operating history to justify the application of a DCF method.

789. The DCF method, like any valuation method, requires the use of discretion and judgment to avoid unsupported results. The mere potential for inaccurate or unsupported results, however, is not a reason to discard the DCF method. In particular, the projection of cash flows over a period of 20 years is reasonable in the circumstances. The Respondent itself highlighted the "transparency and predictability" of the fixed tariff remuneration system on which that projection is based.

790. Consistent with the above considerations, DCF valuation is widespread in transactional contexts.[729] In addition, a substantial number of arbitral tribunals have applied the DCF method to calculate damages resulting from the Respondent's disputes measures and damages in similar circumstances.[730]

---

[729] *See*, e.g., *Rusoro Mining Ltd. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/15/5, Award, 22 August 2016 (**RL-0109**), ¶ 758 ("*Valuations based on the DCF method have become usual in investment arbitrations, whenever the fair market value of an enterprise must be established. The Tribunal agrees that, where the circumstances for its use are appropriate, forward looking DCF has advantages over other, more backwards looking valuation methods.*").

[730] *See*, e.g., *9REN Holding S.a.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/15/15, Award, 31 May 2019 (**CL-130**), ¶ 407 ("*The Tribunal accepts as appropriate the DCF methodology applied by FTI but taking due account of the objections of Econ One.*"); and *Cube Infrastructure Fund SICAV and others v. Kingdom of Spain*, ICSID Case No. ARB/15/20, Decision on Jurisdiction, Liability and Partial Decision on Quantum, 19 February 2019 (**CL-123**), ¶ 478 ("*The Tribunal is conscious of the need for caution in applying the DCF method (...) Nonetheless, it considers that this method, now well established in the practice of international investment tribunals, is appropriate in the present case.*"). See also, Sergey Ripinsky and Kevin Williams, Damages in International Investment Law, British Institute of International and Comparative Law (BIICL), 2008 (**RL-0040**), p. 210 ("*Generally, tribunals seem to have accepted that the DCF method is a 'sound tool used internationally to value companies.' The appropriateness of the DCF method has been confirmed by the practice of the United Nations Compensation Commission.*").

### 3. Alternative Methods and Calculations

791.    The Respondent argues for a Regulated Asset Based ("RAB") valuation as discussed by its proffered experts BDO. This method considers the actual costs of the Claimant's plants and applies to that cost a reasonable rate of return. BDO distinguishes between an Actual and a But For scenario to account for return with and without the measures giving rise to the Respondent's liability, respectively.

792.    The Claimant argues that this method does not address or account for the injury caused to its investment by the Respondent's breaches. Among other things, the Claimant argues that the reasonable rate of return is already reflected in the fixed tariffs applicable at the time it invested.

793.    The Tribunal agrees that the RAB valuation does not address the injury caused to the Claimant's investment as a result of the Respondent's breaches of its obligations under the ECT. Those breaches can be summarized as the negation of the Claimant's legitimate expectation that its PV plants would receive the prescribed fixed tariffs for a minimum period. The appropriate way to repair that breach through compensation is to determine the value as of a given date of the cash flows expected to be generated by those fixed tariffs.

794.    The Tribunal is persuaded in this respect that the Respondent determined the fixed tariffs applicable at the time of the Claimant's investment in application of the principles of the legal framework, including the requirement of a reasonable return on investment. The purpose of offering fixed tariffs through RD 661/2007 and RD 1578/2008 was to afford investors transparency and predictability of returns on their investments. To determine the quantum of damages resulting from the abandonment of this remuneration system, it is therefore appropriate to use the DCF method to compute the value the affected investments in a hypothetical scenario in which the breach has not occurred (the But For scenario) and compare that to the value of the affected investments in the real world in which the breach has taken place (the Actual scenario).

### 4. The Appropriate Date of Valuation

795.    The quantum of compensation should eliminate the consequences of the unlawful act. The Claimant argues that to do so in this case it is appropriate to consider the application of the New Regulatory Regime up to the date of the award (or at the latest practicable

date for which there is relevant information).  The Respondent argues that the only appropriate valuation date is that of the wrongful act because subsequent information may not be the direct result of the wrongful act.

796.  The Tribunal holds that neither the principle of full compensation in lieu of restitution nor the principle of legal causation necessarily requires that compensation be calculated as of the date of the wrongful act.  The date of valuation is likely to depend on the scope and character of the primary obligation and on the circumstances of the breach and resulting injury.  In cases of unlawful expropriation, for example, an *ex post* date of valuation may well be appropriate to avoid unjust enrichment on the part of the expropriating State.  The present case, however, is not one of unlawful expropriation.

797.  The central issue in this case is whether the quantum of damages should take account of additional measures the Respondent has taken that have reduced the PV plants' cash flows more than anticipated as of the date of the Disputed Measures.

798.  International law does not seem to provide a categorical solution to this question.  It requires full compensation but leaves discretion to the Tribunal as to how to determine the value and modality of full compensation.

799.  Establishing the Valuation Date at the time of the Respondent's breach is a logical starting point.  This would require future cash flows from that time onward to be discounted back to the Valuation Date, including the application of a discount for regulatory risk in the But For and in the Actual scenarios.  One reason for applying a later Valuation Date, as close as possible to the date of the Award, would be to take account of the available production and revenue data instead of performing the DCF calculation based on assumptions.  Such an *ex post* Valuation Date could have the *advantage* of allowing the Claimant to provide a more exact basis by extending the "historical" component of the damages and deriving a value for that component which is determined by the difference in revenue for every kW hour of power produced.  It would also require a shorter period for the DCF calculation.  The *disadvantage* of an *ex post* Valuation Date is the risk that the generation and revenue data subsequent to the ECT breach may be impacted by factors that are extraneous to that breach and therefore interrupt the chain of causation.  The Tribunal will need to consider this risk and balance it against the greater availability of more exact historical data.

800.  The record does not seem to show any significant risk that the PV plants' post-breach

historical generation has been impacted by extraneous factors, including any management decisions by its owners.  Presumably the PV plants generated as much as they could to enhance their revenue.

801.  On the above basis, the Tribunal accepts an *ex post* Valuation Date of June 2019.  The Claimant proposes a slightly earlier Valuation Date of November 2018 for the *Aznalcollar* and *Los Cabezos* plants.  However, the valuation of these plants as presented by at Table 1 of Brattle's Second Quantum Report does not seem to vary materially between November 2018 and June 2019.  The Tribunal therefore adopts a uniform Valuation Date of June 2019 for the Claimant's PV plants.

### 5.    The Calculation of Quantum

802.  The Tribunal addresses the Parties' respective arguments on the appropriate factors to consider in performing a DCF calculation of damages.  The Tribunal then applies its finding to calculate the quantum of damages.

803.  There are three principal points of difference in the Parties' respective DCF calculations: (i) BDO's higher proposed risk premium for the But For scenario to reflect the lack of sustainability of the PV remuneration provisions; (ii) BDO's higher proposed illiquidity discount to reflect the need to sell the plants to monetize their value; and (iii) the number and extent of the adjustments that derive from the Tribunal's conclusions as to which of the Disputed Measure were contrary to the Respondent's obligations under the ECT.

804.  **(i) The Risk Premium In The But For Scenario.**  The Tribunal is not persuaded that the risk premium in the But For scenario should be higher than the risk premium applied in the Actual scenario.  The sustainability or otherwise of the remuneration regime under a But For scenario would depend on several factors that could operate without impacting the fixed tariffs determined under RD 611/2007 and RD 1578/2008.  To apply the discount for risk proposed by BDO and espoused by the Respondent would appear to replicate the same impact on the Claimant's legitimate expectations, derived from the Respondent's duty of fair and equitable treatment, as the initial Disputed Measures.  BDO's proposed But For risk premium would therefore undermine the purpose of providing compensation in lieu of restitution as form of full reparation for the consequences of the Respondent's breaches of ECT Article 10(1).

805.  **(ii) The Illiquidity Discount.**  The Tribunal accepts the illiquidity discount proposed

by Brattle over the higher illiquidity discount proposed by BDO.  The number of PV plant transactions following the New Regulatory Regime seems to bear out Brattle's calculation in this respect.  Moreover, there is specific data on the sale of two of the Claimant's PV plants as of the proposed Valuation Date.

806.    **(iii) Adjustments Derived From Disputed Measures Found Not To Breach ECT Article 10(1).**  There are two discrete adjustments to the Claimant's DCF calculation that result from the Tribunal's conclusions on liability.  Those adjustments are needed because the Claimant's DCF calculation is based on the premise that all the Disputed Measures are found to be contrary to the Respondent's ECT Article 10(1) obligations. The Tribunal, however, has not made such a finding with respect to the following Disputed Measures: (i) the 7% TVPEE (for lack of jurisdiction); and (ii) the eligible hours cap under RDL 14/2010.[731]

807.    The Claimant has accounted for this scenario in its DCF calculation spreadsheet submitted with its post-hearing brief.  However, the Claimant argues that the adjustment resulting from this scenario should be "temporary" and not "permanent", meaning that the deductions of these items from the DCF calculation should operate only in the period between their adoption and the discontinuance of the fixed tariff remuneration framework that occurred in June 2014.

808.    The Tribunal does not agree that these adjustments should be limited to the temporary period argued by the Claimant but should instead apply over the entire DCF projection. The adjustments in questions form part of the But For scenario and should not be supressed on account of supervening events in the Actual scenario.

809.    The Claimant's valuation Excel spreadsheet submitted with its Post-Hearing Brief allows the above adjustments to be made in the DCF calculation.  The resulting amount of damages is Euros 10.4 million.

### 6.    Interest

810.    The differences between the Parties on the question of interest are relatively confined. The Parties do not have divergent positions on whether interest may be compounded. The Parties disagree on whether the applicable rate should reflect the long-term (as

---

[731]    The Claimant includes as a third possible adjustment the temporary variation of the price index for adjusting the fixed tariffs.  The Tribunal considers it appropriate to maintain the original price index for the purpose of valuation and therefore does not make any adjustment for this measure.

argued by the Claimant) or the short-term (as argued by the Respondent) Spanish sovereign bond rate. In addition, the Claimant has asked for the Tribunal to apply the highest legal post-award interest, whereas the Respondent argues that there should be no difference between the pre-award and the post-award rate of interest.

811.    The Tribunal agrees that the rate should reflect a shorter maturity period, in the range of 3-4 years. This is justified in particular by the fact that a later Valuation Date applies and therefore the period over which the valuation is brough forward to the date of the award is shorter. The Tribunal shall be guided by the reported Spain three-year sovereign bond yield.

812.    The Tribunal holds that the post-award rate of interest should be calculated on the same basis as the pre-award rate of interest, except that the post-award compounding period should be shorter than the pre-award compounding period. This is justified by the duty of the Respondent to comply with the award. The pre-award rate of interest should be compounded annually. The post-award rate of interest should be compounded every six months.

813.    The actual interest rates will be different according to the respective values of the three-year Spanish bond rate before and after the date of the award. The Tribunal accepts the Claimant's proposed pre-award interest rate of 1%. The Tribunal fixes post-award interest at the yield rate for the Spanish government three-year bond as reported by the European Central Bank on the first day of each month (currently at 2.6%).

## VII.    APPORTIONMENT OF THE COSTS OF THE PROCEEDING

814.    Each of the Parties requests an order for costs from the Tribunal on the basis of Article 50 of the SCC Rules, which provides as follows:

> *Unless otherwise agreed by the parties, the Arbitral Tribunal may in the final award, at the request of a party, order one party to pay any reasonable costs incurred by another party, including costs for legal representation, having regard to the outcome of the case, each party's contribution to the efficiency and expeditiousness of the arbitration and any other relevant circumstances.*

815.    In addition, Article 49 of the SCC Rules governs the Costs of the Arbitration, which consist in (i) the fees of the Arbitral Tribunal; (ii) the Administrative Fee; and (iii) the expenses of the Arbitral Tribunal and of the SCC. Article 49(6) of the SCC Rules provides as follows:

> *Unless otherwise agreed by the parties, the Arbitral Tribunal shall, at the request of a party, apportion the Costs of the Arbitration between the parties, having regard to the outcome of the case, each party's contribution to the efficiency and expeditiousness of the arbitration and any other relevant circumstances.*

816.    The following paragraphs summarize the Parties' respective positions on costs and then sets out the Tribunal's decision on costs.

### A.    The Claimant's Request for Costs

817.    The Claimant argues that Article 50 of the SCC Rules endorses the "loser pays" rule. The Claimant maintains that the outcome of the case warrants an award of costs in its favour, considering the "serious harm" caused to the Claimant's investment.

818.    Claimant also argues that Spain contributed to the inefficiency of the proceedings by unsuccessfully challenging the President and thus causing the hearing to be delayed by several months.

### B.    The Respondent's Request for Costs

819.    The Respondent asks for an award of its costs invoking SCC Arbitration Rules Articles 49 and 50, without further argument.

### C.    The Tribunal's Analysis and Decision on Costs

820.    In accordance with Article 49(2) of the SCC Rules, the Tribunal requested the SCC Board to determine the Costs of the Arbitration.  On 11 October 2022, the Secretariat communicated the Board's decision on Costs in the following terms:

- Alejandro A. Escobar: Fee EUR 141 125
- Oscar Garibaldi: Fee EUR 84 675
- Christophe Bondy: Fee EUR 84 675
- Stockholm Chamber of Commerce: Administrative fee EUR 44 200, plus 25% VAT of Euros 11,050, as applicable

821.    With respect to the outcome of the case, the Claimant has prevailed, but not on all of its claims.  The Tribunal has awarded damages in an amount which is approximately 60% to 65% of its amount claimed.  While the Tribunal has found that the Respondent has incurred liability, the Respondent has presented the substance of its case in a competent and professional manner.

822.    The Respondent, however, resisted the Tribunal's directions to hold a remote hearing

due to the COVID-19 pandemic and then prevented the scheduled hearing from taking place by filing an unsuccessful request for the disqualification of the President.

823.    Taking account of the above and of all other circumstances in this proceeding, the Tribunal apportions the costs as follows:

- The Respondent shall bear 65% of the Costs of the Arbitration.  The Claimant shall bear 35% of the Costs of the Arbitration.
- The Respondent shall pay the Claimant Euros 2,500,000 on account of its legal and other costs.

## VIII.  THE ARBITRAL TRIBUNAL'S DECISION

824.    For the reasons stated above, the Arbitral Tribunal renders the following decisions:

(a)    The Respondent shall pay the Claimant the amount of Euros 10.4 million as compensation for the Respondent's breach of ECT Article 10(1);

(b)    The Respondent shall pay interest on the above amount at a rate of 1%, compounded annually from 1 July 2019 until the date of this Final Award;

(c)    The Respondent shall pay the Claimant Euros 53,201.25 on account of the Costs of the Arbitration plus 25% VAT if applicable;

(d)    The Respondent shall pay the Claimant Euros 2,500,000 on account of the Claimant's legal and other costs; and

(e)    The Respondent shall pay interest on all the above amounts at the yield rate for the Spanish government three-year bond as reported by the European Central Bank on the first day of each month (currently at 2.6%), from the date of this Final Award, compounded every six months until full and final payment.

825.    All other claims are dismissed.

826.    The parties are jointly and severally liable to pay the Costs of the Arbitration to the SCC Arbitration Institute. The Costs of the Arbitration have been set as indicated above.

827.    A party may apply to amend this Final Award regarding the decision on the fees of the arbitrators.  Such application should be filed with the District Court of Stockholm within three months from the date when the party received this Final Award.

Given at Stockholm, 24 October 2022.

Alejandro A. Escobar
Chairperson

Oscar M. Garibaldi
Arbitrator

Christophe Bondy
Arbitrator